# EXHIBIT 1

LIBER 402 PAGE 982

State of Michigan, County of Charlevoix, ss
Charlevoix ____ March 29, 2000 I hereby certify
that there are no tax liens or titles held by the State or by
individuals on the land herein described in the within instrument
and that all taxes due thereon have been paid for the five years
preceding the date of said instrument as appears by the records in
my office. This does not cover taxes in process of collection by
Township, Cities or Village _____
County Treasurer

STATE OF MICHIGAN
COUNTY OF CHARLEVOIX
RECEIVED FOR RECORD

00 MAR 29  PM 3: 10

*Charlene B. Novotny*

REGISTER OF DEEDS

# MASTER DEED
# THE MOUNTAIN GRAND LODGE CONDOMINIUM
(Act 59 of 1978, as Amended)

This Master Deed for The Mountain Grand Lodge Condominium ("Master Deed") is made and executed this 23rd day of March, 2000, by Boyne Properties, Inc., a Michigan corporation, whose address is P.O. Box 19, Boyne Falls, Michigan, 49713 ("Developer"), in pursuance to the provisions of the Condominium Act, being Act 59 of the Public Acts of 1978, as amended.

WHEREAS, Developer desires by recording this Master Deed, together with the exhibits which are attached to and made a part of this Master Deed, to establish the real property described in Article II, together with improvements located thereon and the appurtenances thereto, as a condominium project under the provisions of the Condominium Act, as defined in Article 3.1.

NOW, THEREFORE, Developer does, upon the recording of this Master Deed, establish The Mountain Grand Lodge Condominium as a condominium project under the Act and does declare that The Mountain Grand Lodge Condominium ("Condominium") shall, after such establishment, be held, conveyed, hypothecated, encumbered, leased, rented, occupied, improved, or in any other manner utilized subject to the provisions of the Act and to the covenants, conditions, restrictions, uses, limitations, and affirmative obligations set forth in this Master Deed and the exhibits incorporated into this Master Deed. This Master Deed and the exhibits to this Master Deed shall be a burden and a benefit to Developer, its successors and assigns, and to any persons acquiring or owning an interest in the Condominium, their grantees, successors, heirs, executors, administrators, and assigns. In furtherance of the establishment of the Condominium, it is provided as follows:

## ARTICLE I
## TITLE AND NATURE

1.1 <u>Name</u>.  This Condominium shall be known as The Mountain Grand Lodge Condominium, Charlevoix County Condominium Subdivision Plan No. ___112___.  The Condominium will initially consist of 119 Units.

1.2 <u>Units</u>.  The Units contained in the Condominium, including the number, location, boundaries, dimensions, and area of each, are set forth completely in the Condominium Subdivision Plan, a graphic description of the Units located on such land in a plot plan, which, together with this Master Deed, are of sufficient detail to identify the Common Elements and each Unit and their relative locations and approximate dimensions.  A copy of the Condominium Subdivision Plan is attached to this Master Deed as Exhibit "B."  Each Unit is designed to contain a single residence or commercial unit, which may share a common wall and other improvements.  Each Unit is capable of individual use by reason of having its own entrance from and exit to a Common Element of the Condominium or to a public roadway.  Each Owner in the Condominium shall have a particular and exclusive property right to his Unit and the Limited Common Elements appurtenant thereto, and shall have an undivided and inseparable right to share with other Owners the General Common Elements of the Condominium as designated by this Master Deed.

1.3 <u>Covenants</u>.  All provisions of the Master Deed and its Exhibits, as amended, shall be construed to be covenants running with the land and with every part thereof and interest therein, including every Unit and the appurtenances.  Every Owner of the Condominium or any part thereof or interest therein, and his heirs, executors, administrators, successors and assigns shall be bound by all of the provisions of this Master Deed.

1

LIBER **402** PAGE **983**

## ARTICLE II
### LEGAL DESCRIPTION

2.1  The Condominium Property on which the Condominium is situated and established by this Master Deed is particularly described as follows:

Part of Section 16, T32N, R5W, Boyne Valley Township, Charlevoix County, Michigan,

Commencing at the South 1/4 corner of Section 16, T32N, R5W, Boyne Valley Township, Charlevoix County, Michigan; thence along the South line of said Section 16 N 89°04'29" E 29.60 feet to the centerline of the "Old Boyne City Railroad right of way"; thence along said centerline N 22°58'52" W 628.97 feet; thence N 67°01'08" E 75.25 feet to the Place of Beginning; thence S 20°01'07" W 91.74 feet; thence S 65°01'07" W 36.50 feet; thence N 69°58'53" W 20.45 feet; thence N 24°58'53" W 6.43 feet; thence N 69°58'53" W 313.16 feet; thence S 65°01'07" W 31.59 feet; thence S 87°31'07" W 42.61 feet; thence N 55°28'53" W 40.00 feet; thence N 24°58'53" W 88.29 feet; thence N 65°01'07" E 58.69 feet; thence N 24°58'53" W 336.66 feet; thence N 65°01'07" E 130.86 feet; thence S 24°58'53" E 188.58 feet; thence N 65°01'07" E 42.49 feet; thence S 24°58'53" E 56.00 feet; thence S 65°01'07" W 43.00 feet; thence S 24°58'53" E 169.11 feet; thence S 69°58'53" E 338.68 feet to the Place of Beginning;

2.2  INCLUDING a perpetual non-exclusive easement to use the driveways and parking lot located to the West of the Condominium Property for access and parking;

2.3  INCLUDING a 66 foot wide, non-exclusive, perpetual easement for the purpose of ingress and egress between the described Condominium Project and the county road known as Boyne Mountain Road, upon and over part of the South ½ and the Southwest ¼ of the Northwest ¼ of said Section 16, lying 33.00 feet on either side of, and measured at right angles to a centerline more fully described as follows:

Commencing at the S 1/4 Corner of said Section 16; thence along the South Line of said Section 16, and along the centerline of Cliffdweller Drive, N89°02'55"E, 905.10 feet (recorded as N89°09'08"E); thence continuing along said centerline, N55°38'13"E, 123.87 feet, to a point on the centerline of Boyne Mountain Road (said point being N40°08'14"W, a distance of 88.00 feet from the intersection of the South Line of said Section 16, and the existing centerline of Boyne Mountain Road), for a Point of Beginning of the centerline of said 66.00 foot wide easement; thence N40°08'14"W, 132.08 feet, to the P.C. of a curve to the right, having a Radius of 1070.69 feet, a Central Angle of 12°47'23", and a Long Chord which bears, N33°44'32"W, 238.51 feet; thence along the Arc of said curve, 239.00 feet, to the P.T. of said curve; thence N27°20'51"W, 81.46 feet, to the P.C. of a curve to the left, having a Radius of 685.60 feet, a Central Angle of 26°16'20", and a Long Chord which bears, N40°29'01"W, 311.63 feet; thence along the Arc of said curve, 314.37 feet, to the P.T. of said curve; thence N53°37'11"W, 342.88 feet, to the P.C. of a curve to the left, having a Radius of 500.80 feet, a Central Angle of 50°16'34", and a Long Chord which bears, N78°45'28"W, 425.48 feet; thence along the Arc of said curve, 439.45 feet, to the P.T. of said curve; thence S76°06'15"W, 167.60 feet, to a point which is Northeasterly 58.00 feet, measured at right angles to the centerline of the old Boyne City Railroad, and which point is located within the parking lot and is connected to the driveways located to the West of the Condominium Property for access and parking referred to in Section 2.2 above; thence parallel with said Railroad, N23°00'26"W, 1140.94 feet (recorded as N22°52'52"W, 1163.59 feet), to a point on the centerline of Mountain Pass Road.

2.4  RESERVING to Developer any and all oil, gas and mineral rights on, within or under the above-described Condominium Property; SUBJECT to rights-of-way, easements or restrictions of record, if any.

## ARTICLE III
### DEFINITIONS

Whenever any reference in this Master Deed is made to one gender, the same shall include a reference to any and all genders where the same would be appropriate; similarly, whenever a reference is made in this Master Deed to the singular, a reference to the plural shall also be included where the same would be appropriate and vice versa. The term "include" and similar terms (e.g., includes, including, included, comprises, comprising, such as, e.g., and for example), when used as part of a phrase including one or more specific items, are used by way of example and not of limitation.

The terms utilized in this Master Deed, the Exhibits to this Master Deed, the Vacation Ownership Instrument (defined below), Fractional Instrument (defined below), and other instruments relating to this Condominium are defined in accordance with the Act (defined below) and as follows unless the context otherwise requires:

3.1  Act or Condominium Act means the Michigan Condominium Act, being Act 59 of the Public Acts of 1978, as the same is constituted on the date of the recording of this Master Deed, except when specifically noted otherwise. Any reference to a provision or specific article, section, paragraph, sub-article, sub-section, or sub-paragraph of the Act shall be a reference to the same as it is constituted on the date of the recording of this Master Deed with the Charlevoix County Register of Deeds.

3.2  Association means The Mountain Grand Owners' Association, a nonprofit Michigan corporation, and its successors, which is responsible for the operation of the Condominium.

3.3  BRM means Boyne Resort Management, L.L.C., a Michigan limited liability company, its successors and assigns.

3.4  Board means the board of directors of the Association as it is constituted from time to time.

3.5  Boyne Mountain Resort.  The recreational and residential community known as Boyne Mountain Resort located in Boyne Falls, Michigan.

3.6  BVCM means Boyne Vacation Club Management, Inc., a Michigan corporation, as further described in the Vacation Ownership Instrument.

3.7  Bylaws means the Bylaws of the Association as they may be amended from time to time. A copy of the initial Bylaws are attached as Exhibit "A" and are incorporated in this Master Deed by this reference.

3.8  Club means the Boyne Vacation Club, which is the service name given to the variety of exchange and reservations services and vacation and travel benefits currently offered and the restrictions currently imposed through BVCM as further described in the Vacation Ownership Instrument.

3.9  Club Documents means only those instruments governing the use and operation of the Club, including the Boyne Vacation Club Resort Agreement and the rules and regulations set forth in the Disclosure Guide, which are promulgated, executed, or amended by BVCM from time to time for the purpose of governing the reservation and use of Club accommodations and facilities.

3.10  Commercial Unit means a Unit together with an undivided share in the Common Elements, as set forth in Article VI, intended and designed for the conduct of a business enterprise to serve its Owner, the Owner's guests, invitees, and such other persons who may lawfully be entitled to enter the Condominium Property and refers to any Commercial Unit shown and located on Exhibit "B" to this Master Deed or to subsequent phase amendments to this Master Deed. Unless the context requires otherwise, all references to "Unit," excluding references to "Vacation Ownership Unit," include the Commercial Units.

3.11  Common Elements shall have the meaning ascribed to it in Article IV and in the Act.

3.12  Common Expenses means (a) Condominium Common Expenses as pertains to Unit Owners and (b) Vacation Ownership Dues as pertains to Vacation Ownership Interest Owners.

3.13  Common Surplus means any excess of all receipts of the Association over the amount of the Common Expenses.

LIBER **402** PAGE **985**

3.14  Condominium means The Mountain Grand Lodge Condominium as an approved condominium established in conformity with the provisions of the Act.

3.15  Condominium Common Expenses shall have the meaning as ascribed to it in the Bylaws.

3.16  Condominium Documents means this Master Deed together with all exhibits attached thereto, the Vacation Ownership Instrument, the Fractional Instrument, and all other documents incorporated in this Master Deed by reference, as the same may be amended from time to time.

3.17  Condominium Parcel means a Unit together with the undivided share in the Common Elements and Common Surplus which are appurtenant to the Unit as set forth in Article VI, together with those appurtenances described in Article VII, including membership in the Club, which is an appurtenance to each Vacation Ownership Interest in accordance with this Master Deed and the Club Documents.

3.18  Condominium Property means the lands, leaseholds, easements, and real and personal property that are subjected to condominium ownership from time to time as part of the Condominium, whether or not contiguous, and all improvements thereon and all easements and rights appurtenant thereto intended for use in connection with the Condominium.

3.19  Condominium Rules and Regulations means the rules and regulations concerning the use of Condominium Property as amended from time to time by the Board in the manner provided by the Bylaws.

3.20  Consolidating Master Deed  means the final amended Master Deed which shall describe the Condominium as a completed Condominium, shall reflect the entire land area in the Condominium and all Units and Common Elements therein as finally established by the Developer and shall consolidate all amendments made to the Master Deed and its Exhibits. If the Units and Common Elements in the Condominium are constructed in substantial conformity with the proposed Condominium Subdivision Plan attached as Exhibit "B" to this Master Deed, and, if the perimeter description of the Condominium Premises remains the same, the Developer shall be able to satisfy the foregoing obligation by filing a certificate in the office of the County Register of Deeds confirming that the Units and Common Elements "as built" are in substantial conformity with the proposed Condominium Subdivision Plan and that no Consolidating Master Deed need be recorded.

3.21   Development and Sales Period, for the purposes of the Condominium Documents and the rights reserved to the Developer thereunder, means the period commencing with the recording of the Master Deed and continuing as long as the Developer continues to own any undeveloped land within the Boyne Mountain Resort Residential Community.

3.22  Contractible Condominium means a condominium from which a portion of the land or buildings may be withdrawn at the discretion of the Developer.

3.23  Convertible Area  means a portion of the Common Elements within which additional Units or Common Elements may be created.

3.24  Developer means Boyne Properties, Inc., a Michigan corporation, its successors, or assigns.  No party other than Boyne Properties, Inc., shall exercise the rights and privileges reserved in this Master Deed to the Developer unless such party receives and records with the Charlevoix County Register of Deeds a written assignment from Boyne Properties, Inc. of all or a portion of such rights and privileges.

3.25  Disclosure Guide means the Club Disclosure Guide as the same may be amended from time to time, which includes the rules and regulations governing the reservation and use of Club accommodations and facilities.

3.26  Expandable Condominium means a condominium project to which additional land and units may be added at the discretion of the Developer.

3.27  Fractional Instrument means the instrument or instruments subjecting all or portions of the Condominium to a fractional ownership plan, executed by the Developer or its designated successors or assigns, and recorded with the Charlevoix County Register of Deeds, Michigan, and including any amendments to such instrument and all exhibits attached to such instrument or instruments.

4

3.28 <u>Fractional Interest</u> means an undivided interest in and accompanying right to use a Unit as more particularly described in a Fractional Instrument established in accordance with this Master Deed.

3.29 <u>Fractional Plan</u> means the plan established with respect to certain Units pursuant to the Fractional Instrument and the Condominium Documents whereby such Units are conveyed for periods of time, and each Owner receives a stated time period less than a full year during any given year, until the termination of the plan as provided in this Master Deed or the applicable Fractional Instrument, together with a remainder over in fee simple as a tenant-in-common with all other Owners of Fractional Interests on termination of the Condominium, subject to the Condominium Documents.

3.30 <u>Limited Common Elements</u> shall have the meaning ascribed to it in Article IV.

3.31 <u>Management Agreement</u> means the agreement between the Association and any Management Company pursuant to which the Association assigns its responsibilities and duties relating to the management and operation of the Condominium to the Management Company.

3.32 <u>Management Company</u> means BRM, or any entity engaged to manage the Condominium pursuant to a Management Agreement.

3.33 <u>Master Deed</u> means this Master Deed for The Mountain Grand Lodge Condominium, as amended from time to time, and all exhibits attached to this Master Deed.

3.34 <u>Mortgagee</u> means the Developer (and any successor in interest to the Developer as to a purchase money mortgage), the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any trust, savings and loan association, credit union, mortgage company, bank, insurance company, commercial loan company, or institutional lender, to the extent that any of the same hold a first mortgage encumbering any Unit or any Vacation Ownership Interest.

3.35 <u>Owner</u> or Co-owner means the owner of a Unit, Fractional Interest, or Vacation Ownership Interest.

3.36 <u>Percentage of Value</u> means the percentage assigned to each Unit in Article V of this Master Deed. The Percentage of Value of a Unit (or of a Fractional Interest or Vacation Ownership Interest) determines the proportionate share of ownership in the Common Elements and the proportionate share of responsibility for the Common Expenses.

3.37 <u>Vacation Ownership Instrument</u> means the instrument or instruments subjecting all or portions of the Condominium to a vacation ownership plan or vacation membership plan, executed by the Developer or its designated successors or assigns, and recorded with the Charlevoix County Register of Deeds and including any amendments to such instrument and all exhibits attached to such instrument or instruments.

3.38 <u>Vacation Ownership Interest</u> means, in the case of the Condominium, an undivided interest in and accompanying right to use a Vacation Ownership Unit as more particularly described in a Vacation Ownership Instrument established in accordance with this Master Deed. In the case of other resorts affiliated with the Club, "Vacation Ownership Interest" means a real or personal ownership interest in accommodations at such other resorts in the Club.

3.39 <u>Transitional Control Date</u> means the date on which a Board of Directors of the Association takes office pursuant to an election in which the votes which may be cast by eligible Co-owners unaffiliated with the Developer exceed the votes which may be cast by the Developer.

3.40 <u>Unit</u> means a condominium unit as defined in the Act and in Article V and refers to that part of the Condominium Property which is subject to exclusive ownership by one or more persons. All references to a "Unit" shall include a Vacation Ownership Unit or a Fractional Interest unless the context dictates otherwise.

3.41 <u>Utility Services</u> means and includes electric power, water, garbage and sewage disposal, telephone service, and all other public service and convenience facilities for Condominium Property.

3.42 <u>Vacation Ownership Dues</u> shall have the meaning as ascribed to it in the Bylaws.

3.43 <u>Vacation Ownership Plan</u> means the plan established with respect to Vacation Ownership Units pursuant to the Vacation Ownership Instrument and the Condominium Documents whereby Vacation Ownership Units are conveyed for

periods of time, and each Owner receives a stated time period less than a full year during any given year but not necessarily for consecutive years, until the termination of the plan as provided in this Master Deed or the applicable Vacation Ownership Instrument, together with a remainder over in fee simple as a tenant-in-common with all other Owners of Vacation Ownership Interests on termination of the Condominium, subject to the Condominium Documents.

3.44 <u>Vacation Ownership Unit</u> means a Unit committed to the Vacation Ownership Plan pursuant to this Master Deed and the applicable Vacation Ownership Instrument.

## ARTICLE IV
## COMMON ELEMENTS

The Common Elements of the Condominium and the respective use and responsibilities for maintenance, decoration, repair or replacement thereof, are as follows:

4.1 <u>General Common Elements</u>. The General Common Elements are:

(A) <u>Land</u>. The land described in Article II hereof, including the land lying below any Unit and any surface and sub-surface improvements which are not (i) identified below as Limited Common Elements or (ii) are not located within the boundaries of a Unit.

(B) <u>Electrical</u>. The electrical transmission system throughout the Project, including that contained within Unit walls, up to the point of connection with, but not including, electrical fixtures, plugs and switches within any Unit.

(C) <u>Telephone</u>. The telephone system throughout the Project up to the point of entry to each Unit.

(D) <u>Gas</u>. The gas distribution system throughout the Project, including that contained within Unit walls, up to the point of connection with gas fixtures within any Unit.

(E) <u>Water</u>. The water distribution system throughout the Project, including that contained within Unit walls, up to the point of connection with plumbing fixtures within any Unit and including any water heating systems.

(F) <u>Sanitary Sewer</u>. The sanitary sewer system throughout the Project, including that contained within Unit walls, up to the point of connection with plumbing fixtures within any Unit.

(G) <u>Telecommunications</u>. The telecommunications system up to, but not including, connections to provide service to individual Units, including any security system, up to the point of entry to each Unit.

(H) <u>Elevators</u>. The building elevators.

(I) <u>Service Areas</u>. The corridors, stairs, bridge, attic space, electrical and mechanical rooms, vending machine areas and common restrooms.

(J) <u>Construction</u>. Foundations, supporting columns, Unit perimeter walls (including windows and doors therein), roofs, ceilings, floor construction between Unit levels and mechanical construction.

(K) <u>HVAC</u>. The heating and air conditioning systems throughout the Project.

(L) <u>Easements</u>. All beneficial easements referred to in Articles II and VI hereof.

(M) <u>Personal Property</u>. All personal property related to the operation of the Condominium, except: (a) all of Management Company's personal and intellectual property related to its operation of the Condominium, including Management Company's trade name and the trade names of Management Company's affiliates or subsidiaries and any and all personal property relating to the operation of any reservation program by Management Company, which are and always shall be the personal property of Management Company; (b) any reservation system provided to the Condominium by BVCM, including any and all computer hardware and software, which is and always shall be the property of BVCM; and (c) any other personal property which is not owned by the Owners or the Association.

LIBER **402** PAGE **988**

(N) <u>Other</u>. Such other elements of the Condominium not herein designated as Limited Common Elements or which are not enclosed within the boundaries of a Unit and which are intended for common use or which are necessary for the existence, upkeep and safety of the Condominium, including the sanitary sewer mains and manholes.

Some or all of the utility lines, systems (including mains and service leads) and equipment and the telecommunications system, described above may be owned by the local public authority or by the company that is providing the pertinent service. Accordingly, such utility lines, systems and equipment, and the telecommunications system, shall be General Common Elements only to the extent of the Association's or the Co-owners' interest therein, if any, and the Developer makes no warranty whatever with respect to the nature or extent of such interest, if any.

4.2  <u>Limited Common Elements</u>. The Limited Common Elements are:

(A) <u>Exterior Appurtenances</u>. The exterior appurtenances to each Unit, including decks.

(B) <u>Lobby</u>. The lobby area indicated on Sheet 9 of Exhibit B shall be a Limited Common Element appurtenant to and for the Administrative Office/Front Desk Unit 114.

(C) <u>Interior Surfaces</u>. The interior surfaces of the Unit perimeter walls.

(D) <u>Personal Property</u>. All furnishings and other personal property contained within each Vacation Ownership Unit or Unit committed to the Fractional Plan that are not the property of individual Owners.

(E) <u>Spa Appurtenances</u>. The interior and exterior pools, the glass enclosed area East off of the Spa and the library, storage and office rooms to the North of the Spa on the first floor as indicated on Sheet 8 of Exhibit "B" and the pool filter/mechanical room and laundry room adjacent to the Spa in the Basement as indicated on Sheet 4 of Exhibit "B" shall be Limited Common Elements appurtenant to and for the Spa Unit 112.

(F) <u>Housekeeping Closets</u>. The housekeeping closets and the storage, vending and housekeeping stations and rooms located on the various floors shall be Limited Common Elements appurtenant to and for the Housekeeping Unit 120.

(G) <u>Administrative Office Appurtenances</u>. The offices, corridors, phone room and small meeting rooms adjacent to the Administrative Office/Front Desk Unit 114 as indicated on Sheets 4 and 5 of Exhibit "B" shall be Limited Common Elements appurtenant to and for the Administrative Office/Front Desk Unit 114.

(H) <u>Other</u>. Any other Limited Common Elements which appear on Exhibit "B."

4.3  <u>Use</u>. The use of the Common Elements shall be limited as follows:

(A) <u>General Common Elements</u>. Subject to the rights of the other Co-owners, each Co-owner may use the General Common Elements for the use intended as set forth in this Master Deed and its Exhibits. No Co-owner shall use the General Common Elements in any manner inconsistent with the purposes of the Condominium or in any manner which will interfere with or impair the rights of any other Co-owner.

(B) <u>Limited Common Elements</u>. The use of the Limited Common Elements appurtenant to a Unit shall be limited to the Co-owner(s) of the respective Unit(s), except that the Owners shall have the right to the reasonable use of the lobby area for the purpose of access to and from their Units and to and from the other General Common Elements of the Condominium.

(C) <u>Units</u>. The use of a Unit is limited to the Co-owner(s) thereof. A Co-owner may not use his or her Unit in violation of any provision of these Condominium Documents.

LIBER 4 0 2   PAGE 9 8 9

4.4 <u>Responsibility</u>. The responsibility for the maintenance, decoration, repair and replacement of the Common Elements and Units shall be as follows:

(A) <u>By the Association</u>. Except as set forth in Section 4.4(B) below, the Association shall maintain, repair, and replace at the Association's expense:

(1) All General Common Elements.

(2) The parking area, access driveways, and grounds adjacent to the Condominium.

(3) The exterior appurtenances described in Section 4.2(A) above as Limited Common Elements.

(4) The lobby area described in Section 4.2(B) above as Limited Common Element; the Developer shall have the right to require that the Association maintain the lobby area in the first-class condition commensurate with that of a four-star hotel.

(5) The pools and their mechanical and filter equipment described in Section 4.2(E) above as Limited Common Elements; the Developer shall have the right to require that the Association maintain the pools and equipment in the first-class condition commensurate with that of a four-star hotel.

(6) The Association shall also maintain, repair, and replace the other Limited Common Elements referred to in Section 4.2 above, but the cost shall be assessed to, and paid for by, the Co-owner(s) of the Unit appurtenant thereto.

(B) <u>By the Owner</u>. The responsibilities of the Owner for maintenance, repair, and replacement are as follows:

(1) To promptly report to the Association any defect or need for repairs for which the Association is responsible.

(2) To bear in their entirety any expenses of repairs or replacements to the Condominium Property occasioned by the specific use or abuse by any Owner or any licensee, guest, or tenant of any Owner.

(3) The Association shall be responsible for the decoration, finishing and maintenance of the interior of all Units (including the surfaces of the interior walls) whether or not dedicated to the Vacation Ownership Plan or Fractional Plan, but the cost of the same shall be assessed to the Owners of the particular Unit.

(C) <u>Management Agreement</u>. As set forth in the Bylaws, the Association may enter into such management contracts as it deems necessary to engage the services of a Management Company to carry out all or part of the maintenance and operational duties and obligations of the Association in accordance with this Master Deed, including the operation of the Vacation Ownership Plan and Fractional Plan for the Condominium. The initial Management Company is BRM. If the Management Agreement is terminated, the maintenance duties and other obligations of the Condominium will be the exclusive responsibility of the Association and the new Management Company, if any.

(D) <u>Common Elements or Association Property</u>. The Board has the right, in its discretion and without the approval of the Owners, to maintain, repair, alter, rearrange, improve, remove, or replace any or all personal property or furnishings that are part of the Condominium Property and are not the property of individual Owners from time to time, subject to the approval of Developer, in its sole discretion, for so long as Developer owns a Unit or Vacation Ownership Interest. In addition, the Board shall have the power, in its discretion and without the approval of Owners, but subject to the approval of Developer, in its sole discretion, for so long as Developer owns a Unit or Vacation Ownership Interest, to lease the Common Elements; to enter into agreements to acquire leaseholds, memberships, and other possessory or use interests in lands or facilities, including, without limitation, country clubs, golf courses, marinas, and other recreational facilities; and to acquire, convey, lease, or mortgage Association property. The Board shall have the power to charge a use fee against Owners for the use of Common Elements or Association property, subject to the approval of the Developer, in its sole discretion, for so long as Developer owns a Unit or Vacation Ownership Interest. Except as described in the preceding sentence, all costs associated with the foregoing shall be Common Expenses.

LIBER **402** PAGE **990**

## ARTICLE V
## UNITS

5.1   Description of Units.   Each Unit in the Condominium is described in this Article with reference to the Condominium Subdivision Plan as prepared by Bidstrup Engineering, Inc., Surveyors, and Beta Design Group, Architects, and attached hereto as Exhibit "B."   Each Unit shall consist of the space contained within the Unit boundaries as shown in Exhibit "B" hereto and delineated with heavy outlines.   For the purposes of this description, the space contained within each Unit shall be measured from the interior, unpainted finish surfaces of the walls and ceilings and from the interior surface of its subfloors. There are, initially, no Units 46 or 48.

5.2   Percentage Interests in Common Elements, Common Surplus, and Common Expenses.   An undivided interest in the General Common Elements and, except as specifically provided for herein, in the Limited Common Elements, shall be and hereby is, allocated to each Condominium Unit, Vacation Ownership Interest and Fractional Interest, which interest shall be proportionate to the Percentage of Value assigned to that Unit, Vacation Ownership Interest or Fractional Interest in Article V, Section 2, below.   Each Unit within the Condominium shall have an undivided percentage interest in the Common Surplus and a share of the Common Expenses of the Condominium based on the Percentage of Value established in Section 3 below.

5.3   Percentage of Value.   The total value of the Units is 100 percent, and, the Percentage of Value allocated to each Unit is as follows:

| Unit Number: | % of Value: |
|---|---|
| Residential/Hotel Units: | |
| 1-45, 47 | 1.00 |
| 49-68 | 0.64 |
| 69 | 1.00 |
| 70-87 | 0.64 |
| 88 | 1.00 |
| 89 | 0.64 |
| 90 | 1.00 |
| 91-109 | 0.64 |
| 110, 111 | 1.00 |
| Commercial Units: | |
| 112 | 4.17 |
| 113 | 0.38 |
| 114 | 2.06 |
| 115 | 1.12 |
| 116 | 0.85 |
| 117 | 1.63 |
| 118 | 0.91 |
| 119 | 0.91 |
| 120 | 0.09 |
| 121 | 0.12 |
| Total: | 100.00% |

This determination of Percentages of Value was made after reviewing the comparative size, market value, location and allocable expense of maintenance for each Unit in the Condominium.   The Developer has determined that the best indicators of relative value and expense of the residential Units are square footage and allocable expense of maintenance.   The Grand and Core Suites all have relatively comparable square footages and almost identical burden on the expense of maintenance, so, they have each been assigned a Percentage of Value of 0.64%.   The Grand and Core Penthouse Suites and the Tower Suites also all have relatively comparable square footages and almost identical burden on the expense of maintenance, so, they have each been assigned a Percentage of Value of 1.00%.   The Developer has also determined that the Commercial Units would be primarily serving Owners and guests who were already in or from the Condominium and would

LIBER 4 0 2   PAGE 9 9 1

therefore not cause a representative increase in the expense of maintenance of the Common Elements, and that the Commercial Units would not have a definite or easily marketable value. Therefore, the Developer has decided that the Commercial Units would have a Percentage of Value, when compared to the relative square footage size of residential Units, equal to one-half of that of a residential Unit. The Percentages of Value shall not be changed except in the manner provided in Article XIII. As additional phases are added to the Condominium, the Percentages of Value shall be reduced accordingly.

5.4   Vacation Ownership Estates. Vacation Ownership estates are being created in units of the Condominium by submitting any portion or all of the Condominium to a Vacation Ownership Instrument (as defined in Article III). The degree, quantity, nature, and extent of such Vacation Ownership estates, as well as the minimum duration of the recurring periods of rights of use, possession, or occupancy, are defined and described in this Master Deed and the Vacation Ownership Instrument. The Condominium also is subject to a multisite Vacation Ownership plan as further described in the Vacation Ownership Instrument.

5.5   Fractional Interests. Fractional interests are being created in units of the Condominium by submitting any portion or all of the Condominium to a Fractional Instrument (as defined in Article III). The degree, quantity, nature, and extent of such Fractional interests, as well as the minimum duration of the recurring periods of rights of use, possession, or occupancy, are defined and described in this Master Deed and the Fractional Instrument.

5.6   Warranty Limitation. **Developer disclaims any and all warranties, express or implied, including implied warranties of merchantability and fitness for a particular purpose in connection with the construction of the Units and the Common Elements and with respect to personal property in the accommodations or facilities. Owner assumes all risks and liabilities in connection with the use of the aforementioned property. Developer makes no warranties, express or implied, concerning the Unit, personal property, or Common Elements, except as specifically provided by the Act.**

## ARTICLE VI
## EASEMENTS

6.1   Easement for Maintenance of Encroachments and Utilities. In the event any portion of a Unit, dwelling, or Common Element encroaches upon another Unit, dwelling or Common Element due to shifting, settling, or moving of any structure or due to survey errors or construction deviations, reciprocal easements shall exist for the maintenance of such encroachment for so long as such encroachment exists, and for maintenance thereof after rebuilding in the event of any destruction. There shall be easements to, across, through, and over those portions of the Condominium Property, structures, buildings, and improvements for the continuing maintenance and repair of all utilities in the Condominium Property. One of the purposes of this Article is to clarify the right of the Owners to maintain structural elements and fixtures which have been approved by the Developer or the Association and which project into the Common Elements surrounding each Unit notwithstanding their projection beyond the Unit perimeters.

6.2   Easement for Maintenance of Dwelling Exteriors, Limited Common Element Areas, Etc. There shall be easements to and in favor of the Association, and its officers, directors, agents, and designees, in, on and over all Units in the Condominium, for access to the Units and the exterior of each of the Units and other structures and appurtenances that are constructed within the Condominium Property to permit the maintenance, decoration, repair, and replacement thereof in accordance with provisions of this Master Deed. The Association may in the first instance (but subject to enlargement or reduction by action of the Board) be responsible and have easements for performance of the certain maintenance functions within individual Units as set forth in this Master Deed. Except as limited by this Master Deed, each Owner shall be responsible for all other responsibilities and costs of decoration, maintenance, repair, and replacement of his Unit and the residential dwelling constructed within his Unit, together with all appurtenances thereto, except as such responsibilities may be undertaken by the Association from time to time on behalf of all Owners. If any Owner fails to discharge his responsibilities in accordance with the aesthetic, maintenance, and architectural standards imposed by the Association and the Condominium Documents, the Association may enter upon the Unit and perform any Owner's required decoration, maintenance, repair, or replacement responsibilities and assess the costs thereof to the pertinent Owner in accordance with the provisions of Article II of the Bylaws.

6.3   Association Easements. Except as limited by the Act, the Board may grant, modify, or move easements from time to time over the Common Elements or Association property without obtaining the approval of the Owners. The Board also may enter into easements or licenses benefiting all or a portion of the Condominium Property, with all costs incurred in connection with such easements or licenses to be Common Expenses. For so long as Developer owns a Unit or Vacation Ownership Interest, such powers may only be exercised with the approval of Developer.

LIBER **402** PAGE **992**

6.4 <u>Easements for Public Utilities</u>. The Developer reserves the right at any time prior to transfer of control of the Association, to grant easements for utilities over, under, across, and through the Condominium Property to appropriate governmental agencies or public utility companies and to transfer title of utilities to governmental agencies or to utility companies. Any such easement or transfer of title may be conveyed by the Developer without the consent of any Owner, mortgagee, or other person and shall be evidenced by an appropriate amendment to this Master Deed and to Exhibit "B" hereto, recorded with the County Register of Deeds. All of the Owners and mortgagees of Units and other persons interested or to become interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such amendment or amendments of this Master Deed as may be required to effectuate the foregoing grant of easement or transfer of title.

6.5 <u>Additional Easements for Developer's Other Projects</u>. The Developer hereby reserves the following easements in connection with any improvements constructed or to be constructed by the Developer in any are of future development, any adjacent property, and on any tracts of land within The Boyne Mountain Resort area, whether or not such improvements are made a part of the Condominium Property (such improvements being hereinafter collectively referred to as the "Other Projects").

(A) <u>Roads</u>. A perpetual nonexclusive easement in, over and upon the main service roads in the Condominium Property for purposes of ingress and egress to and from the Other Projects by the Developer and the owners of the Other Projects. The Developer shall have the right to alter any such main service roads by installation of curb cuts, paving, and roadway connections at such locations as the Developer may from time to time select. All of the costs of such alterations shall be paid for by the Developer and the Developer will restore all areas in the Condominium Property disturbed by such alteration to their original condition immediately prior to the alternations, to the extent possible consistent with the alterations. All expenses of maintenance, repair and replacement of such main service roads shall be shared by the Association and such owners of the Other Projects as shall have primary access to their dwellings over such main service roads, on a proportionate basis determined on the basis of the respective number of Units in the Condominium Property and the number of units of the Other Projects having such primary access over such main service roads.

(B) <u>Utilities</u>. A perpetual nonexclusive easement for utilization, tapping into, tying into, extending, moving, and enlarging all utility mains located in the Condominium Property, including, but not limited to, water, gas, telephone, cable television, storm (if any), and sanitary sewer mains. The Developer will pay all costs of such utilization, tapping into, tying into, extending, moving and enlarging, and will restore all areas thereby disturbed to their original condition immediately prior to commencement thereof, to the extent possible consistent therewith. All expenses of maintenance, repair, replacement and replacement of such utility mains shall be shared by the Association and the owners of units in the Other Projects utilizing such utility mains on a proportionate basis determined on the basis of the respective number of Units in this Condominium and the number of units of the Other Projects utilizing such utility mains.

(C) <u>Common Elements</u>. The Developer shall also have the right to grant such further easements over or with respect to Common Elements as may be necessary or desirable in furtherance of development, community usage, coordinated maintenance, and operation of Boyne Mountain Resort and to confer responsibilities and jurisdiction for administration and maintenance of such easements upon the administrator of said area.

The above easements shall be for the benefit of the Developer and owners of the Other Projects, and their respective heirs, successors, assigns, families, guests, and invitees.

6.6 <u>Easements for Development and for Maintenance, Repair, and Replacement</u>. The Developer, the Association, and all public or private utility companies shall have such easements as may be necessary over the Condominium Property, including all Units and Common Elements to fully develop and service the Condominium and any other properties within the Boyne Mountain Resort and to fulfill any responsibilities of maintenance, decoration, placement, removal, repair, or replacement which they or any of them are required or permitted to perform under the Condominium Documents and such recorded contracts or easements. These easements include, without any implication of limitation, the right of the Association to obtain access during reasonable hours and upon reasonable notice to water meters, sprinkler controls and valves and for purposes of inspection of the dwellings constructed on any Unit and its appurtenant Limited Common Elements to ascertain that the same have been designed and constructed in conformity with standards imposed and/or specific approvals granted by the Developer or the Board.

11

LIBER 402 PAGE 993

6.7  Telecommunications Agreements.  The Board, subject to the Developer's approval prior to transfer of control of the Association, shall have the power to grant such easements, licenses and other rights of entry, use, and access and to enter into any contract or agreement, including wiring agreements, right-of-way agreements, access agreements, and multi-unit agreements and, to the extent allowed by law, contracts for sharing of any installation or periodic subscriber service fees as may be necessary, convenient or desirable to provide for telecommunications, telephone, cable television, videotext, broad band cable, satellite dish, earth antenna, and similar services (collectively "Telecommunications") to the Condominium or any Unit therein.  Notwithstanding the foregoing, in no event shall the Board enter into any contract or agreement or grant any easement, license, or right of entry or do any other act or thing which will violate any provision of any federal, state, or local law or ordinance.  Any or all of such agreements may provide for fees to be paid to the Developer for services furnished by the Developer.

6.8  Construction of Amenities.  The Developer reserves the right to build, or not to build, any amenities indicated on the Condominium Subdivision Plan as "need not be built."

6.9  Sales Facilities.  The Developer reserves the right, at any time, for so long as Developer conducts active sales at the Condominium, to maintain offices, model units and similar sales facilities in the Condominium.  Developer shall pay all costs related to the use of such facilities while owned by the Developer and shall restore the facilities to habitable status upon termination of use.  In addition the Developer reserves exclusive easement rights over and across the Condominium Property for the purpose of marketing, sales, and rental of Units and Vacation Ownership Interests at this Condominium, Vacation Ownership interests at other resorts affiliated with the Club or such other Vacation Ownership or multisite Vacation Ownership plans developed or marketed by Developer or its affiliates from time to time, for the purpose of leasing any Units that have not been declared as part of this Condominium, and for the purpose of leasing Developer-owned Vacation Ownership Interests.  Lessees of Developer-owned non-declared Units shall have, for the length of the term of their leases, the same easement rights over and across the Condominium Property and use rights to the recreational areas and facilities of the Condominium as are reserved for Owners of declared Units.

6.10  Specific Written Easements.  The Developer may, by subsequent instrument, prepared and recorded in its sole discretion without the necessity of consent by any other interested party, specifically define by legal description any of the easements created by or referred to in this Article.

6.11  Developer Easements.  The Developer reserves the following exclusive easements (except as specifically designated as non-exclusive) and rights to grant easements:

(A)  Governmental Requirements.  For so long as the Developer holds any interest in any Unit or Vacation Ownership Interest, the Developer reserves the right to grant such easements, from time to time, as may be required by any government agency.  The easements shall specifically include any environmental easements required by state or federal environmental agencies.

(B)  Recreational Areas and Commonly Used Facilities.  The Developer reserves the right to grant such easements, from time to time, to any other third party for the purpose of providing such parties with the same use rights over and across the Condominium Property and the recreational areas and commonly used facilities as those reserved for Owners.

6.12  Traffic.  A non-exclusive easement over, across, and under the Condominium Property is expressly provided for and granted for pedestrian traffic over, through, and across sidewalks, paths, walks, halls, lobbies, and other portions of the Common Elements as may be from time to time intended and designated for such purpose and use, for vehicular and pedestrian traffic over, through, and across such portions of the Common Elements as may from time to time be paved and intended for such purposes, and for vehicular parking on such portions of the Common Elements as may from time to time be paved, intended, and designated for such purposes.  Such easements shall be for the use and benefit of the Owners within this Condominium, the Developer, the owners of interests in properties located adjacent to the Condominium which are designated by the Developer, those claiming by, through, or under such persons, and the person's guests, licensees, and invitees; provided, however, that nothing in this Master Deed shall be construed to give or create in any person the right to park any vehicle on any portion of the Condominium Property except to the extent that space may be specifically designated and assigned for parking purposes as determined by the Board and approved by the Developer with respect to the Developer's rights to park on the Condominium Property.  In addition, further easements shall exist for ingress and egress over such streets, walks, and other rights of way serving the Units as shall be necessary to provide for reasonable access to the public ways.

LIBER402 PAGE994

6.13 Connecting Access. The Developer hereby grants to the Association and to each Owner of a Unit in the Condominium a perpetual, non-exclusive easement over and across the driveways, sidewalks, parking lot and other lands referred to in Section 2.2 and located, or to be located, between the Condominium Property and the access easement referred to in Section 2.3 to access the Condominium and the Units and Common Elements therein to be use for their purpose intended.

6.14 Consent. Any right reserved by the Developer under this Article may be exercised by the Developer, or his assignee, without the consent of any Owner, mortgagee, or other person and shall be evidenced by an appropriate amendment to this Master Deed or its Exhibit "B" recorded in the County Records. All of the Owners and mortgagees of Units and other persons interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such amendments to this Master Deed as may be required to effectuate the exercise of the rights retained in this Master Deed.

6.15 Relocation of Certain Improvements. The Developer reserves the right at any time during the Development and Sales Period to relocate certain improvements which may be located outside of the Condominium Premises, but which serve the Condominium, including the parking lot and the access driveways, provided that Developer is responsible for the cost of the relocation and provided that an alternative improvement is provided to serve the Condominium in its place.

## ARTICLE VII
## APPURTENANCES

7.1 Appurtenant Interests. Each Unit shall have as an appurtenance thereto that undivided share of the Common Elements and Common Surplus as more specifically described in Article VI. The Owner of each Unit shall be liable for that share of the Condominium Common Expenses which equals the percentage interest in the Common Elements and Common Surplus appurtenant to the Unit. For Owners of Fractional Interests, such Owners shall be liable for their pro rata share of the Condominium Common Expenses pursuant to this Master Deed and the Fractional Instrument. For Vacation Ownership Units, Owners of Vacation Ownership Interests shall be liable for their pro rata share of the Vacation Ownership Dues as set forth in the Vacation Ownership Instrument. Each Unit's share of the Common Expenses and Common Surplus and each Unit's undivided interest in the Common Elements shall be calculated as more specifically set forth in Article VI.

7.2 Partition of Common Elements. The share of the undivided percentage interest in the Common Elements appurtenant to each Unit and each Vacation Ownership Interest shall remain undivided, and no Owner shall bring, or have any right to bring, any action for partition or division of same.

7.3 Partition of Units. No action for partition of any Unit or any appurtenance to a Unit shall lie.

## ARTICLE VIII
## MAINTENANCE, ALTERATION, AND ADDITION

8.1 Maintenance of Condominium Property. Responsibility for the maintenance of the Condominium Property and restrictions on its alteration and improvement shall be as set forth in the Bylaws. In addition, the Association shall have the responsibility to maintain, repair, renovate, and replace all Common Elements as set forth in the Bylaws.

8.2 Association's Access to Units. The Association has the irrevocable right of access to each Unit for: (i) inspecting, maintaining, repairing, replacing, or operating the Condominium Property; (ii) making emergency repairs to prevent damage to the Common Elements or to another Unit; and (iii) determining compliance with the Condominium Documents, or if applicable, a Vacation Ownership Instrument or Fractional Instrument.

## ARTICLE IX
## ASSESSMENTS AND COMMON EXPENSES

9.1 Assessments. Owners of Units which are not committed to the Vacation Ownership Plan are responsible for Condominium Common Expenses. Owners of Units which have been committed to the Fractional Plan are also responsible for any additional expenses provided for in the Fractional Instrument. Owners of Vacation Ownership Interests are responsible for Vacation Ownership Dues. The mailing and collection of assessments against each Owner for Common Expenses, for the costs or expenses for which an individual Owner may be solely responsible pursuant to the Condominium Documents, and for reserves as may from time to time be established by the Association, shall be pursuant to the Bylaws.

9.2 Common Surplus. Each Owner shall own a share of the Common Surplus attributable to each Unit or Vacation Ownership Interest owned in accordance with Article 7.1.

13

LIBER 402 PAGE 995

## ARTICLE X
## THE ASSOCIATION

10.1   Association Powers On Merger; Operation of Other Condominiums.  If this Condominium is merged pursuant to Article XX with another separate and independent condominium to form a single condominium, the Association is expressly empowered to manage and operate the resulting single condominium as provided for in this Master Deed. The Association is also specifically empowered to manage, operate, and maintain any other separate and independent condominiums that the Board shall elect to manage, operate, and maintain from time to time in accordance with this Master Deed and the master deed of the other separate and independent condominium.

10.2   Possession and Use of Units.  The Association, on behalf of the Owners, is authorized to arrange for the assignment of the possession and use of Units by owners from other resorts, including other resorts affiliated with the Club, and the possession and use of accommodations at other resorts by Owners.  In this regard and with respect to the Club, the Association has entered into the Boyne Vacation Club Resort Agreement for the Condominium.  Notwithstanding anything in this Master Deed to the contrary, it is the intent of this Master Deed that the Board shall not have the power independently to terminate the Boyne Vacation Club Resort Agreement. The Boyne Vacation Club Resort Agreement may only be terminated in accordance with it own terms.

10.2   Association's Authority Respecting Developer Easements and Rights.  The Association shall not have the authority to grant, modify, terminate, or move any easement or right granted to or reserved by Developer, with respect to this Master Deed or the Condominium Property, without the prior approval of Developer.

## ARTICLE XI
## USE RESTRICTIONS

The use of the Condominium Property shall be in accordance with the following provisions as long as the Condominium exists:

11.1   Personal Use Restriction.  Each Vacation Ownership Unit shall be occupied only as vacation accommodations. Owners may occupy their Vacation Ownership Unit and use any facilities of the Condominium in accordance with the Condominium Documents or the Club Documents.  The Board reserves the right to allow Owners to use the facilities of the Condominium on a daily basis at times other than during an Owner's reserved Week, in accordance with the Condominium Rules and Regulations.  The Board reserves the right, which right is delegable to the Management Company, to limit or charge for such daily use.  Use of all Vacation Ownership Units and the facilities of the Condominium by Owners is limited solely to the personal use of Owners, their guests, invitees, and lessees and for recreational uses by corporations and other entities owning Vacation Ownership Interests.  Use of Vacation Ownership Units or the facilities of the Condominium by their Owners for commercial purposes or any purposes other than the personal use described in this Master Deed is expressly prohibited.  "Commercial purpose" includes a pattern of rental activity or other occupancy by an Owner that the Association, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice.  This paragraph shall not apply to Units or Vacation Ownership Interests owned by the Developer or to Commercial Units.

11.2   Common Elements.  Except as approved by the Board, the Common Elements shall be used only for the purposes for which they are intended in the furnishing of services and facilities for the enjoyment of and use by the Owners and others who are permitted use by an agreement entered into by the Developer or the Association, from time to time.  This paragraph shall not apply to the Developer.

11.3   Developer's Use.  Notwithstanding anything in this Master Deed to the contrary, the Developer may make such use of the Condominium Property as may facilitate the sale of Units or Vacation Ownership Interests by the Developer, including showing of the Condominium Property and the display of signs and other promotional devices.

14

## ARTICLE XII
## RIGHTS OF DEVELOPER

Notwithstanding anything in this Master Deed to the contrary, and in addition to any other rights which may be reserved to Developer in this Master Deed or in any agreement for the reservation and purchase of a Unit, Developer shall have the following rights:

12.1  Alteration of Unit Boundaries and Dimensions.  Developer reserves the right to change the size, location, interior design or arrangement of any Unit after the date of the recording of this Master Deed and prior to the date of groundbreaking of construction of The Mountain Grand Lodge, provided the change shall be reflected by an amendment to this Master Deed, and provided that any person or party who has a pending agreement for the reservation and purchase of the changed or altered Unit shall be given the opportunity to terminate their reservation and purchase agreement set forth in Section 12.3 below.  Such an amendment for the purpose of altering the size, location, interior design or arrangement of a Unit shall be signed and acknowledged only by Developer and need not be approved by the Association or other Owners, whether or not elsewhere required for an amendment, except that no change shall be made by Developer which would conflict with the Act and Article XIII.  After the date of groundbreaking of construction of The Mountain Grand Lodge the Developer may only change the size, location, interior design or arrangement of any Unit that is still owned by Developer and is not subject to a reservation and purchase agreement.

12.2  Adjustment of Purchase Prices.  Because this Master Deed is being prepared and recorded a considerable period of time before the actual commencement of construction of The Mountain Grand Lodge, and because a development project of this size and scope will be affected by numerous factors and circumstances not fully known and not fully within the control of the Developer, the Developer reserves the right, notwithstanding anything to the contrary contained in any other document or reservation and purchase agreement, to adjust the Purchase Price of any Unit prior to the date of groundbreaking of construction of The Mountain Grand Lodge, provided that any person or party who has a pending agreement for the reservation and purchase of Unit the purchase price of which has been adjusted shall be given the opportunity to terminate their reservation and purchase agreement set forth in Section 12.3 below.

12.3  Termination of Purchase Agreement.  Should the Developer materially change the size, location, interior design or arrangement of a Unit, or adjust the Purchase Price of a Unit, which is subject to a pending reservation and purchase agreement prior to the date of groundbreaking of construction of The Mountain Grand Lodge, the Developer shall give written notice to the purchaser of the subject Unit of the nature of the material change or adjustment by First Class US Mail. The purchaser shall have 21 days after the date of mailing of the notice to notify the Developer in writing by First Class US mail of the purchaser's desire to terminate the pending reservation and purchase agreement.  Within seven days of the date of Developer's receipt of notification of purchaser's desire to terminate their reservation and purchase agreement, Developer shall return any earnest monies paid plus any interest earned thereon to purchaser in full termination of all rights under the reservation and purchase agreement.  If the purchaser does not notify Developer in writing and within the time allowed of purchaser's desire to terminate the reservation and purchase agreement, the reservation and purchase agreement shall remain in full force and effect as changed or adjusted by Developer.

12.4  Sharing of Recreational Facilities and Other Common Areas.  In addition to the cross-use and cost-sharing contemplated under this Master Deed, Developer also reserves the right to unilaterally amend this Master Deed to provide for the sharing of the recreational facilities and other common areas of this Condominium with the owners of accommodations on other properties, resorts, or condominiums located adjacent to or in near proximity to this Condominium, including the granting of any ingress and egress easements necessary to effectuate same; provided, however, that if this Master Deed is so amended, the owners of interests in such other property, resort, or condominium shall be required to share with the Owners any recreational facilities and common areas existing as a part of their property, resort, or condominium.  In addition, the owners at each property, resort or condominium shall bear their pro rata share of the costs of maintaining all such shared facilities and common areas.

12.5  Nightly Rental Program.  Developer intends and expressly reserves the right to operate or permit the operation of a nightly rental program with respect to unsold Units and Vacation Ownership Interests.

15

**ARTICLE XIII**
**AMENDMENTS**

This Master Deed and its Exhibits may be amended as follows:

13.1   Amendments by Developer.   Subject to the limitations contained in Article 13.3, amendments may be unilaterally made and recorded by Developer without the consent of Owners or Mortgagees for one or more of the following purposes:

(A)   To substantially, materially, or otherwise alter, modify, rearrange, redefine, relocate, or replace Common Elements, property that is Association property, and adjust the percentage interest in the Common Elements appurtenant to each Unit in connection therewith, to redefine any converted area, to allocate the Common Expenses among the Owners, and to make any other amendments specifically described and permitted to Developer in any provision of this Master Deed;

(B)   To modify the location and size of unsold Units and their appurtenant Limited Common Elements;

(C)   To amend the Bylaws, subject to any restrictions stated therein;

(D)   To correct arithmetic errors, typographical errors, survey or plan errors, deviations in construction, or any similar errors in the Master Deed or Condominium Documents or to correct errors in the boundaries or locations of improvements;

(E)   To clarify or explain the provisions of the Master Deed or its exhibits;

(F)   To comply with the Act or rules promulgated thereunder or with any requirements of any governmental or quasi-governmental agency or any financing institution providing mortgages on Units on the Condominium premises;

(G)   To make, define, or limit easements affecting the Condominium premises;

(H)   To record a Consolidating Master Deed or to designate any improvements shown on the Plan as "must be built," subject to any limitations or obligations imposed by the Act;

(I)   To modify or relocate the location of roads, drives, or pedestrian walks as may be required by any difficulties encountered during construction as a result of the topography;

(J)   To exercise any right which the Developer has reserved to itself in this Master Deed;

(K)   To terminate or eliminate reference to any right which the Developer has reserved to itself in this Master Deed;

(L)   To facilitate conventional mortgage loan financing for existing or prospective Owners and to enable the purchase of such mortgage loans by the Federal Home Mortgage Corporation, the Federal National Mortgage Association, the Government National Mortgage Association or any other agency of the Federal Government or the State of Michigan;

(M)   To relocate boundaries of a Unit as permitted by this Master Deed;

(N)   To delete reference to any improvements listed on Exhibit "B" as "proposed" or "need not be built;"

(O)   To convert duplex Units into single, detached Units, or conversely, to convert single, detached Units into duplex Units; and

(P)   To add, rearrange, redefine, modify, relocate, or replace recreational areas or facilities.

The foregoing amendments may be made without the consent of Owners or mortgagees. The rights reserved to the Developer in this Master Deed may not be amended except by or with the consent of the Developer. If there is no Owner other than the Developer, the Developer may, with the consent of any Mortgagee, unilaterally amend this Master Deed or any Exhibit thereto. An amendment under this Article shall become effective upon the recording thereof.

16

LIBER **402** PAGE **998**

The Association may not make amendments without the written consent of the Developer as long as the Developer owns any Units or Vacation Ownership Interests in the Condominium.

For the purposes of this Article the term "material amendment" shall be deemed to be an amendment which substantially alters the ability of a Owner to use and enjoy his or her Unit and the Common Elements.

13.2   Material Amendments.  Except as otherwise provided in this Master Deed, and subject to the limitations of Section 13.3 below, the Master Deed, Bylaws, and Condominium Subdivision Plan may be amended by the Developer or by the Association, even if the amendment will materially alter or change the rights of the Owners, with the consent of not less than two-thirds (2/3) of the votes of the Owners (unless a greater majority is specified in this Master Deed or in the Condominium Bylaws).  Whenever a proposed amendment would materially alter or change the rights of Mortgagees generally, then such amendments shall require the approval of two-thirds (2/3) of all first Mortgagees of record, allocating one vote for each mortgage held.  The Association may make no amendment without the written consent of the Developer as long as the Developer owns any Units or Vacation Ownership Interests in the Condominium.

13.3   Limitation on Amendments.  Notwithstanding any other provision of this Article XIII, the method or formula used to determine the percentage interest in the Common Elements appurtenant to each Unit, as described in Article VI, and any provisions relating to the ability or terms under which a Owner may rent a Unit, may not be modified without the consent of each affected Owner and Mortgagee.  An Owner's Unit dimensions or appurtenant General Common Elements or Limited Common Elements may not be modified without the Owner's consent.

13.4   Amendments to Effectuate Modifications.  If any amendment results from the exercise of the rights of Developer to convert, contract or expand the Condominium or to consolidate or modify Units, each portion of the Unit or Units resulting from such consolidation, modification or relocation of boundaries shall be separately identified by number, when appropriate, and the percentage interest in the Common Elements appurtenant to each Unit as set forth in Article V for the Unit or Units consolidated or modified shall be adjusted in order to preserve a total value of 100% for the entire Condominium resulting from such amendment or amendments to this Master Deed and to preserve the principle that the percentage interest in the Common Elements appurtenant to each Unit shall be equal regardless of whether the Units to which they relate have been enlarged, reduced or eliminated.  Such amendment or amendments to the Master Deed shall also contain such further definitions of Common Elements as may be necessary to adequately describe the Units in the Condominium as so modified.  All of the Owners and mortgagees of Units and other persons interested or to become interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such amendment or amendments of this Master Deed to effectuate the foregoing and to any proportionate reallocation of the percentage interest in the Common Elements appurtenant to each Unit which Developer or its successors may determine necessary in conjunction with such amendment or amendments.  All such interested persons irrevocably appoint Developer or its successors as agent and attorney for the purpose of execution of such amendments to the Master Deed and all other documents necessary to effectuate the foregoing.  Such amendments may be effected without the necessity of re-recording an entire Master Deed or its Exhibits.

13.5   Procedures for Amendment.

(A)   Owners and mortgagees of record shall be notified of proposed amendments not less than 10 days before the amendment is recorded.

(B)   A person causing or requesting an amendment to the Condominium Documents shall be responsible for costs and expenses of the amendment, except for amendments based upon a vote of a prescribed majority of Owners and Mortgagees or based upon the advisory committee's decision, the costs of which are expenses of administration.

(C)   A Master Deed amendment, including the Consolidating Master Deed, dealing with the addition, withdrawal or modification of units or other physical characteristics of the Condominium shall comply with the standards prescribed in Section 66 of the Act for preparation of an original Condominium Subdivision Plan for the Condominium.

## ARTICLE XIV
### TERMINATION

LIBER 402 PAGE 999

The Condominium may be terminated as follows:

(A)   In accordance with Section 50 of the Act, so long as there is no Owner of the Condominium other than Developer, Developer with the consent of any interested Mortgagee, may unilaterally terminate the Condominium.

(B)   If there is an Owner of the Condominium other than Developer, then the Condominium may only be terminated in accordance with Section 51 of the Act with the written consent of 85% of all Owners and mortgagees.

## ARTICLE XV
### CONVERSION

This Condominium is established as a convertible condominium in accordance with the provisions of the Act and this Article.

15.1   Right to Convert.   Developer reserves the right, but not an obligation, to convert certain portions of the Common Elements of the Condominium to other common uses or for the purpose of modifying unsold Units or adding additional Units and amenities.   There are no restrictions or limitations on Developer's right to convert the Condominium except as stated in this Article and except as provided by local zoning ordinance.   Nothing in Master Deed, however, shall in any way obligate Developer to convert these portions of the Condominium.

15.2   Consent.   The consent of any Owner shall not be required to convert the Condominium.   All of the Owners and mortgagees of Units and persons interested or to become interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such conversion of the Condominium and any amendment or amendments to this Master Deed to effectuate the conversion.   All such interested persons irrevocably appoint Developer or its successors as agents and attorney for the purpose of executing such amendment or amendments to the Master Deed and all other documents necessary to effectuate the foregoing.   Such amendments may be made without the necessity of re-recording an entire Master Deed or the exhibits thereto and may incorporate by reference all or any pertinent portions of this Master Deed and the exhibits to this Master Deed.

15.3   Time Limitation.   The Developer's right to convert the Condominium shall expire six (6) years after the initial recording of this Master Deed.

15.4   Designation of Convertible Area.   All Common Elements and Units in the Condominium have been designated as "Convertible Areas" within which the Common Elements and the Units (provided that they are unsold or that their respective Owner has consented to the conversion) may be modified or converted as provided in this Master Deed.

15.5   Successive Conversion.   The Convertible Areas may be converted in one amendment to this Master Deed or in successive amendments to this Master Deed, at the same time or at different times in the Developer's discretion.   There are no restrictions upon the order in which portions of the Convertible Areas may be converted.

15.6   Modification of Common Elements and Units.   The Developer reserves the right to modify the size, location, design, or elevation of unsold Units and dwellings or Common Elements appurtenant or geographically proximate to such Units, and to enlarge, extend, add, or eliminate unsold Units and the dwellings contained therein or to construct or relocate driveways, walkways, air conditioner compressors, privacy areas, courtyards, atriums, patios, decks, spas, hot tubs, swimming pools, and other private amenities on all or any portion or portions of the Convertible Areas designated for such purpose on the Condominium Subdivision Plan.   The foregoing list is intended only to be illustrative, not exclusive.   The precise number, nature, size, and location of Unit additions, deletions, enlargements, modifications and extensions or other modifications of dwellings and private amenities which may be constructed shall be determined by Developer in its sole judgment.   Any private amenity other than a dwelling extension may be assigned by the Developer as a Common Element or Limited Common Element appurtenant to an individual Unit.

15.7   Construction of Additional Amenities.   The Developer may, in its sole discretion, construct various amenities including jogging or walking paths, tennis courts, detention or retention pond areas, signage, recreational areas, landscaping features and walls, walks, patios, gazebos, or other related amenities ("Amenities") and hereby reserves the right to do so anywhere within the Common Elements described on the Condominium Subdivision Plan.   Developer shall pay the costs of such Amenities, if constructed, unless otherwise approved by a two-thirds majority of non-Developer Owners.   Upon

inclusion of the same in the Condominium, all Owners and all future Owners shall thereafter contribute to the maintenance, repair, and replacement of the Amenities as an expense of administration of the Condominium (and as a cost of construction if approved by a two-thirds majority of non-Developer Owners). Developer has no obligation to construct any particular Amenities or include the same in the Condominium except pursuant to its discretionary election to do so. Final determination of the design, layout, and location of such Amenities, if and when constructed, will be at the sole discretion of the Developer.

15.8 Amendments. If the Condominium is converted, it shall be converted by an amendment to the Master Deed or by a series of successive amendments to the Master Deed. Any conversion shall be deemed to have occurred at the time of the recording of an amendment to this Master Deed embodying all essential elements of the conversion.

## ARTICLE XVI
### EXPANSION

This Condominium is established as an expandable condominium in accordance with the provisions of the Act and this Article.

16.1 Right to Expand. Developer reserves the right, but not an obligation, to expand the Condominium for the purpose of adding additional Units, General Common Elements, and Limited Common Elements as provided in this Article. There are no restrictions or limitations on Developer's right to expand the Condominium except as stated in this Article and except as provided by local zoning ordinance. Nothing in this Master Deed, however, shall in any way obligate Developer to expand the Condominium, and Developer may, in its discretion, establish all or a portion of the additional land described in this Master Deed as any other form of development, including existing uses.

16.2 Consent. The consent of any Owner shall not be required to expand the Condominium. All of the Owners, Mortgagees, and persons who hold an interest in or to become interest-holders in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such expansion of the Condominium and any amendment or amendments to this Master Deed to effectuate the expansion and to any reallocation of the percentage interest in the Common Elements appurtenant to each existing Unit which Developer may determine necessary in conjunction with such amendment or amendments. All such interested persons irrevocably appoint Developer or its successors as agents and attorney for the purpose of executing such amendment or amendments to the Master Deed and all other documents necessary to effectuate the foregoing. Such amendments may be made without the necessity of re-recording an entire Master Deed or the exhibits thereto and may incorporate by reference all or any pertinent portions of this Master Deed and the exhibits to this Master Deed.

16.3 Time Limitation. The Developer's right to expand the Condominium shall expire six (6) years after the initial recording of this Master Deed.

16.4 Legal Description. The land which may be added to the Condominium is marked "Future Development Area" on Sheet 2 of Exhibit "B" to this Master Deed, is located in Boyne Valley Township, Charlevoix County, Michigan, is referred to as "Additional Land" and is described as follows:

Part of Section 16, T32N, R5W, Boyne Valley Township, Charlevoix County, Michigan,

Commencing at the South 1/4 corner of Section 16, T32N, R5W, Boyne Valley Township, Charlevoix County, Michigan; thence along the South line of said Section 16 N 89°04'29" E 29.60 feet to the centerline of the "Old Boyne City Railroad right of way" thence along said centerline N 22°58'52" W 434.77 feet to the Place of Beginning; thence S 67°01'08" W 658.39 feet; thence N 22°58'52" W 1186.12 feet; thence N 67°01'08" E 1028.00 feet; thence S 22°58'52" E 1186.12 feet; thence S 67°01'08" W 369.61 feet to the Place of Beginning.

16.5 Successive Expansion. The Additional Land may be added to the Condominium in its entirety or in parcels, in one amendment to this Master Deed or in successive amendments to this Master Deed, at the same time or at different times in the Developer's discretion. There are no restrictions upon the order in which portions of the Additional Land may by added to the Condominium.

16.6 Use Restrictions. There are no restrictions on the type, use or density of the Common Elements, Units or other improvements which the Developer may place in or upon the Additional Land except those restrictions contained in applicable law or ordinance.

LIBER 4 0 3   PAGE 0 0 2

16.7  Amendments. If the Condominium is expanded, it shall be expanded by an amendment to the Master Deed or by a series of successive amendments to the Master Deed, each adding additional land or improvements to the Condominium. Each amendment resulting from expansion shall reflect the new percentage interest in the Common Elements appurtenant to each Unit determined by the same system and as set forth in Article VI. Any expansion shall be deemed to have occurred at the time of the recording of an amendment to this Master Deed embodying all essential elements of the expansion. At the conclusion of expansion of the Condominium, but not later than one year after completion, a Consolidating Master Deed and plans showing the Condominium "as built" shall be prepared and recorded by Developer. A copy of the recorded Consolidating Master Deed shall be provided to the Association.

## ARTICLE XVII
### CONTRACTION

This Condominium is established as a contractible condominium in accordance with the provisions of the Act and this Article.

17.1  Right to Contract. Developer reserves the right, but not an obligation, to contract the Condominium by withdrawing from the Condominium any portions of the Condominium owned by the Developer as provided in this Article. There are no restrictions or limitations on Developer's right to contract the Condominium except as stated in this Article.

17.2  Consent. The consent of any Owner or mortgagee shall not be required to contract the Condominium. All of the Owners and mortgagees of Units and persons interested or to become interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such contraction of the Condominium and any amendment or amendments to this Master Deed to effectuate the contraction and to any reallocation of the percentage interest in the Common Elements appurtenant to each existing Unit which Developer may determine necessary in conjunction with such amendment or amendments. All such interested persons irrevocably appoint Developer or its successors as agents and attorney for the purpose of executing such amendment or amendments to the Master Deed and all other documents necessary to effectuate the foregoing. Such amendments may be made without the necessity of re-recording an entire Master Deed or the exhibits thereto and may incorporate by reference all or any pertinent portions of this Master Deed and the exhibits to this Master Deed.

17.3  Time Limitation. The Developer's right to contract out any portion of the Condominium shall expire six (6) years after the initial recording of this Master Deed.

17.4  Successive Contraction. Portions of the Condominium can be contracted out in one or more parcels, in one amendment to this Master Deed or in successive amendments to this Master Deed, or at the same time or at different times in the Developer's discretion. There are no restrictions upon the order in which portions of the Condominium may be contracted out.

17.5  Use Restrictions. There are no restrictions on the use to which the Developer may put land which is contracted out of the Condominium.

17.6  Amendments. If the Condominium is contracted, it shall be contracted by an amendment to the Master Deed or by a series of successive amendments to the Master Deed. Each amendment resulting from contraction shall reflect the new percentage interest in the Common Elements appurtenant to each Unit, if any, determined by the same system and as set forth in Article VI. Any contraction shall be deemed to have occurred at the time of the recording of an amendment to this Master Deed embodying all essential elements of the contraction. At the conclusion of contraction of the Condominium, but not later than one year after completion, a Consolidating Master Deed and plans showing the Condominium "as built" shall be prepared and recorded by Developer. A copy of the recorded Consolidating Master Deed shall be provided to the Association.

20

LIBER **403** PAGE **003**

## ARTICLE XVIII
### SEVERABILITY AND CONFLICT

The invalidity in whole or in part of any covenant or restriction, or any article, section, subsection, sentence, clause, phrase, word, or other provision of the Condominium Documents shall not affect the validity of the remaining portions.

## ARTICLE XIX
### COMMERCIAL UNITS

Commercial Unit Owners shall be entitled to all of the rights and benefits otherwise provided to Owners under this Master Deed including the right to vote at any meeting of the Association as provided for in the Bylaws. Commercial Units shall share in the Condominium Common Expenses and the Common Surplus in accordance with Article VII; however, the Owner of a Commercial Unit shall be solely responsible for all expenses of maintaining, repairing, and operating the interior of the Commercial Unit. In addition to all appurtenances, easements, and other benefits passing with Units as provided under this Master Deed, each Commercial Unit has as an appurtenance the following perpetual nonexclusive easements for the use and benefit of the Commercial Unit Owner, the Commercial Unit Owner's successors and assigns, social guests, lessees, licensees, and invitees:

(A) an easement for ingress and egress over all Common Elements of the Condominium as the same may exist from time to time for such purposes as permitted by law, including such commercial activities that the Commercial Unit Owner may engage in from time to time; and

(B) an easement for placement, maintenance, repair, replacement, removal, and relocation of any items necessary for use of the Commercial Units as permitted in this Master Deed, including water lines, piping, ductwork, conduits, electrical and telecommunications wiring, refrigeration, and ventilation needs.

The Owner of a Commercial Unit may, in its sole discretion, subdivide its Commercial Unit into smaller Commercial Units without the consent of any other Owners or the Association. The Owner of a Commercial Unit also may convey his Commercial Unit, or any subdivision thereof, to the Association without the consent of any other Owner or the Association, and the Association shall be obligated to accept such conveyance. A Commercial Unit conveyed to the Association as contemplated in this Master Deed may only be conveyed by the Association to a third party in accordance with the same restrictions which govern the conveyance by the Association of portions of the Common Elements. Notwithstanding the rights to conduct commercial activities in a Commercial Unit, each Commercial Unit Owner has the right, in its sole discretion, to not engage in any commercial activity.

## ARTICLE XX
### MERGER

This Master Deed, the Association, and the Common Elements may be merged with the master deed, condominium association, and common elements of another independent and separate condominium to form a single condominium with the consent of a majority of the total number of voting interests and with the approval of all of the record owners of liens on the Units and Vacation Ownership Interests. If the consent and approval is obtained, a new or amended master deed and articles of incorporation and bylaws of the Association shall be recorded and shall contain provisions necessary to amend and modify the appurtenances to the Units and the percentages by which the Owners share the Common Expenses and own the Common Surplus and Common Elements, in order to create a consolidated single condominium.

## ARTICLE XXI
### ASSIGNMENT

Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or Bylaws, including the power to approve or disapprove any act, use or proposed action or any other matter or thing, may be assigned by it to any other entity or to the Association. Any such assignment or transfer shall be made by an appropriate instrument duly recorded in the office of the County Register of Deeds.

LIBER 4 0 3 PAGE 0 0 4

## ARTICLE XXII
## VACATION OWNERSHIP PLAN

22.1 Vacation Ownership Plan. Units in this Condominium may become committed to a Vacation Ownership Plan upon the recording of a Vacation Ownership Instrument, or an amendment to a Vacation Ownership Instrument, subjecting such Unit to a Vacation Ownership Plan. A Vacation Ownership Unit will no longer be committed to a Vacation Ownership Plan any time all Vacation Ownership Interests in that Vacation Ownership Unit are owned by the same legal entity and on approval by the Developer for so long as Developer owns a Unit or Vacation Ownership Interest. The Developer may remove a Vacation Ownership Unit from a Vacation Ownership Plan at any time all Vacation Ownership Interests in that Vacation Ownership Unit (including or excluding any Vacation Ownership Interest set aside for maintenance) are owned by the Developer.

22.2 Other Vacation Ownership Plans. No Unit or Vacation Ownership Interest shall be contributed or subjected to any Vacation Ownership Plan created by any entity other than the Developer without the Developer's prior written consent which may be withheld in the Developer's sole, absolute and unfettered discretion.

22.3 Vacation Ownership Instrument. This Master Deed and the Vacation Ownership Instrument creating a Vacation Ownership Plan shall govern the Vacation Ownership Plan created by such Vacation Ownership Instrument. In the event of a conflict between the terms and provisions of this Master Deed and the terms and provisions of any Vacation Ownership Instrument, the terms and provisions of this Master Deed shall prevail.

22.4 Managing Entity. The Association shall be the managing entity for each Vacation Ownership Plan that the Developer so designates in the Vacation Ownership Instrument creating such Vacation Ownership Plan. The Association will not serve as managing entity of any Vacation Ownership Plan created by an entity other than the Developer without the Developer's prior written consent.

## ARTICLE XXIII
## FRACTIONAL INTERESTS

23.1 Fractional Plan. Units in this Condominium may become committed to a Fractional Plan upon the recording of a Fractional Instrument, or an amendment to a Fractional Instrument, subjecting such Unit to a Fractional Plan. A Unit will no longer be committed to a Fractional Plan any time all Fractional Interests in that Unit are owned by the same legal entity and on approval by the Developer for so long as Developer owns a Unit or Fractional Interest. The Developer may remove a Unit from a Fractional Plan at any time all Fractional Interests in that Unit are owned by the Developer. The Developer may also allow Units committed to a Fractional Plan to subscribe to an exchange program subject to rules and regulations determined by Developer.

23.2 Other Fractional Plans. No Unit or Fractional Interest shall be contributed or subjected to any Fractional Plan created by any entity other than the Developer without the Developer's prior written consent which may be withheld in the Developer's sole, absolute and unfettered discretion.

23.3 Fractional Instrument. This Master Deed and the Fractional Instrument creating a Fractional Plan shall govern the Fractional Plan created by such Fractional Instrument. In the event of a conflict between the terms and provisions of this Master Deed and the terms and provisions of any Fractional Instrument, the terms and provisions of this Master Deed shall prevail.

23.4 Managing Entity. The Association shall be the managing entity for each Fractional Plan that the Developer so designates in the Fractional Instrument creating such Fractional Plan. The Association will not serve as managing entity of any Fractional Plan created by an entity other than the Developer without the Developer's prior written consent.

## LIBER 403 PAGE 005

In witness whereof, the Developer has executed this Master Deed this 23rd day of March, 2000.

Witnesses:

Signed by:
Boyne Properties, Inc., a
Michigan corporation

LINDA MARZELLA

By: _____

By: Stephen M. Kircher, President

Neil Marzella


State of Michigan      )
                       )
County of Charlevoix   )

The foregoing instrument was acknowledged before me this 23rd day of March, 2000, by Stephen M. Kircher, the President of Boyne Properties, Inc., a Michigan corporation, on its behalf.

Neil Marzella, Notary Public
Emmet County, Michigan
Acting in Charlevoix County, Michigan
My Commission expires:  8/3/2001


Master Deed drafted by:
Neil Marzella, Attorney
P. O. Box 808
Harbor Springs, MI  49740

LIBER 4 0 3 PAGE 0 0 6

# EXHIBIT "A"

# THEE MOUNTAIN GRAND LODGE

# CONDOMINIUM BYLAWS

LIBER 4 0 3  PAGE 0 0 7

## INDEX

| ARTICLE | SUBJECT | PAGE NUMBER |
|---|---|---|
| I | Association of Owners | 1 |
| II | Assessments and Common Expenses | 1 |
| III | Arbitration | 6 |
| IV | Insurance | 7 |
| V | Reconstruction or Repair | 9 |
| VI | Restrictions | 11 |
| VII | Mortgages | 16 |
| VIII | Voting | 17 |
| IX | Meetings | 18 |
| X | Advisory Committee | 19 |
| XI | Board of Directors | 19 |
| XII | Officers | 22 |
| XIII | Finance | 23 |
| XIV | Indemnification | 23 |
| XV | Amendments | 24 |
| XVI | Compliance and Default | 24 |
| XVII | Remedies for Default | 25 |
| XVIII | Assessment of Fines | 26 |
| XIX | Alienability | 27 |
| XX | Rights Reserved to Developer | 27 |
| XXI | Severability | 27 |

THE MOUNTAIN GRAND LODGE     LIBER 403 PAGE 008

## EXHIBIT A

## BYLAWS

## ARTICLE I
## ASSOCIATION OF CO-OWNERS

The Mountain Grand Lodge, a Condominium Project located in Boyne Valley Township, Charlevoix County, Michigan, shall be administered by an Association of Co-owners which shall be a non-profit corporation, hereinafter called the "Association", organized under the applicable laws of the State of Michigan, and responsible for the management, maintenance, operation and administration of the Common Elements, easements and affairs of the Condominium Project in accordance with the Condominium Documents and the laws of the State of Michigan. These Bylaws shall constitute both the Bylaws referred to in the Master Deed and required by Section 3(8) of the Act. Each Co-owner shall be entitled to membership and no other person or entity shall be entitled to membership. Any term referred to in these Bylaws shall have the same definition as in the Master Deed. The share of a Co-owner in the funds and assets of the Association cannot be assigned, pledge or transferred in any manner except as an appurtenance to his Unit. The Association shall keep current copies of the Master Deed, all amendments to the Master Deed and other Condominium Documents for the Condominium Project available at reasonable hours to Co-owners, prospective purchasers and prospective mortgagees of Units in the Condominium Project. All Co-owners in the Condominium Project and all persons using or entering upon or acquiring any interest in any Unit therein or the Common Elements thereof shall be subject to the provisions and terms set forth in the aforesaid Condominium Documents.

## ARTICLE II
## ASSESSMENTS and COMMON EXPENSES

Owners of Units which are not committed to the Vacation Ownership Plan are responsible for Condominium Common Expenses. Owners of Units which have been committed to a Fractional Plan are also responsible for any additional expenses provided for in the Fractional Instrument. Owners of Vacation Ownership Interests are responsible for Vacation Ownership Dues. The determination and collection of assessments against each Owner for Common Expenses, for the costs or expenses for which an individual Owner may be solely responsible pursuant to the Condominium Documents, and for reserves as may from time to time be established by the Association, shall be carried out according to the following provisions:

Section 1. <u>Condominium Common Expenses</u>. All expenses arising from the management, administration and operation of the Association in pursuance of its authorizations and responsibilities as set forth in the Condominium Documents and the Act shall be deemed "Condominium Common Expenses" and shall be levied by the Association against the Units and the Co-owners thereof in accordance with the provisions of this Article. Condominium Common Expenses include the following:

(A) Expenses of administration and management of the Condominium Property and of the Association, including compensation paid by the Association to an accountant, attorney, or other employee or independent contractor. Such expenses also shall include any compensation, fees, salaries, costs, or expenses paid to the Management Company, including any fees, costs, or expenses incurred by the Management Company to maintain an affiliation for the Condominium with a brand.

(B) Expenses of maintenance, operation, repair, and replacement of the Common Elements, as determined by the Board from time to time, as well as all other costs and expenses properly incurred by the Association.

(C) Expenses declared Condominium Common Expenses by the provisions of the Condominium Documents or the Act.

(D) Any valid charge against the Condominium Property as a whole, including security costs.

(E) All costs and expenses incurred by the Association in connection with regulatory compliance.

(F) All reserves for replacement and maintenance of the Condominium Property.

1

LIBER 403 PAGE 009

(G) Casualty, flood, or liability insurance on the Condominium Property.

(H) The costs of a master antenna television system or duly franchised cable television service obtained pursuant to a bulk contract.

(I) The costs of maintaining the land and appurtenances immediately adjacent to the Condominium, including, but not limited to, the landscaping and maintenance of the grounds immediately surrounding the Mountain Grand Lodge and the snowplowing, maintenance and repair of the parking lot and driveways serving the Mountain Grand Lodge, whether located within the Condominium or not.

(J) Beach Club or Spa Assessments. The Developer or Boyne USA, Inc may develop and make available to the Co-owners certain amenities such as the spa, pools or beach club either on an Association budget line item basis or a membership dues basis. Membership, if and when made available, shall be mandatory for each Co-owner. Whether access is on an Association budget line item basis or a membership basis, the Co-owners shall be responsible for their proportionate share of the cost of the operation, maintenance and repair of the amenity based on the number of Units that use the amenity. The Association shall collect any membership dues from the Co-owners and pay the same directly to the Developer. All monies collected by the Association or by the Developer for an amenity shall be used for the operation of that amenity.

(K) Any other expenses incurred in the normal operation and maintenance of the Units and the Common Elements, excluding Vacation Ownership Dues or Fractional dues, which cannot be attributed to a particular Owner.

(L) All costs incurred under the terms of the Roadway and Utility Easement Agreement.

(M) Any costs incurred in the satisfaction of any liability arising within, caused by, or connected with, the Common Elements or the administration of the Condominium.

Section 2.   Determination of Assessments. Assessments for the payment of Condominium Common Expenses shall be determined in accordance with the following provisions:

(A) Budget and Annual Assessment. The Board of Directors of the Association shall establish an annual budget in advance for each fiscal year and such budget shall project all expenses for the forthcoming year which may be required for the proper operation, management and maintenance of the Condominium, including a reasonable allowance for contingencies and reserves. An adequate reserve fund for maintenance, repairs and replacement of those Common Elements that must be replaced on a periodic basis shall be established in the budget and must be funded by regular installment payments as set forth in Section 3 below rather than by special assessments. At a minimum, the reserve fund shall be equal to 10% of the Association's current annual budget on a non-cumulative basis. Since the minimum standard required by this subparagraph may prove to be inadequate, the Association of Co-owners should carefully analyze the Condominium to determine if a greater amount should be set aside, or if additional reserve funds should be established for other purposes from time to time. Upon adoption of an annual budget by the Board of Directors, copies of the budget shall be delivered to each Co-owner, and the assessment for said year shall be established based upon said budget, although the failure to deliver a copy of the budget to each Co-owner shall not affect or in any way diminish the liability of any Co-owner of any existing or future assessments. Should the Board of Directors at any time decide, in the sole discretion of the Board of Directors: (1) that the assessments levied are or may prove to be insufficient to pay the costs of operation and management of the Condominium, (2) to provide replacements of existing Common Elements, (3) to provide additions to the Common Elements not exceeding $3,000 annually for the entire Condominium, or (4) in the event of emergencies, the Board of Directors shall have the authority to increase the general assessment or to levy such additional assessment or assessments as it shall deem to be necessary. The Board of Directors also shall have the authority, without Co-owner consent, to levy assessments pursuant to the provisions of Article V, Section 3, hereof. The discretionary authority of the Board of Directors to levy assessments pursuant to this subparagraph shall rest solely with the Board of Directors for the benefit of the Association and its members, and shall not be enforceable by any creditors of the Association.

The Board of Directors of the Association, or any management company engaged to manage the Vacation Ownership Plan and/or the Fractional Plan, shall also establish annual budgets in advance for each fiscal year for the Vacation Ownership Plan and the Fractional Plan, and such budget shall project all expenses for the forthcoming year which may be required for the proper operation, management and maintenance of the Vacation Ownership Units and Fractional Interests,

2

including a reasonable allowance for contingencies and reserves. These additional expenses shall be assessed to the Owners of the Vacation Ownership Units and the Fractional Interests in relation to their respective fractions in a like manner as the assessments for Common Condominium Expenses as set forth below.

(B) Special Assessments. Specials assessments, in addition to those required in Section 2 (A) above, may be made by the Board of Directors from time to time and approved by the Co-owners as hereinafter provided to meet other requirements of the Association, including, but not limited to: (1) assessments for addition to the Common Elements of a cost exceeding $3,000 for the entire Condominium per year, (2) assessments to purchase a Unit upon foreclosure of the lien for assessments described in Section 8 hereof or (3) assessments for any other appropriate purpose not elsewhere herein described. Special assessments referred to in this Section 2 (B) (but not including those assessment referred to in this Section 2 (A) above, which shall be levied in the sole discretion of the Board of Directors) shall not be levied without the prior approval of more than 60% of the votes of all Co-owners. The authority to levy assessments pursuant to this subparagraph is solely for the benefit of the Association and its members and shall not be enforceable by any creditors of the Association or its members.

Section 3.   Apportionment of Assessment.  Unless otherwise provided herein or in the Master Deed, all assessments levied against the Co-owners to cover Condominium Common Expenses shall be apportioned among and paid by the Co-owners of the Units based upon the Percentages of Value set forth in Article V, Section 2 of the Master Deed.

Annual assessments as determined in accordance with Article II, Section 2(A) above shall be payable by the Co-owners in monthly installments, commencing with acceptance of a deed to or a land contract vendee's interest in a Unit, or with the acquisition of fee simple title to a Unit by any other means. The frequency of the installments can be changed at the discretion of the Board of Directors.

Section 4.   Vacation Ownership Dues.  The Condominium Common Expenses assessable to Units committed to the Vacation Ownership Plan together with all expenses arising from the management, administration and operation of the Vacation Ownership Units pursuant to the terms of the Vacation Ownership Plan and the Condominium Documents shall be deemed "Vacation Ownership Dues" and shall be levied by the Association against the Vacation Ownership Units and the Owners of the Vacation Ownership Interests therein and collected in accordance with the provisions of this Article. Vacation Ownership Dues include the following:

(A) Repair and maintenance of the interior of a Vacation Ownership Unit, including any housekeeping expenses not paid at the time of check-in or check-out.

(B) Repair and replacement of furniture, fixtures, appliances, carpeting, and any other personal property of Vacation Ownership Units, and deferred maintenance and replacement reserves for the same.

(C) Insurance coverage relating to the interior of any Vacation Ownership Unit.

(D) Utility Services for Vacation Ownership Units.

(E) Any other expenses incurred in the normal operation and maintenance of Vacation Ownership Units which cannot be attributed to a particular Owner, including any compensation, fees, salaries, costs, or expenses paid to the Management Company for the management and operation of the Vacation Ownership Plan.

(F) All costs and fees relating to the operation of the reservation system and the Club that are allocable to the Condominium and assessed by BVCM pursuant to the Club Documents.

(G) Expenses declared Vacation Ownership Dues of the Vacation Ownership Plan or the Club by the Act or the Condominium Documents.

(H) Uncollected Ad Valorem Taxes assessed against each Vacation Ownership Unit shall be treated as Vacation Ownership Dues.

(I) Condominium Common Expenses for each Vacation Ownership Unit.

3

LIBER 4 0 3 PAGE 0 1 1

Section 5. Fractional Interest Dues. In addition to their share of the Common Condominium Expenses, the Owners of Units committed to a Fractional Plan shall also be responsible for the additional expenses provided for in the Fractional Instrument Plan and the Condominium Documents. Such additional expenses shall be deemed "Fractional Interest Dues" and shall be levied by the Association against the Fractional Interest Units and the Owners of the Fractional Interests therein and collected in accordance with the provisions of this Article.

Section 6. Penalties for Default; Interest; Application of Payments. Assessments and installments on assessments paid on or before ten (10) days after the date when due shall not bear interest, but all sums not paid on or before ten (10) days after the date when due shall bear interest at the highest rate permitted by law from the date when due until paid. In addition, the Association may charge an administrative late fee for each delinquent installment in the amount of $25.00. The Association may use the services of a collection agency for collection of delinquent accounts and to charge and impose a lien against the delinquent Owner for such costs in accordance with the Act. All payments shall be first applied to interest, administrative late fees, costs and reasonable attorneys' fees incurred in collection including any incurred in all bankruptcy and probate proceedings, and then to the assessment payment first due. The Board shall have the discretion to increase or decrease the amount of the administrative late fee or interest rate within the limits imposed by law; provided, however, that the increase or decrease shall be made effective by amending the Condominium Rules and Regulations and notifying the Owners of same by regular mail addressed to each Owner at the last known address of each Owner as set forth in the Association's books and records. Notwithstanding any provision of this paragraph to the contrary, the Association shall have the right to waive any late fees or interest that accrue as a result of delinquent payment.

Section 7. Lien for Assessments. The Association shall have a lien against each Unit or Vacation Ownership Interest, as applicable, for any unpaid assessments and for interest, which lien shall also secure any late charges, reasonable attorneys' fees and costs incurred by the Association incident to the collection of the assessment or enforcement of such lien, whether or not legal proceedings are initiated and including those incurred in all bankruptcy and probate proceedings, and all sums advanced and paid by the Association for taxes and payments on account of superior mortgages, liens, or encumbrances which may be advanced by the Association in order to preserve and protect its lien. The lien upon each Condominium Unit or Vacation Ownership Interest owned by the Co-owner shall be in the amount assessed against the Unit or Vacation Ownership Interest, plus a proportionate share of the total of all other unpaid assessments attributable to Condominium Units no longer owned by the Co-owner but which became due while the Co-owner had title to the Condominium Units. The lien may be foreclosed by an action or by advertisement by the Association in the name of the Condominium on behalf of the other Co-owners. The lien is effective from and after recording a claim of lien in the Office of the Charlevoix County Register of Deeds stating the legal description of the Unit or Interest, as applicable, the name of the Owner of record, the amount claimed to be due and the due dates. The lien shall continue in effect until all sums secured by the lien shall have been fully paid or until such time as is otherwise permitted by law. Claims of lien shall be signed and verified by an officer of the Association, or by an authorized agent of the Association. On receipt of full payment, the party making payment shall be entitled to a recordable satisfaction of lien, to be prepared and recorded at such party's expense. All such liens shall be subordinate to any mortgage recorded prior to the date of recording the claim of lien, and all such liens may be foreclosed by suit brought in the name of the Association in the same manner as a foreclosure of a mortgage on real property, or as otherwise provided by applicable law. The Association may also sue to recover a money judgment for unpaid assessments without thereby waiving any claim of lien.

If a Mortgagee (or its successors or assigns) obtains title to a Unit or Vacation Ownership Interest as a result of the foreclosure of its first mortgage, or in the event a Mortgagee obtains title to a Unit or Vacation Ownership Interest as the result of a conveyance in lieu of foreclosure of its first mortgage, the Mortgagee is not liable for the Common Expenses chargeable to the Unit or Vacation Ownership Interest which became due prior to the acquisition of title to the Unit by such person. Any unpaid share of Common Expenses or assessments chargeable against any such foreclosed Unit or Vacation Ownership Interest or against any Unit or Vacation Ownership Interest transferred in lieu of foreclosure shall be deemed a Common Expense to be paid in the same manner as other Common Expenses by all of the Owners.

Nothing in these Bylaws shall be construed as a modification of any rights or remedies of the Association pursuant to the Act, except to the extent that the Condominium Documents allow additional remedies, to the extent that such additional remedies are permitted by law and except as to Mortgagees as provided above.

Section 8. Foreclosure Proceedings. Each Co-owner and every other person who from time to time has any interest in the Condominium, shall be deemed to have granted to the Association the unqualified right to elect to foreclose the lien securing payment of assessments either by judicial action or by advertisement. The provisions of Michigan law pertaining to foreclosure of mortgages by judicial action and by advertisement, as the same may be amended from time to time, are

4

LIBER 4 0 3 PAGE 0 1 2

incorporated herein by reference for the purposes of establishing the alternative procedures to be followed in lien foreclosure actions and the rights and obligations of parties to such actions. Further, each Co-owner and every other person who from time to time has any interest in the project shall be deemed to have authorized and empowered the Association to sell or to cause to be sold the Unit with respect to which the assessment(s) is or are delinquent and to receive, hold and distribute the proceeds of such sale in accordance with the priorities established by applicable law. Each Co-owner of a Unit in the Condominium acknowledges that at the time of acquiring title to such Unit, he was notified of the provisions of this subparagraph and that he voluntarily, intelligently and knowingly waived notice of any proceedings brought by the Association to foreclose by advertisement the lien for nonpayment of assessments and a hearing on the same prior to the sale of the subject Unit.

Notwithstanding the foregoing, neither a judicial foreclosure action nor a suit at law for a money judgment shall be commenced, nor shall any notice of foreclosure by advertisement be published, until the expiration of 10 days after mailing, by first class mail, postage prepaid, addressed to the delinquent Co-owner(s) at his or their last known address, a written notice that one or more installments of the annual assessment levied against the pertinent Unit is or are delinquent and that the Association may invoke any of its remedies hereunder if the default is not cured within 10 days after the date of mailing. Such written notice shall be accompanied by a written affidavit of an authorized representative of the Association that sets forth (i) the affiant's capacity to make the affidavit, (ii) the statutory or other authority for the lien, (iii) the amount outstanding (exclusive of interest, costs, attorney's fees and future assessments), and (v) the name(s) of the Co-owner(s) of record. Such affidavit shall be recorded in the office of the Charlevoix County Register of Deeds prior to commencement of any foreclosure proceeding, but it need not have been recorded as of the date of mailing as aforesaid. If the delinquency is not cured within the 10 day period, the Association may take such remedial action as may be available to it hereunder or under Michigan law.

Section 9.  Personal Liability for Unpaid Assessments.  Each Owner is personally liable for all assessments made against the Unit or Vacation Ownership Interest, as applicable, pursuant to the Condominium Documents and the Act, and the Association may bring an action for a money judgment against a delinquent Owner to collect all sums due the Association, including interest, late charges, costs, and reasonable attorneys' fees, including those incurred in all bankruptcy and probate proceedings. If a Unit or Vacation Ownership Interest is owned by more than one person or entity such owners shall be jointly and severally liable for all assessments made against their respective Unit or Vacation Ownership Interest. The liability for assessments may not be avoided by waiver of the use or enjoyment of any Common Element or by abandonment of the Unit or Vacation Ownership Interest for which the assessments are made. Any person acquiring title shall pay the amount owed to the Association within 30 days after transfer of title.

Section 10.  Other Remedies.  The Association also may discontinue the furnishing of any utilities or other services to a Co-owner in default upon 7 days written notice to such Co-owner of its intention to do so. A Co-owner in default shall not be entitled to utilize any of the General Common Elements of the Condominium and shall not be entitled to vote at any meeting of the Association so long as such default continues; provided, however, this provision shall not operate to deprive any Co-owner of ingress and egress to and from his Unit. In a judicial foreclosure action, a receiver may be appointed to collect a reasonable rental for the Unit from the Co-owner thereof or any persons claiming under him. The Association may also assess fines for late payment or nonpayment of assessments in accordance with the provisions of Article XVIII of these Bylaws. All of these remedies shall be cumulative and not alternative. The expenses incurred in collecting unpaid assessments, including interest, costs, actual attorney's fees (not limited to statutory fees) and advances for taxes or other liens paid by the Association to protect its lien, shall be chargeable to the Co-owner in default and shall be secured by the lien on his Unit.

Section 11.  Payments of Assessments.  No Owner may withhold payment of any regular or special assessment or any portion thereof because of any dispute which may exist between that Owner and the Association, the Board, the Management Company, or the Developer, or among any of them, but rather each Owner shall pay all assessments when due pending resolution of any dispute. No Co-owner may exempt himself from liability for his contribution toward the Common Expenses by waiver of the use of enjoyment of any of the Common Elements or by the abandonment of his Unit.

Section 12.  Liability of Mortgagee.  Notwithstanding any other provisions of the Condominium Documents, the holder of any first mortgage covering any Unit in the Condominium which comes into possession of the Unit pursuant to the remedies provided in the mortgage or by deed (or assignment) in lieu of foreclosure, or any purchaser at a foreclosure sale, shall take the property free of any claims for unpaid assessments or charges against the mortgaged Unit which accrue prior to the time such holder comes into possession of the Unit (except for claims for a pro rata share of such assessments or charges resulting from a pro rata re-allocation of such assessments or charges to all Units including the mortgaged Unit).

Section 13.   Developer's Responsibility for Assessments.   The Developer, even though a member of the Association, shall not be responsible for payment of any assessments except as specifically provided for in this Section. With respect to Residential Units the Developer shall become obligated to pay the Condominium Common Expenses assessed to a Unit when the Unit has been completed and has been made available for rental or hotel accommodation use. With respect to Commercial Units the Developer shall become obligated to pay the Condominium Common Expenses assessed to a Unit when the Unit has been completed and has been first opened for the business or use for which it was intended.  The Developer shall in no event be liable for any assessment levied in whole or in part to purchase any Unit from the Developer or to finance any litigation or other claims against the Developer, any cost of investigating and preparing such litigation or claim or any similar or related costs.  A Unit shall be deemed "completed" for the purpose of this Section when a certificate of occupancy has been issued for it.

Section 14.   Property Taxes and Special Assessments.   All property taxes and special assessments levied by a public taxing authority shall be assessed in accordance with Section 131 of the Act.

Section 15.   Personal Property Tax Assessment of Association Property.   The Association shall be assessed as the person or entity in possession of any tangible personal property of the Condominium owned or possessed in common by all Co-owners, and personal property taxes based thereon shall be treated as Condominium Common Expenses.

Section 16.   Construction Lien.   A construction lien otherwise arising under Act No. 497 of the Michigan Public Acts of 1980, as amended, shall be subject to Section 132 of the Act.

Section 17.   Statement as to Unpaid Assessments.   The purchaser of any Unit may request a statement of the Association as to the amount of any unpaid Association assessments thereon, whether regular or special.  Upon written request to the Association accompanied by a copy of the executed purchase agreement pursuant to which the purchaser holds the right to acquire a Unit, the Association shall provide a written statement of such unpaid assessments as may exist or a statement that none exist, which statement shall be binding upon the Association for the period stated therein.  Upon the payment of that sum within the period stated, the Association's lien for assessments as to such Unit shall be deemed satisfied; provided, however, that the failure of a purchaser to request such statement at least 5 days prior to the closing of the purchase of such Unit shall render any unpaid assessments and the liens securing the same fully enforceable against such purchaser and the Unit itself, to the extent provided by the Act.  Under the Act, unpaid assessments constitute a lien upon the Unit and shall be paid out of the proceeds of sale thereof prior to all claims except real property taxes and first mortgages of record.

## ARTICLE III
## ARBITRATION

Section 1.   Scope and Election.   Disputes, claims or grievances arising out of or relating to the interpretation or the application of the Condominium Documents, or any disputed claims or grievances arising among or between the Co-owners and the Association, upon the election and written consent of the parties to any such disputes, claims or grievances (which consent shall include an agreement of the parties that the judgment of any circuit court of the State of Michigan may be rendered upon any award pursuant to such arbitration), and upon written notice to the Association, shall be submitted to arbitration and the parties thereto shall accept the arbitrator's decision as final and binding, provided that no questions affecting the claim of title of any person to any fee or life estate in real estate is involved.  The Commercial Arbitration Rules of the American Arbitration Association as amended and in effect from time to time hereafter shall be applicable to any such arbitration.

Section 2.   Judicial Relief.   In the absence of the election and written consent of the parties pursuant to Section 1 above, no Co-owner or the Association shall be precluded from petitioning the courts to resolve any such disputes, claims or grievances.

Section 3.   Election of Remedies.   Such election and written consent by Co-owners or the Association to submit any such dispute, claim or grievance to arbitration shall preclude such parties from litigating such dispute, claim or grievance in the courts.

LIBER 4 0 3   PAGE 0 1 4

## ARTICLE IV
## INSURANCE

Section 1.Purchase of Insurance.  The Association shall obtain fire and extended coverage insurance and vandalism and malicious mischief insurance insuring all of the insurable improvements to the Condominium, together with such other insurance as the Board of Directors deems necessary in and for the interest of the Association, all Owners and their Mortgagees, as their interests may appear, in an amount which shall be equal to the maximum insurable replacement value as determined annually; and the premiums for such coverage and other expenses in connection with said insurance shall be assessed against the Owners as a Condominium Common Expense.  The named insured shall be the Association, individually and as agent for the Owners, without naming them, and as agent for their Mortgagees.  Notwithstanding the certain types of insurance and amounts of coverage required to be obtained pursuant to this Article, in obtaining insurance the Board may consider such factors as availability of types of insurance and the market for insurance premiums in deciding which type of insurance and the amounts of coverage to obtain.

Provisions shall be made for the issuance of mortgagee endorsements and memoranda of insurance to the mortgagees.  Such policies shall provide that payments for losses thereunder by the insurer shall be made to the insurance trustee hereinafter designated, and all policies and endorsements thereon shall be deposited with the insurance trustee.  Owners may obtain insurance coverage at their own expense on their own personal property and for their personal liability and living expenses.  Insurance policies issued to individual Owners shall provide that the coverage afforded by such policies is excess over the amount recoverable under any other policy covering the same property without the rights of subrogation against the Association.

Section 2.  Coverage.

(A)  Casualty.  All buildings and improvements on the Condominium Property shall be insured in an amount equal to the maximum insurable replacement value, excluding foundation and excavation costs, and all personal property included in the Common Elements shall be insured for its value, all as determined annually by the Board.  Such coverage shall afford protection against:

(1)  Loss of damage by fire and other hazards covered by a standard extended coverage endorsement; and

(2)  Such other risks as from time to time shall be customarily covered with respect to buildings similar in construction, location, and use as the buildings on the Condominium Property, including vandalism and malicious mischief.

All such hazard policies issued to protect Condominium buildings shall provide that the word "building," wherever used in the policy, shall include fixtures, installations, or additions comprising that part of the building within the unfinished interior surfaces of the perimeter walls, floors, and ceilings of the individual Units initially installed, or replacements thereof of like kind or quality, in accordance with the original plans and specifications, or as existed at the time the Unit was initially conveyed if the original plans and specifications are not available.  However, before a Unit becomes subject to the Vacation Ownership Plan, and, thereafter, whenever any such Unit once again is owned by a single Owner or Owners and not subject to the Vacation Ownership Plan, the word "building" shall not include floor coverings, wall coverings, or ceiling coverings.  Once a Unit becomes subject to the Vacation Ownership Plan, those portions of the building containing such Unit should become insured such that floor coverings, wall coverings, and ceiling coverings are covered by any such insurance policy.  With respect to the coverage provided for by this paragraph, the Owners shall be considered additional insureds under the policy.

(B)  Public Liability.  Public liability insurance shall be obtained in such amounts and with such coverage as shall be required by the Board with cross liability endorsement and endorsement to cover liabilities of the Owners as a group to an Owner, and to liabilities of one Owner to another Owner.

(C)  Insurance on Vacation Ownership Units.  The Board or appropriate officer of the Association shall obtain casualty and liability insurance, as needed, on all Vacation Ownership Units.  Each policy shall reflect the respective interests of the Association, and all Owners of Vacation Ownership Interests in each such Unit.  Casualty insurance shall be in an amount equal to the replacement cost of the accommodations and facilities of the Vacation Ownership Plan.  The premiums shall constitute part of the Vacation Ownership Dues.  All proceeds shall be payable to the insurance trustee hereinafter designated.  All proceeds shall be used for the purpose of repair or replacement of any loss, or in the event such loss is not to be repaired or replaced, as determined pursuant to these Bylaws, to be divided among all Owners of Vacation

7

LIBER 4 0 3   PAGE 0 1 5

Ownership Interests in such Unit in accordance with their percentage interest in remainder.  Any surplus in such proceeds shall be divided among the Owners in accordance with each Owner's Percentage of Value as set forth in Article V of the Master Deed.  Deficits shall be treated as part of the Vacation Ownership Dues for such Owners.

(D) Other Insurance.  Other insurance, including business interruption insurance or liability insurance for officers and directors, shall be obtained as the Board determines from time to time.  All persons who control or disburse funds of the Association shall be fidelity bonded in an amount as may be determined by the Board, but in any event, in the principal sum of not less than an amount as is permitted by law.

Section 3.  Premiums.  Premiums on insurance policies purchased by the Association shall be paid by the members of the Association as a Condominium Common Expense, Vacation Ownership Dues or Fractional Interest Dues, as appropriate.  The premiums on the bonds required by Section 2 (D) above shall be paid by the Association.

Section 4.  Insurance Trustee; Share of Proceeds.  All insurance policies shall provide that all proceeds covering property losses shall be paid to the insurance trustee, which shall be designated by the Board with the approval of Developer and which may be any bank or trust company in Michigan with trust powers or the Association itself as agent.  The insurance trustee shall not be liable for payment of premiums nor for the renewal or the sufficiency of policies, nor for the failure to collect any insurance proceeds.  The duty of the insurance trustee shall be to receive such proceeds as are paid and to hold the same in trust for the purposes stated in these Bylaws and for the benefit of the Owners and their Mortgagees in the following shares, but which shares need not be set forth on the records of the insurance trustee:

(A) Common Elements.  Proceeds on account of damage to Common Elements, an undivided share for each Owner, such share being the same as the undivided share in the Common Elements appurtenant to his Unit or Vacation Ownership or Fractional Interest.

(B) Units.  Proceeds on account of damage to Units shall be held in the following undivided shares:

(1) When the Building is to be Restored.  For the Owners of damaged Units in proportion to the cost of repairing the damage suffered by each Owner, which cost shall be determined by the Board.

(2) When the Building is not to be Restored.  An undivided share for each Owner, such share being the same as the undivided share in the Common Elements appurtenant to his Unit.

(C) Mortgagees.  If a Mortgagee endorsement has been issued as to a Unit, whether or not the Unit is subject to the Vacation Ownership Plan, the share of the Owner shall be held in trust for the Mortgagee and the Owner as their interests may appear; provided, however, that no Mortgagee shall have any right to determine or participate in the determination as to whether or not any damaged property shall be reconstructed or repaired, and no Mortgagee shall have any right to apply or have applied to the reduction of a mortgage debt any insurance proceeds except distributions thereof made to the Owner and Mortgagee pursuant to the provisions of these Bylaws.

Section 5.  Distribution of Proceeds.  Proceeds of insurance policies received by the insurance trustee shall be distributed to or for the benefit of the Owners in the following manner:

(A) Expense of the Trust.  All expenses of the insurance trustee shall be first paid or provision made therefor.

(B) Reconstruction or Repair.  If the damage for which the proceeds are paid is to be repaired or reconstructed, the remaining proceeds shall be paid to defray the cost thereof as elsewhere provided.  Any proceeds remaining after defraying such costs shall be paid to the Owner and to each Mortgagee having an interest in the Unit in accordance with their respective interests, the remittance being made payable to the Mortgagee to the extent of the amount outstanding (principal, interest, and other costs and expenses secured thereby) under its mortgage (as certified in writing by each Mortgagee to the Association).  This is a covenant for the benefit of any Mortgagee and may be enforced by such Mortgagee.

(C) Failure to Reconstruct or Repair.  If it is determined in the manner provided in these Bylaws that the damage for which the proceeds are paid shall not be reconstructed or repaired, the remaining proceeds shall be distributed to the Owners, remittances to Owners and their Mortgagees being payable jointly to them.  This is a covenant for the benefit of any Mortgagee of a Unit and may be enforced by such Mortgagee.  In this regard, the Owners of any Units in the Condominium which are not reconstructed or repaired after casualty (or an eminent domain action), and for which insurance

8

LIBER 4 0 3 PAGE 0 1 6

proceeds are distributed as provided in these Bylaws, shall be removed from the Club so that Owners will not be competing for available accommodations within the Club on a greater than one-to-one purchaser to accommodation ratio.

(D) Certificate. In making distribution to Owners and their Mortgagees, the insurance trustee may rely on a certificate of the Association made by its president and secretary as to the names of the Owners and their respective shares of the distribution.

Section 6. Association as Agent. The Association is irrevocably appointed agent for each Owner, Mortgagee, or other lienholder or owner of any other interest in the Condominium Property to adjust all claims arising under insurance policies purchased by the Association and to execute and deliver releases on the payment of claims.

Section 7. Responsibilities of Co-owners with Respect to Insurance. Regardless of any insurance coverage which may or may not be maintained by the Association with respect to individual Units, each Co-owner of a Unit not committed to the Vacation Ownership Plan or a Fractional Plan shall, at all times, be solely responsible for obtaining insurance coverage for the Co-owner's personal liability for occurrences within the Co-owner's Unit and for all of the Co-owner's personal property located within the Unit as well as for any other personal insurance coverage that the Co-owner wishes to carry. Nothing contained in this Section, however, shall require any Co-owner to carry hazard insurance or liability insurance with respect to any General Common Elements, which shall remain the sole responsibility of the Association.

Section 8. Waiver of Rights of Subrogation. The Association and all Co-owners shall use their best efforts to cause all property and liability insurance carried by the Association or any Co-owner to contain appropriate provisions whereby the insurer waives its right of subrogation as to any claims against any Co-owner or the Association.

Section 9. Indemnification. Each individual Co-owner shall indemnify and hold harmless every other Co-owner, the Developer and the Association for all damages and costs, including attorneys' fees, which such other Co-owners, the Developer or the Association may suffer as a result of defending any claim arising out of an occurrence on or within such individual Co-owner's Unit and shall carry insurance to secure this indemnity if so required by the Association (or the Developer during the Development and Sales Period). This Section shall not be construed to give any insurer any subrogation right or other right or claim against any individual Co-owner, however.

## ARTICLE V
## RECONSTRUCTION OR REPAIR

Section 1. Determination to Reconstruct or Repair. If any part of the Condominium Property is damaged by casualty, whether it shall be reconstructed or replaced shall be determined in the following manner:

(A) Common Element. If the damaged improvement is a Common Element, the damaged property shall be reconstructed or repaired, unless it is determined in the manner provided in these Bylaws that the Condominium shall be terminated.

(B) Units. Reconstruction or repair shall be mandatory for any casualty loss or damage to a building containing Units occurring within twenty (20) years from the date of recording of the Master Deed. Thereafter, reconstruction or repair shall be mandatory, unless the damaged improvement is a building or buildings containing Units, and if Units to which more than seventy-five percent (75%) of the Common Elements are appurtenant are found by the Board not to be tenantable, then the damaged property will be reconstructed or repaired unless within 120 days after the casualty, the Owners holding seventy-five percent (75%) or more of the total interest in the Common Elements agree in writing against the reconstruction or repair, in which event the Condominium will be terminated.

(C) Certificate. The insurance trustee may rely on a certificate of the Association made by its president and secretary to determine whether or not the damaged property is to be reconstructed or repaired.

Section 2. Plans and Specifications. Any reconstruction or repair must be substantially in accordance with the plans and specifications for the original building(s); or if not, then according to plans and specifications approved by the Board, and if the damaged property is a building or buildings containing Units having appurtenant to them an interest of not less than 75% of the Common Elements, then on a 75% affirmative vote of the members of the Association.

Section 3. Responsibility. If the damage is only to those parts of one Unit (other than Vacation Ownership Units) for which the responsibility of maintenance and repair is that of the Owner, then the Owner shall be responsible for

LIBER 4 0 3  PAGE 0 1 7

reconstruction and repair after casualty. In all other instances, the responsibility of reconstruction and repair after casualty shall be that of the Association.

Section 4. <u>Estimates of Costs</u>. Immediately after a determination is made to rebuild or repair damage to property for which the Association has the responsibility of reconstruction and repair, the Association shall obtain reliable and detailed estimates of the cost to rebuild or repair.

Section 5. <u>Assessments</u>. The amount by which an award of insurance proceeds to the insurance trustee is reduced on account of a deductible clause in an insurance policy shall be assessed against all Owners in proportion to their shares in the Common Elements. If the proceeds of such assessments and of the insurance are not sufficient to defray the estimated costs of reconstruction and repair by the Association, or if, at any time during reconstruction and repair, or on completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, special assessments shall be made against the Owners. Such special assessments on account of damage shall be a Condominium Common Expense.

Section 6. <u>Construction Funds</u>. The funds for payment of costs of reconstruction and repair after casualty, which shall consist of proceeds of insurance held by the insurance trustee and funds collected by the Association from assessments against Owners, shall be disbursed in payment of such costs in the following manner:

(A) <u>Association</u>. If the total assessment made by the Association in order to provide funds for payment of costs of reconstruction and repair which is the responsibility of the Association is more than $20,000.00, or if the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is more than $20,000.00 and the Association makes assessments for any such costs which are not paid from insurance proceeds, then the sums paid on such assessments shall be deposited by the Association with the insurance trustee. In all other cases, the Association shall hold the sums paid on such assessments and the Management Company on behalf of the Association shall disburse the same in payment of the costs of reconstruction and repair.

(B) <u>Insurance Trustee</u>. The proceeds of insurance collected on account of a casualty, and the sums deposited with the insurance trustee by the Association from collections of assessments against Owners on account of a casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner and order:

(1) <u>Association--Lesser Damage</u>. If the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is less than $20,000.00, then the construction fund shall be disbursed in payment of the costs on the order of the Board; provided, however, that on request to the insurance trustee by a Mortgagee which is a beneficiary of an insurance policy, the proceeds of which are included in the construction fund, such funds shall be disbursed in the manner provided below for the reconstruction and repair of major damage.

(2) <u>Association--Major Damage</u>. If the amount of the estimated costs of reconstruction and repair which is the responsibility of the Association is more than $20,000.00, then the construction fund shall be disbursed in payment of such costs in the manner required by the Board and on approval of an architect licensed to practice in Michigan and employed by the Association to supervise the work.

(3) <u>Surplus</u>. It shall be presumed that the first monies disbursed in payment of costs and reconstruction and repair shall be from insurance proceeds. If there is a balance in a construction fund after payment of all costs established which are the responsibility of the Association, the balance shall be distributed to the beneficial owner of the fund in the manner stated in these Bylaws; except, however, that if there are excess insurance proceeds and if there is a mortgage on a Unit or Vacation Ownership Interest, as applicable, the distribution shall be paid to the Mortgagee to the extent of the amount of the outstanding principal, interest, and other costs and expenses secured under its mortgage as certified by the mortgagee to the Association.

(4) <u>Certificate</u>. The insurance trustee shall not be required to determine whether sums paid by Owners on assessments shall be deposited by the Association with the insurance trustee, nor to determine whether the disbursements from the construction fund are on the order of the Association or on approval of an architect or otherwise, nor to determine whether surplus funds to be distributed are less than the assessments paid by Owners.

10

Instead, the insurance trustee may rely on a certificate of the Association, made by its president and secretary, as to all such matters.

Section 7. Interruption of Use. During any reconstruction, replacement, or repair period, Owners may temporarily attempt to make reservations for available Weeks under the Vacation Ownership Plan on a greater than one-to-one purchaser to accommodation ratio. In no event shall the interruption of use be deemed to relieve affected Owners from any obligation to pay assessments due under these Bylaws or from any obligation to make payments due to a Mortgagee.

If the Association has acquired business interruption insurance, such insurance proceeds shall be used to secure replacement accommodations or related facilities for Owner use during any reconstruction, replacement, or acquisition period. If the Association has not acquired business interruption insurance, the Board, in its sole discretion, shall have the right to secure, at the Association's expense, alternate accommodations or related facilities for Owner use during any reconstruction, replacement, or acquisition period. Should the Board determine to use Association funds to acquire alternate accommodations or related facilities, special assessments may be made against all Owners in sufficient amounts to provide funds for the payment of such costs. Such special assessments shall be in proportion to the Owners' respective obligations for Common Expenses.

Section 8. Limitation On Liability of Association. Notwithstanding the duty of the Association to maintain and repair portions of the Condominium Property, the Association shall not be liable to Owners for injury or damage, other than for the cost of maintenance and repair, caused by any latent condition of the property to be maintained and repaired by the Association, or caused by the elements or other Owners or persons.

## ARTICLE VI
## RESTRICTIONS

All of Units in the Condominium shall be held, used and enjoyed subject to the following limitations and restrictions:

Section 1. Use. Residential Units in the Condominium may be used for residential, vacation accommodation, transient resort accommodation or rental purposes and also for occupancy by Co-owners, their families, and their guests and invitees who do not pay consideration for such occupancy. Commercial Units may be used for any use allowed by law, and any income derived from their use shall belong to the Co-owner of the Unit. The Common Elements shall be used only for purposes consistent with these uses. Neither the Units nor the Common Elements shall be used in violation of applicable zoning and other ordinances of the County or Township or in violation of other pertinent laws and/or public regulations.

No person may enter, stay, or dwell on or about a Vacation Ownership Unit with the intent or desire to be or become a legal domiciliary of the State of Michigan or any political subdivision thereof, and all persons waive, release, and remise any such intent or desire. No person may enter, stay, or dwell on or about a Vacation Ownership Unit with the intent that the Unit be or become that person's principal dwelling, and all persons shall maintain a principal dwelling at all times at a location other than within a Vacation Ownership Unit.

Section 2. Leasing and Rental.

(A) Right to Lease. A Co-owner may lease his Unit for the same purposes set forth in Section 1 of this Article VI and as otherwise provided for in these Bylaws. No Co-owner shall lease or rent any Unit for an occupancy period of less than one day. The terms of all leases, occupancy agreements and occupancy arrangements shall incorporate, or be deemed to incorporate, all of the provisions of the Condominium Documents. The Developer may lease any number of Units in the Condominium in its discretion and without restriction.

(B) Leasing Procedure. The leasing of Units in the Condominium shall conform to the following provisions:

(1) Tenants and non-owner occupants shall comply with all of the conditions of the Condominium Documents and all leases and rental agreements shall so state.

(2) If the Association determines that the tenant or non-owner occupants have    failed to comply with the conditions of the Condominium Documents, the Association shall take the following action:

11

LIBER **4 0 3**   PAGE **0 1 9**

(i)  The Association shall notify the Co-owner by certified mail advising of the alleged violation by the tenant.

(ii)  The Co-owner shall have 15 days after receipt of such notice to investigate and correct the alleged breach by the tenant or advise the Association that a violation has not occurred.

(iii)  If after 15 days the Association believes that the alleged breach is not cured or may be repeated, it may institute on its behalf or derivatively by the Co-owners on behalf of the Association if it is under the control of the Developer, an action for eviction against the tenant or non-owner occupant and simultaneously for money damages in the same action against the Co-owner and tenant or non-owner occupant for breach of the conditions of the Condominium Documents.  The relief provided for in this subparagraph may be by summary proceeding.  The Association may hold both the tenant and the Co-owner liable for any damages to the Common Elements caused by the Co-owner or tenant in connection with the Unit or the Condominium.

(3)  When a Co-owner is in arrears to the Association for assessments, the Association may give written notice of the arrearage to a tenant occupying a Co-owner's Unit under a lease or rental agreement, and the tenant, after receiving the notice, shall deduct the arrearage from rental payments due and pay them to the Association. The deductions shall not constitute a breach of the rental agreement or lease by the Tenant.

Section 3.  Architectural Control.  No building, structure or other improvement shall be constructed within a Condominium Unit or elsewhere within the Condominium, nor shall any material exterior modification be made to any existing buildings, structure or improvement, unless plans and specifications therefor, containing such detail as the Developer may reasonably request, have first been approved in writing by the Developer.  Construction of any building or other improvements must also receive any necessary approvals from the local public authority. Developer shall have the right to refuse to approve any such plans, specifications, location of buildings, grading, or landscaping plans, which are not suitable or desirable in its opinion for aesthetic or other reasons; and in passing upon such plans and specifications it shall have the right to take into consideration the suitability of the proposed structure, improvement or modification, the site upon which it is proposed to be constructed and the degree of harmony thereof with the Condominium as a whole.

Section 4.  Alterations and Modification.  No Co-owner shall make any alterations in the exterior appearance of his or her dwelling or make changes in any of the Common Elements, limited or general, without the express written approval of the Association (and the Developer during the Development and Sales Period). No Co-owner shall in any way restrict access to or tamper with any pump, plumbing, waterline, waterline valves, water meter, sprinkler system valves or any other element that must be accessible to service other Units, the Common Elements or which affects an Association responsibility in any way. Should access to any facilities of any sort be required, the Association may remove any coverings or attachment of any nature that restrict such access and it will have no responsibility for repairing, replacing or reinstalling any materials that are damaged in the course of gaining such access.

Section 5.  Decoration of Units; Additions, Alterations, and Renovations.  No Owner, guest, invitee, or lessee shall alter the furnishings, appliances, personal property, or decor of any Vacation Ownership Unit.  The Developer shall only be responsible for declaring the Vacation Ownership Unit to the Vacation Ownership Plan with the furnishings, appliances, personal property, or decor as represented to the purchasers of Vacation Ownership Interests in that Vacation Ownership Unit.  On recording of the first deed of a Vacation Ownership Interest in a Vacation Ownership Unit, the Board shall have the obligation and the authority to determine the interior color scheme, décor, and furnishings of such Vacation Ownership Unit as well as the proper time for redecorating and renovating such Vacation Ownership Unit and its contents, and the Developer shall have no further obligations in this regard.  This authority shall include the right to alter, remove or replace any furnishings, appliances, personal property or decor in a Vacation Ownership Unit without the approval of any Owner; provided, however, that no such change shall be made without the approval of the Developer so long as it owns a Vacation Ownership Interest in such Vacation Ownership Unit.  Except for Commercial Unit Owners as to the Commercial Unit owned and Owners of Units which are not committed to the Vacation Ownership Plan as to those Units, no Owner, guest, invitee, or lessee shall paint or otherwise decorate or change the appearance of any portion of the Condominium Property nor shall any Owner, guest, invitee, or lessee make any additions, alterations, or renovations to the Condominium Property.

Section 6.  Activities.  No immoral, improper, unlawful or offensive activity shall be carried on in any Unit or upon the Common Elements nor shall anything be done which may be or become an annoyance or a nuisance to the Co-owners of the Condominium. No unreasonably noisy activity shall occur in or on the Common Elements or in any Unit at any time,

12

LIBER **403** PAGE **020**

and disputes among Co-owners, arising as a result of this provision which cannot be amicably resolved, shall be arbitrated by the Association. No Co-owner shall do or permit anything to be done or keep or permit to be kept in his Unit or on the Common Elements anything that will increase the rate of insurance on the Condominium without the written approval of the Association, and each Co-owner shall pay to the Association the increased cost of insurance premiums resulting from any such activity or the maintenance of any such condition even if approved. Activities which are deemed offensive and are expressly prohibited include, but are not limited to, the following: Any activity involving the use of firearms, air rifles, pellet guns, B-B guns, bows and arrows, or other similar dangerous weapons, projectiles or devices.

Section 7. Pets. Except for persons with disabilities who are dependent on special animals, no pets of any type are allowed on Condominium Property; Condominium Property includes each type of Unit. Any Co-owner who causes any animal to be brought or kept upon the premises of the Condominium shall indemnify and hold harmless the Association from any loss, damage or liability which the Association may sustain as the result of the presence of such animal on the premises. The Association may, without liability to the owner thereof, remove or cause to be removed any animal from the Condominium. In the event of any violation of this Section, the Board of Directors of the Association may assess fines for such violation in accordance with these Bylaws and in accordance with duly adopted rules and regulations of the Association.

Section 8. Aesthetics. The Units and the Common Elements shall not be used for storage of supplies, materials, personal property or trash or refuse of any kind, except as provided in duly adopted rules and regulations of the Association. Garage doors shall be kept closed at all times except as may be reasonably necessary to gain access to or from any garage. No unsightly condition shall be maintained on any patio, porch or deck, and only furniture and equipment consistent with the normal and reasonable use of such areas shall be permitted to remain there during seasons when such areas are reasonably in use, and no furniture or equipment of any kind shall be stored thereon during seasons when such areas are not reasonably in use. Trash receptacles shall be maintained in areas designated therefor at all times and shall not be permitted to remain elsewhere on a Unit or the Common Elements except for such short periods of time as may be reasonably necessary to permit periodic collection of trash. The open areas within Units and Common Elements shall not be used in any way for the drying, shaking or airing of clothing or other fabrics. In general, no activity shall be carried on nor condition maintained by a Co-owner, either in his Unit or upon the Common Elements, which is detrimental to the appearance of the Condominium.

Section 9. Damage. No Owner or guest, invitee, or lessee of such Owner shall deface, mar, or otherwise damage any part of the Condominium Property. In the event of such damage, the Owner shall be liable for the cost of repair. If a Unit or facility is rendered unusable due to the intentional or negligent act or omission of an Owner, guest, invitee, or lessee of such Owner, the Owner also shall be responsible for the cost of securing alternative accommodations or facilities of comparable quality and location until the damaged accommodations or facilities are repaired.

Section 10. Right of Occupancy - Holdover Owners. If any Owner or the guest, invitee, or lessee of such Owner fails to vacate a Vacation Ownership Unit or Fractional Unit at the expiration of the Week, such Owner shall be deemed a "holdover owner." The Association shall take steps as may be necessary to remove a holdover owner from the Unit. The Association also shall assist the person who has reserved the use of a subsequent Week and may be affected by the holdover owner's failure to vacate, in finding alternate accommodations during such holdover period.

(A) In addition to such other remedies as may be available to it, the Association shall have the right, but not the obligation, to secure, at its expense, alternate accommodations for any holder of a subsequent reserved use period who may not occupy the Unit due to the failure to vacate of any holdover owner. Such accommodations shall be as near in value as possible to the Unit owned. The holdover owner shall be charged for the cost of such alternate accommodations, any other costs incurred due to his failure to vacate, and a fine during this period of holding over. In the event it is necessary that the Association contract for a period greater than the actual period of holding over in order to secure alternate accommodations as set forth above, the entire period shall be the responsibility of the holdover owner, although the fine shall cease on actual vacating by the holdover owner, or the guest, invitee, or lessee of such Owner.

(B) The Association shall submit a bill to the holdover owner.

(C) The foregoing provisions shall not abridge the Association's right to take such other action against a holdover owner as is permitted by law including eviction proceedings. Further, the foregoing provisions shall not limit the Association's right to take any action permitted by Michigan law against trespassers who are not Owners.

13

LIBER 4 0 3 PAGE 0 2 1

Section 11. <u>Vehicles</u>. No house trailers, commercial vehicles, boat trailers, boats, camping vehicles, camping trailers, motorcycles, all terrain vehicles, snowmobiles, snowmobile trailers or vehicles, other than automobiles and passenger trucks, may be parked or stored upon the premises of the Condominium or any parking area benefiting the Condominium. No inoperable vehicles of any type may be brought or stored upon the Condominium Premises either temporarily or permanently. Commercial vehicles and trucks shall not be parked in or about the Condominium unless while making deliveries or pickups in the normal course of business. Co-owners shall, if the Association shall require, register with the Association all cars to be parked on the Condominium or such parking areas. Use of motorized vehicles anywhere on the Condominium or parking areas and private roadways benefiting the Condominium, other than conventional passenger automobile or passenger trucks, authorized maintenance vehicles and commercial vehicles as provided in this Section, is absolutely prohibited. The Association may, without liability to the owner thereof, cause vehicles in violation of this Section to be towed from the Condominium, or such parking areas or roadways, and stored elsewhere, all at the expense of the offending Co-owner.

Section 12. <u>Advertising and Signs</u>. No signs or other advertising devices of any kind shall be displayed which are visible from the exterior of a Unit or on the Common Elements, including "For Sale" signs, without written permission from the Association and the Developer.

Section 13. <u>Rules and Regulations</u>. It is intended that the Association may make rules and regulations from time to time to reflect the needs and desires of the majority of the Co-owners in the Condominium. Reasonable regulations consistent with the Act, the Master Deed and these Bylaws concerning the use of the Common Elements may be made and amended from time to time by the Association, including the first Board of Directors (or its successors) prior to the Transitional Control Date. Copies of all such rules, regulations and amendments thereto shall be furnished to all Co-owners. All such rules and regulations shall be subject to the written consent of Developer and shall not conflict with any other rules and regulations of the Boyne Mountain Resort.

Section 14. <u>Right of Access of Association</u>. The Association or its duly authorized agents shall have access to each Unit and any Limited Common Elements appurtenant thereto from time to time, during reasonable working hours, upon notice to the Co-owner thereof, as may be necessary for the maintenance, repair or replacement of any of the Common Elements. The Association or its agents shall also have access to the dwelling on each Unit and any Limited Common Elements appurtenant thereto at all times without notice as may be necessary to make emergency repairs to prevent damage to the Common Elements or to another Unit. It shall be the responsibility of each Co-owner to provide the Association means of access to the dwelling on his Unit and any Limited Common Elements appurtenant thereto during all periods of absence, and in the event of the failure of such Co-owner to provide means of access, the Association may gain access in such manner as may be reasonable under the circumstances and shall not be liable to such Co-owner for any necessary damage to his Unit and any Limited Common Elements appurtenant thereto caused thereby or for repair or replacement of any doors or windows damaged in gaining such access.

Section 15. <u>Landscaping</u>. The Association shall not perform any landscaping or plant any trees, shrubs or flowers or place any ornamental materials upon the Common Elements (including any Limited Common Element area appurtenant to a Unit), without the prior written approval of Developer. No Co-owner shall perform any such activities without the prior written consent of Developer and the Association.

Section 16. <u>Common Element Maintenance</u>. Corridors, sidewalks, yards, landscaped areas, and roads, shall not be obstructed nor shall they be used for purposes other than that for which they are reasonably and obviously intended. No bicycles, vehicles, chairs or or other obstructions may be left unattended on or about the Common Elements.

Section 17. <u>Co-owner Maintenance</u>. Each Co-owner shall maintain his Unit in a safe, clean, sanitary and aesthetically satisfactory condition and in accordance with any duly adopted regulations of the Association. Each Co-owner shall also use due care to avoid damaging any of the Common Elements including, but not limited to, the telephone, water, gas, plumbing, electrical or other utility conduits and systems and any other Common Elements which may affect any other Unit. Each Co-owner shall be responsible for damages or costs to the Association resulting from negligent damage to or misuse of any of the Common Elements by him, or his family, guests, agents or invitees, unless such damages or costs are covered by insurance carried by the Association (in which case there shall be no such responsibility unless reimbursement to the Association is limited by virtue of a deductible provision, in which case the responsible Co-owner shall bear the expense to the extent of the deductible amount). Any costs or damages to the Association may be assessed to and collected from the responsible Co-owner in the manner provided in Article II hereof.

Section 18. Developer's Right of First Refusal: Resale Brokerage Restriction: Leasing Restriction.

(A) Right of First Refusal. No Co-owner may dispose of a Unit or any interest therein by sale without complying with this Section 18(A):

(1) Notice to Developer. A Co-owner intending to make a sale of a Unit, or any interest therein, shall deliver written notice of such intention to the Developer and shall furnish the name and address of the intended purchaser and such other information as the Developer shall reasonably require. At the time of giving such notice, such Co-owner shall also furnish the Developer with copies of all instruments setting forth the terms and conditions of the proposed transaction. The giving of such notice shall constitute a warranty and a representation by such Co-owner to the Developer that the Co-owner believes the proposed sale to be bona fide in all respects. The selling Co-owner shall be responsible to the Developer for any damages suffered by it in exercise of its rights hereunder and, in the event any proposed sale is not bona fide, such damages shall include (but not be limited to) the difference between the price paid by the Developer for the Unit or interest and the fair market value thereof.

(2) Action by Developer. Within thirty (30) days after receipt of such notice of intention to sell, the Developer shall either waive its right to purchase the Unit or interest by written notice delivered to the selling Co-owner or execute and deliver to such Co-owner a contract of sale upon terms as favorable to the selling Co-owner as the terms furnished with the notice. The Developer shall have not less than thirty (30) days subsequent to the date of execution of such contract in which to close the transaction. The selling Co-owner shall be bound to consummate the transaction with the Developer pursuant to such contract. If the Developer fails to execute and deliver such written waiver or contract for sale to such selling Co-owner within such 30-day period for any reason whatsoever, such Co-owner may then sell the Unit or interest to the offeror provided that the sale is on the terms and conditions and for the price set forth in the notice of intention to sell delivered to the Developer.

(3) Improper Disclosure. In the event a sale is consummated between a Co-owner and any proposed purchaser upon any basis other than as disclosed to the Developer, the Developer shall then have the same right of first refusal as expressed above, which right shall expire thirty (30) days after the Developer receives knowledge of the actual terms of the transaction or one year after consummation of the original transaction, whichever occurs first.

(4) Sale by Mortgagee. This Section shall not apply to a public or private sale held pursuant to foreclosure of a first mortgage on any Unit in the Condominium, nor shall this Section apply to any subsequent sale by any holder of a first mortgage on any Unit in the Condominium who or which obtained title to the Unit covered by such mortgage pursuant to the remedies provided in the mortgage, foreclosure of the mortgage, or deed (or assignment) in lieu of foreclosure.

(5) Waiver of Right. Waiver of the right to purchase by the Developer with respect to a proposed sale of a Unit or interest shall not constitute waiver of the Developer's right of first refusal with respect to any future proposed sales by a Co-owner thereof.

(B) Resale Brokerage Restriction. No Co-owner may dispose of a Unit or any interest therein by sale without complying with this Section 18(B):

(1) Notice to Developer. A Co-owner intending to make a sale of a Unit, or any interest therein, shall deliver written notice of such intention to the Developer. Such Co-owner must list such Unit or interest for sale with a broker designated by the Developer, as exclusive agent, pursuant to such broker's then current standard exclusive listing agreement for the Condominium, for a period of ninety (90) days, unless the Developer waives its rights under this Section in writing, which written waiver shall state the period of such waiver.

(2) Relisting Upon Reduction of Sales Price. If, at any time (whether during the term of the Developer's original listing agreement or otherwise), the selling Co-owner reduces the selling price of the Unit or interest, the Co-owner shall again list the Unit or interest for sale with the broker designated by Developer, as exclusive agent, pursuant to such broker's then current standard exclusive listing agreement for the Condominium, for another 90 day period, at such reduced price.

15

LIBER 4 0 3  PAGE 0 2 3

(3) Waiver of Mortgagee Sale. This Section shall not apply to a public or private sale held pursuant to a foreclosure of a first mortgage on any Unit in the Condominium, nor shall this Section apply to any subsequent sale by any holder of a first mortgage on any Unit in the Condominium who or which obtained title to the Unit covered by such mortgage pursuant to the remedies provided in the mortgage, foreclosure of the mortgagee, or deed (or assignment) in lieu of foreclosure.

(4) Termination of Waiver. Waiver of the resale brokerage restriction contained in this Section by the Developer with respect to a Co-owner's proposed sale shall not extend beyond the period stated in the writing evidencing such waiver.

(C) Leasing Restriction. A Co-owner may not lease his Unit unless the Unit is leased only through Developer or a leasing agent designated by Developer, pursuant to Developer's or such leasing agent's then current leasing agency/management agreement for the Condominium, and upon such terms and conditions as Developer or such leasing agent may require, in their sole discretion. Developer may lease any number of Units in the Condominium, for any period of time, without the use of a leasing agent, upon such terms and conditions as Developer may determine, in Developer's sole discretion.

(D) Notices. All writings required or permitted to be given or delivered under this Article VI shall be deemed given or delivered, if the writing is directed to the Developer, by delivering it personally to an officer of the Developer, or if such writing is directed to the selling Co-owner, by delivering it personally to such Co-owner, or if mailed, in a sealed wrapper by United States registered or certified mail, return receipt requested, postage prepaid, properly addressed, if to the Developer, c/o P.O. Box 19, Boyne Falls, Michigan, 49713, and, if to such Co-owner, at the Co-owner's address shown on the records of the Association. Each such mailed writing shall be deemed to have been given or delivered when deposited in the US mail as above provided. Each such personally delivered writing shall be deemed given or delivered upon delivery thereof in the manner above provided. The Developer may change its address for the purposes of delivery of such writing by delivering written notice of such change to the Co-owner in the manner above provided at least 10 days prior to the effective date of such change.

Section 19. Reserved Rights of Developer.

(A) Developer's Rights in Furtherance of Development and Sales. None of the restrictions contained in this Article VI shall apply to the commercial activities of signs or billboards, if any, of the Developer during the Construction and Sales Period or of the Association in furtherance of its powers and purposes set forth herein and in its Articles of Incorporation, as the same may be amended from time to time. Notwithstanding anything tot he contrary elsewhere herein contained, Developer shall have the right to maintain a sales office, a business office, a construction office, model units, storage areas and reasonable parking incident to the foregoing and such access to, from and over the entire Project by Developer and may continue to do so during the entire Construction and Sales Period.

(B) Enforcement of Bylaws. The Condominium Project shall at all times be maintained in a manner consistent with the highest standards of a first class resort development for the benefit of the Co-owners and all persons interested in the Condominium. If at any time the Association fails or refuses to carry out its obligations to maintain, repair, replace and landscape in a manner consistent with the maintenance of such high standards, then Developer or any entity to which developer may assign this right, at its option, may elect to maintain, repair and/or replace any Common Elements required by these Bylaws and to charge the cost thereof to the Association as an expense of administration. The Developer shall have the right to enforce these Bylaws notwithstanding that it may no longer own a Unit in the Condominium, which right of enforcement shall include (without limitation) an action to restrain the Association or any Co-owner from any activity prohibited by these Bylaws.

### ARTICLE VII
### MORTGAGES

Section l.      Notice to Association. Any Co-owner who mortgages his Unit shall notify the Association of the name and address of the mortgagee, and the Association shall maintain such information in a book entitled "Mortgages of Units". The Association may, at the written request of a mortgagee of any such Unit, report any unpaid assessments due from the Co-owner of such Unit. The Association shall give the holder of any first mortgage covering any Unit in the Project written notification of any default in the performance of the obligations of the Co-owner of such Unit that is not cured within 60 days.

16

LIBER **4 0 3** PAGE **0 2 4**

Section 2.    Insurance.  The Association shall notify each mortgagee appearing in said book of the name of each company insuring the General Common Elements against fire, perils covered by extended coverage, vandalism and malicious mischief and the amounts of such coverage.

Section 3.    Notification of Meetings.  Upon request submitted to the Association, any institutional holder of a first mortgage lien on any Unit in the Condominium shall be entitled to receive written notification of every meeting of the members of the Association and to designate a representative to attend such meeting.

## ARTICLE VIII
## VOTING

Section 1.    Vote.  Except as limited in these Bylaws, each Co-owner of a residential Unit not committed to the Vacation Club Plan shall be entitled to twelve votes for each Unit owned, each Owner of a ¼ Fractional Interest shall be entitled to three votes and each Owner of a Vacation Ownership Interest shall be entitled to one vote.  Any Owner of a Commercial Unit shall be entitled to twelve votes for each Commercial Unit owned.  Whenever these Bylaws set forth a percentage of votes necessary to pass a proposal, that percentage shall be deemed to mean the percentage of all votes cast by the various Co-owners eligible to vote.

Section 2.    Eligibility to Vote.  No Co-owner, other than the Developer, shall be entitled to vote at any meeting of the Association until he has presented evidence of ownership of a Unit in the Condominium to the Association.  Except as provided in Article XI, Section 2 of these Bylaws, no Co-owner, other than the Developer, shall be entitled to vote prior to the date of the First Annual Meeting of members held in accordance with Section 2 of Article IX.  The vote of each Co-owner may be cast only by the individual representative designated by such Co-owner in the notice required in Section 3 of this Article VIII below or by a proxy given by such individual representative.  The Developer shall be the only person entitled to vote at a meeting of the Association until the First Annual Meeting of members.  The Developer shall be entitled to vote for each Unit it owns according to the number of votes set forth in Section 1 of this Article.

Section 3.    Designation of Voting Representative.  Each Co-owner shall file a written notice with the Association designating the individual representative who shall vote at meetings of the Association and receive all notices and other communication from the Association on behalf of such Co-owner.  Such notice shall state the name and address of the individual representative designated, the number(s) of the Condominium Unit(s) owned by the Co-owner, and the name and address of each person, firm corporation, partnership, association, trust or other entity who is the Co-owner.  Such notice shall be signed and dated by the Co-owner.  The individual representative designated may be changed by the Co-owner at any time by filing a new notice in the manner herein provided.

Section 4.    Quorum.  The presence in person or by proxy of 33% of the total Percentage of Value of the Condominium shall constitute a quorum for holding a meeting of the members of the Association, except for voting on questions specifically required by the Condominium Documents to require a greater quorum.  The written vote of any person furnished at or prior to any duly called meeting at which meeting said person is not otherwise present in person or by proxy shall be counted in determining the presence of a quorum with respect to the question upon which the vote is cast.

Section 5.    Voting.  Votes may be cast only in person or by a writing duly signed by the designated voting representative not present at a given meeting in person or by proxy.  Proxies and any written votes must be filed with the Secretary of the Association at or before the appointed time of the meeting of the Association.  Cumulative voting shall not be permitted.

Section 6.    Majority.  A majority, except where otherwise provided herein, shall consist of more than 50% of the total number of votes that may be cast by the Co-owners present in person or by proxy (or written vote, if applicable) at a given meeting of the members of the Association.  Whenever provided specifically herein, a majority may be required to exceed the simple majority herein set forth of designated voting representatives present in person or by proxy, or by written vote, if applicable, at a given meeting of the members of the Association.

## ARTICLE IX
### MEETINGS

Section 1.    Place of Meeting.   Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the Co-owners as may be designated by the Board of Directors. Meetings of the Association shall be conducted in accordance with Sturgis' Code of Parliamentary Procedure, Roberts Rules of Order or some other generally recognized manual of parliamentary procedure, when not otherwise in conflict with the Condominium Documents or the laws of the State of Michigan.

Section 2.    First Annual Meeting.   The First Annual Meeting of members of the Association may be convened only by Developer and may be called at any time after more than 50% of the Units (based upon Percentage of Value) in the Condominium have been sold and the purchasers thereof qualified as members of the Association.   In no event, however, shall such meeting be called later than 120 days after the conveyance of legal or equitable title to non-Developer Co-owners of two-thirds (based upon Percentage of Value) of all Units or 54 months after the first conveyance of legal or equitable title to a non-Developer Co-owner of a Unit in the Condominium, whichever first occurs.  Developer may call meetings of members for informative or other appropriate purposes prior to the First Annual Meeting of members and no such meeting shall be construed as the First Annual Meeting of members. The date, time and place of such meeting shall be set by the Board of Directors, and at least 10 days written notice thereof shall be given to each Co-owner.

Section 3.    Annual Meeting.   Annual meetings of members of the Association shall be held on a date determined by the Board of Directors from time to time each succeeding year after the year in which the First Annual Meeting is held, at such time and place as shall be determined by the Board of Directors; provided, however, that the second annual meeting shall not be held sooner than eight months after the date of the First Annual Meeting.  At such meetings there shall be elected by ballot of the Co-owners a Board of Directors in accordance with the requirements of Article XI of these Bylaws.  The Co-owners may also transact at annual meetings such other business of the Association as may properly come before them.

Section 4.    Special Meeting.   It shall be the duty of the President to call a special meeting of the Co-owners as directed by resolution of the Board of Directors or upon a petition signed by 1/4 of the Co-owners presented to the Secretary of the Association.  Notice of any special meeting shall state the time and place of such meeting and the purposes thereof.  No business shall be transacted at a special meeting except as stated in the notice.

Section 5.    Notice of Meetings.   It shall be the duty of the Secretary (or other Association officer in the Secretary's absence) to serve a notice of each annual or special meeting, stating the purpose thereof as well as the time and place where it is to be held, upon each Co-owner of record, at least 10 days but not more than 60 days prior to such meeting.  The mailing, postage prepaid, of a notice to the representative of each Co-owner at the address shown in the notice required to be filed with the Association by Article VIII, Section 3 of these Bylaws shall be deemed notice served.  Any member may, by written waiver of notice signed by such member, waive such notice and such waiver, when filed in the records of the Association, shall be deemed due notice

Section 6.    Adjournment.   If any meeting of Co-owners cannot be held because a quorum is not in attendance, the Co-owners who are present may adjourn the meeting to a time not less than 48 hours from the time the original meeting was called.

Section 7.    Order of Business.   The order of business at all meetings of the members shall be a follows: (a) roll call to determine the voting power represented at the meeting; (b) proof of notice of meeting or waiver of notice; (c) reading of minutes of preceding meeting; (d) reports of officers; (e) reports of committees; (f) appointment of inspectors of election (at annual meeting or special meeting held for such purpose); (g) election of Directors; (h) unfinished business; and (i) new business.  Meetings of members shall be chaired by the most senior officer of the Association present at such meeting.  For purposes of this Section, the order of seniority of officers shall be President, Vice President, Secretary and Treasurer.

Section 8.    Action Without Meeting.   Any action which may be taken at a meeting of the members (except for the election or removal of Directors) may be taken without a meeting by written ballot of the members.  Ballots shall be solicited in the same manner a provided in Section 5 for the giving of notice of meetings of members.  Such solicitations shall specify (a) the number of responses needed to meet the quorum requirements; (b) the percentage of approvals necessary to approve the action; and (c) the time by which ballots must be received in order to be counted.  The form of written ballot shall afford an opportunity to specify a choice between approval and disapproval of each matter and shall

18

LIBER 4 0 3  PAGE 0 2 6

provide that, where the member specified a choice, the vote shall be constituted by receipt, within the time period specified in the solicitation of (i) a number of ballots which equals or exceeds the quorum which would be required if the action were taken at a meeting; and (ii) a number of approvals which equals or exceed the number of votes which would be required for approval if the action were taken at a meeting at which the total number of votes cast was the same as the total number of ballots cast.

Section 9.  Consent of Absentees.  The transaction of any Association business at any meeting of members, either annual or special, however called and noticed, shall be as valid as though made at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy; and if, either before or after the meeting, each of the members not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Section 10.  Minutes; Presumption of Notice.  Minutes or a similar record of the proceedings of meetings of members, when signed by the President or Secretary, shall be presumed truthfully to evidence the matters set forth therein.  A recitation in the minutes of any such meeting that notice of the meeting was properly given shall be prima facie evidence that such notice was given.

## ARTICLE X
## ADVISORY COMMITTEE

Within one year after conveyance of legal or equitable title to the first Unit in the Condominium to a purchaser or within 120 days after conveyance to purchasers of 1/3 of the total number of Units that may be created, whichever first occurs, the Developer shall cause to be established an Advisory Committee consisting of at least one non-Developer Co-owners.  The Committee shall be established and perpetuated in any manner the Developer deems advisable, except that if more than 50% of the non-Developer Co-owners (based on Percentage of Value) petition the Board of Directors for an election to select the Advisory Committee, then an election for such purpose shall be held.  The purpose of the Advisory Committee shall be to facilitate communications between the temporary Board of Directors and the other Co-owners and to aid in the transition of control of the Association from the Developer to purchaser Co-owners.  The Advisory Committee shall cease to exist automatically when the non-Developer Co-owners have the voting strength to elect a majority of the Board of Directors of the Association.  The Developer may remove and replace at its discretion any member of the Advisory Committee who has not been elected by the Co-owners.

## ARTICLE XI
## BOARD OF DIRECTORS

Section 1.  Number and Qualification of Directors.  The initial Board of Directors shall be comprised of three members all of whom must be members of the Association or officers, partners, trustees, employees or agents of members of the Association, except for the first Board of Directors.  The number of Directors can be changed, at the discretion of the Board to a number not less than three and not more than seven.  Directors shall serve without compensation.

Section 2.  Election of Directors.

(A)  First Board of Directors.  The first Board of Directors, or its successors as selected by the Developer, shall manage the affairs of the Association until the appointment of the first non-Developer Co-owners to the Board.  Elections for non-Developer Co-owners Directors shall be held as provided in subsections (B) and (C) below.

(B)  Appointment of Non-Developer Co-owners to Board Prior to First Annual Meeting.  Not later than 120 days after conveyance of legal or equitable title to non-Developer Co-owners of 25% of the Units that may be created (based on Percentage of Value), at least one of the three Directors shall be selected by non-Developer Co-owners.  When the required percentage of conveyances has been reached, the Developer shall notify the non-Developer Co-owners and request that they hold a meeting and elect the required Directors.  Upon certification by the Co-owners to the Developer of the Directors(s) so elected, the Developer shall then immediately appoint such Director(s) to the Board to serve until the First Annual Meeting of members unless he is removed pursuant to Section 7 of this Article or he resigns or becomes incapacitated.

(C) Election of Directors at and After First Annual Meeting.  LIBER **4 0 3**  PAGE **0 2 7**

(1) Not later than 120 days after conveyance of legal or equitable title to non-Developer Co-owners of 75% of the Units that may be created (based upon Percentage of Value), and before conveyance of 90% of such Units, the non-Developer Co-owners shall elect all Directors on the Board, except that the Developer shall have the right to designate at least one Director as long as the Developer owns and offers for sale at least 10% of the Units in the Condominium or as long as 10% of the Units remain that may be created. Whenever the 75% conveyance level is achieved, a meeting of Co-owners shall be promptly convened to effectuate this provision, even if the First Annual Meeting has already occurred.

(2) Regardless of the percentage of Units which have been conveyed, upon the expiration of 54 months after the first conveyance of legal or equitable title to a non-Developer Co-owner of a Unit in the Condominium, the non-Developer Co-owners have the right to elect a number of members of the Board of Directors equal to the percentage of Units they own (based upon Percentage of Value) and the Developer has the right to elect a number of members of the Board of Directors equal to the percentage of Units which are owned by the Developer (based upon Percentage of Value) and for which maintenance expenses are payable by the Developer. This election may increase, but shall not reduce, the minimum election and designation rights otherwise established in subsection (1). Application of this subsection does not require a change in the size of the Board of Directors.

(3) At the First Annual Meeting two Directors shall be elected for a term of two years and one Director shall be elected for a term of one year. If the Developer is retaining two directorships, one shall have a two year term, and one shall have a one year term. If the Developer is retaining only one directorship, it shall be a two year term. At such meeting all nominees shall stand for election as a group, and each Unit shall have the right to vote for up to the number of directorships up for election. Voting rights are not cumulative, meaning a Co-owner may not place all of his votes for one nominee. The two persons receiving the highest number of votes shall be elected for a term of two years and the person receiving the next highest number of votes shall be elected for a term of one year. At each annual meeting held thereafter, Directors shall be elected depending upon the number of Directors whose terms expire after the First Annual Meeting, the term of office (except for one of the Directors elected at the First Annual Meeting) of each Director shall be two years. The Directors shall hold office until their successors have been elected and hold their first meeting.

(4) If the calculation of the percentage of members of the Board of Directors that the non-developer Co-owners have the right to elect under subsections (B) and (C)(1), or if the product of the number of members of the Board of Directors multiplied by the percentage of Units held by the non-developer Co-owners under subparagraph (C)(2) results in a right of non-developer Co-owners to elect a fractional number of members of the Board of Directors, then a fractional election right of 0.5 or greater shall be rounded up to the nearest whole number, which number shall be the number of members of the Board of Directors that the non-developer Co-owners have the right to elect. After application of this formula the Developer shall have the right to elect the remaining members of the board of directors. Application of this subparagraph shall not eliminate the right of the Developer to designate one director as provided in subparagraph (1).

(5) Once the Co-owners have acquired the right to elect a majority of the Board of Directors, annual meetings of Co-owners to elect Directors and conduct other business shall be held in accordance with the provisions of Article IX Section 3 hereof.

Section 3.   Powers and Duties.  The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Association and may do all acts and things as are not prohibited by the Condominium Documents or required thereby to be exercised and done by the Co-owners.

Section 4.   Other Duties.  In addition to the foregoing duties imposed by these Bylaws or any further duties which may be imposed by resolution of the members of the Association, the Board of Directors shall be responsible specifically for the following:

(A) To manage and administer the affairs of and to maintain the Condominium and the Common Elements.

20

LIBER 4 0 3 PAGE 0 2 8

(B) To levy and collect assessments from the members of the Association and to use the proceeds thereof for the purposes of the Association.

(C) To carry insurance and collect and allocate the proceeds thereof.

(D) To rebuild Common Elements after casualty.

(E) To contract for and employ persons, firms, corporations or other agents to assist in the management, operation, maintenance and administration of the Condominium.

(F) To acquire, maintain and improve; and to buy, operate, manage, sell, convey, assign, mortgage or lease any real or personal property (including any Unit in the Condominium and easements, rights-of-way and licenses) on behalf of the Association in furtherance of any of the purposes of the Association.

(G) To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Association, and to secure the same by mortgage, pledge, or other lien on property owned by the Association; provided, however, that any such action must be approved by affirmative vote of all of the members of the Association.

(H) To make rules and regulations in accordance with Article VI, Section 10 of these Bylaws.

(I) To establish such committees as it deems necessary and to appoint persons thereto for the purpose of implementing the administration of the Condominium and to delegate to such committees any functions or responsibilities which are not by law or the Condominium Documents required to be performed by the Board.

(J) To provide for, or contract for, security for the Condominium of a nature and in an amount determined necessary by the Board.

(K) To enforce the provisions of the Condominium Documents.

Section 5.     Management Agent.     The Association is authorized to contract for management of the Condominium and the Vacation Ownership Plan, and to delegate to such contractor all powers and duties of the Association except such as are specifically required by the Condominium Documents or applicable law to have approval of the Board or members of the Association. Notwithstanding anything in the Master Deed or these Bylaws to the contrary, it is the intent of the Master Deed and these Bylaws that the Board shall not have the power independently to terminate the Management Agreement. The Management Agreement may only be terminated in accordance with its own terms or by vote of the Owners in accordance with the Act.

Section 6.     Vacancies.     Vacancies in the Board of Directors which occur after the Transitional Control Date caused by any reason other than the removal of a Director by vote of the members of the Association shall be filled by vote of the majority of the remaining Directors, even though they may constitute less than a quorum, except that the Developer shall be solely entitled to fill the vacancy of any Director whom it is permitted in the first instance to designate. Each person so elected shall be a Director until a successor is elected at the next annual meeting of the members of the Association. Vacancies among non-Developer Co-owners elected Directors which occur prior to the Transitional Control Date may be filled only through election by non-Developer Co-owners and shall be filled in the manner specified in Section 2(B) of this Article.

Section 7.     Removal.     At any regular or special meeting of the Association duly called with due notice of the removal action proposed to be taken, any one or more of the Directors may be removed with or without cause by the affirmative vote of more than 50% of the votes of the Co-owners present, and a successor may then and there be elected to fill any vacancy thus created. The quorum requirement for the purpose of filling such vacancy shall be the normal 33% requirement set forth in Article VIII, Section 4. Any Director whose removal has been proposed by the Co-owners shall be given an opportunity to be heard at the meeting. The Developer may remove and replace any or all of the Directors selected by it at any time or from time to time in its sole discretion. Likewise, any Director selected by the non-Developer Co-owners to serve before the First Annual Meeting may be removed before the First Annual Meeting in the same manner set forth in this paragraph for removal of Directors generally.

LIBER4 0 3 PAGE 0 2 9

Section 8.    First Meeting.  The first meeting of a newly elected Board of Directors shall be held within ten days of election at such place as shall be fixed by the Directors at the meeting at which such Directors were elected, and no notice shall be necessary to the newly elected Directors in order to legally constitute such meeting, providing a majority of the whole Board shall be present.

Section 9.    Regular Meetings.  Regular meetings of the Board of Directors may be held at such times and places as shall be determined from time to time by a majority of the Directors, but at least two such meetings shall be held during each fiscal year.  Notice of regular meetings of the Board of Directors shall be given to each Director personally, by mail, telephone or telegraph, at least 10 days prior to the date named for such meeting.

Section 10.    Special Meetings.  Special meetings of the Board of Directors may be called by the President on three days notice to each Director given personally, by mail, telephone or telegraph, which notice shall state the time, place and purpose of the meeting.  Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of two Directors.

Section 11.    Waiver of Notice.  Before or at any meeting of the Board of Directors, any Director may, in writing, waive notice of such meeting and such waiver shall be deemed equivalent to the giving of such notice.  Attendance by a Director at any meetings of the Board shall be deemed a waiver of notice by him of the time and place thereof.  If all the Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

Section 12.    Quorum.  At all meetings of the Board of Directors, a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at a meeting at which a quorum present, the majority of those present may adjourn the meeting to a subsequent time upon 24 hours prior written notice delivered to all Directors not present.  At any such adjourned meeting, any business which might have been transacted at the meeting as originally called may be transacted without further notice.  The joinder of a Director in the action of a meeting by signing and concurring with the minutes thereof, shall constitute the presence of such Director for purposes of determining a quorum.

Section 13.    First Board of Directors.  The actions of the first Board of Directors of the Association or any successors thereto selected or elected before the Transitional Control Date shall be binding upon the Association so long as such actions are within the scope of the powers and duties which may be exercised generally by the Board of Directors as provided herein.

Section 14.    Fidelity Bonds.  The Board of Directors shall require that all officers and employees of the Association handling or responsible for Association funds shall furnish adequate fidelity bonds.  The premium on such bonds shall be Condominium Common Expenses.

## ARTICLE XII
## OFFICERS

Section 1.    Officers.  The principal officers of the Association shall be a President, who shall be a member of the Board of Directors, a Vice President, a Secretary, and a Treasurer.  The Directors may appoint an Assistant Treasurer, and an Assistant Secretary, and such other officers as in their judgment may be necessary.  Any two offices except that of President and Vice President may be held by one person.

(A) President.  The President shall be the chief executive officer of the Association.  He shall preside at all meetings of the Association and of the Board of Directors.  He shall have all of the general powers and duties which are usually vested in the office of the president of an association, including, but not limited to, the power to appoint committees from among the members of the Association from time to time as he may, in his discretion, deem appropriate to assist in the conduct of the affairs of the Association.

(B) Vice President.  The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act.  If neither President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board to so do on an interim basis.  The Vice President shall also perform such other duties as shall from time to time be imposed upon him by the Board of Directors.

(C) <u>Secretary</u>. The Secretary shall keep the minutes of all meetings of the Board of Directors and the minutes of all meetings of the members of the Association; he shall have charge of the corporate seal, if any, and of such books and papers as the Board of Directors may direct; and he shall, in general, perform all duties incident to the office of the Secretary.

(D) <u>Treasurer</u>. The Treasurer shall have responsibility for the Association's funds and securities and shall be responsible for keeping full and accurate accounts of all receipts and disbursements in books belonging to the Association. He shall be responsible for the deposit of all monies and other valuable effects in the name and to the credit of the Association, and in such depositories as may, from time to time, be designated by the Board.

Section 2.   <u>Election</u>. The officers of the Association shall be elected annually by the Board of Directors at the organizational meeting of each new Board and shall hold office at the pleasure of the Board.

Section 3.   <u>Removal</u>. Upon affirmative vote of a majority of the members of the Board of Directors, any officer may be removed either with or without cause, and his successor elected at any regular meeting of the Board of Directors, or at any special meeting of the Board called for such purposes. No such removal action may be taken, however, unless the matter shall have been included in the notice of such meeting. The officer who is proposed to be removed shall be given an opportunity to be heard at the meeting.

Section 4.   <u>Duties</u>. The officers shall have such other duties, powers and responsibilities as shall, from time to time, be authorized by the Board of Directors.

### ARTICLE XIII
### FINANCE

Section 1.   <u>Records</u>. The Association shall keep detailed books of account showing all expenditures and receipts of administration and which shall specify the maintenance and repair expenses of the Common Elements and any other expenses incurred by or on behalf of the Association and the Co-owners. Such accounts and all other Association records shall be open for inspection by the Co-owners and their mortgagees during reasonable working hours. The Association shall prepare and distribute to each Co-owner at least once a year a financial statement, the contents of which shall be defined by the Association. The books of account shall be audited at least annually by qualified independent auditors; provided, however, that such auditors need not be certified public accountants nor does such audit need to be a certified audit. Any institutional holder of a first mortgage lien on any Unit in the Condominium shall be entitled to receive a copy of such annual audited financial statement within 90 days following the end of the Association's fiscal year upon request therefor. The costs of any such audit and any accounting expenses shall be Condominium Common Expenses.

Section 2.   <u>Fiscal Year</u>. The Fiscal year of the Association shall be an annual period commencing on such date as may be initially determined by the Directors. The commencement date of the fiscal year shall be subject to change by the Directors for accounting reasons or other good cause.

Section 3.   <u>Bank</u>. Funds of the Association shall be initially deposited in such bank or savings association as may be designated by the Directors and shall be withdrawn only upon the check or order of such officers, employees or agents as are designated by resolution of the Board of Directors from time to time. The funds may be invested from time to time in accounts or deposit certificates of such bank or savings association as are insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation and may also be invested in interest-bearing obligations of the United States Government.

### ARTICLE XIV
### INDEMNIFICATION OF OFFICERS AND DIRECTORS

Every Director and Officer of the Association shall be indemnified by the Association against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed upon him in connection with any proceeding to which he may be a party or in which he may become involved by reason of his being or having been a Director or officer of the Association, whether or not he is a Director or officer at the time such expenses are incurred, except in such cases wherein the Director or officer is adjudged guilty of willful or wanton misconduct or gross negligence in the performance of his duties; provided that, in the event of any claim for reimbursement or indemnification hereunder based upon a settlement by the Director or officer seeking such reimbursement or indemnification, the indemnification herein shall apply only if the Board of Directors (with the Director seeking reimbursement abstaining) approves such

LIBER 403 PAGE 031

settlement and reimbursement as being in the best interest of the Association. The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such Director or officer may be entitled. At least 10 days prior to payment of any indemnification which it has approved, the Board of Directors shall notify all Co-owners thereof. The Board of Directors is authorized to carry officers' and directors' liability insurance covering acts of the officers and Directors of the Association in such amounts as it shall deem appropriate.

## ARTICLE XV
## AMENDMENTS

Section 1.  Proposal.  Amendments to these Bylaws may be proposed by the Board of Directors of the Association acting upon the vote of the majority of the Directors or may be proposed by 1/3 or more of the Co-owners by instrument in writing signed by them.

Section 2.  Meeting.  Upon any such amendment being proposed, a meeting for consideration of the same shall be duly called in accordance with the provisions of these Bylaws.

Section 3.  Voting.  These Bylaws may be amended by the Co-owners at any regular annual meeting or a special meeting called for such purpose by an affirmative vote of not less than 66-2/3% of the votes of all Co-owners eligible to vote. No consent of mortgagees shall be required to amend these Bylaws unless such amendment would materially alter or change the rights of such mortgagees, in which event the approval of 66-2/3% of the mortgagees shall be required, with each mortgagee to have the same number of votes for their respective Unit or interest as set forth in Section 1 of Article VIII above.

Section 4.  By Developer.  Prior to the Transitional Control Date, these Bylaws may be amended by the Developer without approval from any other person so long as any such amendment does not materially alter or change the right of a Co-owner or Mortgagee (including but not limited to any change required by any governmental agency).

Section 5.  When Effective.  Any amendment to these Bylaws shall become effective upon recording of such amendment in the office of the Charlevoix County Register of Deeds.

Section 6.  Binding.  A copy of each amendment to the Bylaws shall be furnished to every member of the Association after adoption; provided, however, that any amendment to these Bylaws that is adopted in accordance with this Article shall be binding upon all persons who have an interest in the Condominium irrespective of whether such persons actually receive a copy of the amendment.

## ARTICLE XVI
## COMPLIANCE AND DEFAULT

Section 1.  Compliance and Default.  Each Owner shall be governed by and shall comply with the Condominium Documents as the same may be amended from time to time. Failure of an Owner to comply with the Condominium Documents shall entitle the Association or other Owners to pursue any and all legal and equitable remedies for the enforcement of the Condominium Documents, including an action for damages, an action for injunctive relief, an action for declaratory judgment, or, with respect to Vacation Ownership Units, suspension of the right of an Owner to access the benefits of the use of such Owner's Vacation Ownership Interest as contemplated under the Master Deed, these Bylaws, the Boyne Vacation Club Resort Agreement for the Condominium, and the Club Documents. All provisions of these Bylaws shall be enforceable equitable servitudes and shall run with the land and shall be effective until the Condominium is terminated.

Section 2.  Costs and Attorneys' Fees.  In any proceeding arising because of an alleged failure of an Owner to comply with the Condominium Documents as amended from time to time, the prevailing party shall be entitled to recover the costs of the proceeding, and recover such reasonable attorneys' fees as may be awarded by the Court, including all proceedings in bankruptcy and probate.

Section 3.  No Waiver of Rights.  The failure of Developer, the Association, or any Owner to enforce any covenant, restriction, or other provision of the Act or the Condominium Documents shall not constitute a waiver of the right thereafter.

24

Section 4.  Injunctive Relief.  The Association may seek an injunction from a court of equity to compel compliance with or prohibit violation of the Condominium Documents regardless of whether an adequate remedy at law exists.

Section 5.  Governing Law; Waiver of Jury Trial; Venue of Actions.  The Condominium Documents shall be governed by, and shall be construed in accordance with, the laws of the State of Michigan.  The Association, each Owner, the Developer, the Management Company, and any other party claiming rights or obligations by, through, or under the Master Deed, each waive any right they may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against the others concerning the interpretation, construction, validity, enforcement, or performance of the Master Deed, these Bylaws or any other agreement or instrument executed in connection with the Master Deed.  If any such suit or legal action is commenced by any party, the other parties hereby agree, consent and submit to the personal jurisdiction of the Circuit Court in and for Charlevoix County, Michigan, with respect to such suit or legal action, and each party also consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county.  Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

## ARTICLE XVII
## REMEDIES FOR DEFAULT

Any default by a Co-owner shall entitle the Association or another Co-owner or Co-owners to the following relief:

Section 1.   Legal Action.  Failure to comply with any of the terms or provisions of the Condominium Documents shall be grounds for relief, which may include, without intending to limit the same, an action to recover sums due for damages, injunctive relief, foreclosure of lien (if default in payment of assessment) or any combination thereof, and such relief may be sought by the Association or, if appropriate, by an aggrieved Co-owner or Co-owners.

Section 2.   Recovery of Costs.  In any proceeding arising because of an alleged default by an Co-owner, the Association, if successful, shall be entitled to recover the costs of the proceeding and such reasonable attorney's fees (not limited to statutory fees) as may be determined by the court, but in no event shall any Co-owner be entitled to recover such attorney's fees.

Section 3.   Removal and Abatement.  The violation of any of the provisions of the Condominium Documents shall also give the Association or its duly authorized agents the right, in addition to the rights set forth above, to enter upon the Common Elements or into any Unit, where reasonably necessary, and summarily remove and abate, at the expense of the Co-owner in violation, any structure, thing or condition existing or maintained contrary to the provisions of the Condominium Documents.  The Association shall have no liability to any Co-owner arising out of the exercise of its removal and abatement power authorized herein.

Section 4.   Assessment of Fines.  The violation of any of the provisions of the Condominium Documents by any Co-owner shall be grounds for assessment by the Association, acting through its duly constituted Board of Directors, of monetary fines for such violations in accordance with Article XVIII of these Bylaws.

Section 5.   Non-waiver of Right.  The failure of the Association or of any Co-owner to enforce any right, provision, covenant or condition which may be granted by the Condominium Documents shall not constitute a waiver of the right of the Association or of any such Co-owner to enforce such right, provision, covenant or condition in the future.

Section 6.   Cumulative Rights, Remedies and Privileges.  All rights, remedies and privileges granted to the Association or any Co-owner or Co-owners pursuant to any terms, provisions, covenants or conditions of the Condominium Documents shall be deemed to be cumulative and the exercise of any one or more shall not be deemed to constitute an election of remedies, nor shall it preclude the party thus exercising the same from exercising such other and additional rights, remedies or privileges as may be available to such party at law or in equity.

Section 7.   Enforcement of Provisions of Condominium  Documents.  A Co-owner may maintain an action against the Association and its officers and Directors to compel such persons to enforce the terms and provisions of the Condominium Documents.  A Co-owner may maintain an action against any other Co-owner for injunctive relief or for damages or any combination thereof for noncompliance with the provisions of the Condominium Documents or the Act.

25

## ARTICLE XVIII
## ASSESSMENT OF FINES

Section 1.    General.  The violation by any Co-owner, occupant or guest of any of the provisions of the Condominium Documents including any duly adopted rules and regulations shall be grounds for assessment by the Association, acting through its duly constituted Board of Directors, of monetary fines against the involved Co-owner. Such Co-owner shall be deemed responsible for such violations whether they occur as a result of his personal actions or the actions of his family, guests, tenants or any other person admitted through such Co-owner to the Condominium.

Section 2.    Procedures.  Upon any such violation being alleged by the Board, the following procedures will be followed:

(A)  Notice.  Notice of the violation, including the Condominium Document provision violated, together with a description of the factual nature of the alleged offense set forth with such reasonable specificity as will place the Co-owner on notice as to the violation, shall be sent by first class mail, postage prepaid, or personally delivered to the representative of said Co-owner at the address shown in the notice required to be filed with the Association pursuant to Article VIII, Section 3 of these Bylaws.

(B)  Opportunity to Defend.  The offending Co-owner shall have an opportunity to appear before the Board and offer evidence in defense of the alleged violation.  The appearance before the Board shall be at its next scheduled meeting, but in no event shall the Co-owner be required to appear less than 10 days from the date of the notice.

(C)  Default.  Failure to respond to the notice of violation constitutes a default.

(D)  Hearing and Decision.  Upon appearance by the Co-owner before the Board and presentation of evidence of defense, or, in the event of the Co-owner's default, the Board shall, by majority vote of a quorum of the Board, decide whether a violation has occurred.  The Board's decision is final.

Section 3.    Amounts.  Upon violation of any of the provisions of the Condominium Documents and after default of the offending Co-owner or upon the decision of the Board as recited above, the following fines, plus any repair or out-of-pocket expenses or fees incurred, may be levied:

(A)  First Violation.  Up to $100.00.

(B)  Second Violation.  Up to $200.00 fine.

(C)  Third and Subsequent Violations.  Up to $400.00 fine.

Section 4.    Continuing Violations.  In the event that a violation continues beyond 10 days from the date of the offending Co-owner's hearing at which the Board determines that a violation has occurred, the continuing violation will be treated as a separate and subsequent violation and the new and increased fines may be levied on each occasion of any subsequent violation determination without the necessity of a further hearing or hearings thereon.

Section 5.    Collection.  The fines levied pursuant to Section 3 above shall be assessed against the Co-owner and shall be due and payable on demand or in such other manner as determined by the Board.  Failure to pay the fine will subject the Co-owner to all liabilities set forth in the Condominium Documents, including, without limitation, those described in Article II and Article XVII of these Bylaws.

Failure or delay on the part of the Association in the assessment of any fine does not waive any right the Association has hereunder.  Failure to impose a monetary fine for a violation does not limit the Association's right to impose a subsequent, higher fine.

## ARTICLE XIX    LIBER**403** PAGE**034**
## ALIENABILITY OF UNITS OR OWNERSHIP INTERESTS

The right of Owners to sell, transfer, assign, or hypothecate their Unit or Vacation Ownership Interest shall not be subject to the approval of the Association. Accordingly, a proper transfer or conveyance of the Unit or Vacation Ownership Interest shall not require the written approval of the Association. However, any sale between an Owner and a bona fide third party shall be deemed to contain a provision requiring that any sums due to the Association as assessments must be paid in full as a condition of closing of the sale, and any lease or rental agreement shall be deemed to contain a provision requiring that any sums due to the Association as assessments must be deducted from the gross rentals and paid directly to the Association. Further, the Management Company shall have the right to create such reservation approval restrictions as it deems necessary from time to time, and compliance with such restrictions shall be required before and during possession and occupancy of a Unit.

## ARTICLE XX
## RIGHTS RESERVED TO DEVELOPER

Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law, including the right and power to approve or disapprove any act, use, or proposed action or any other matter or thing, may be assigned by it to any other entity or to the Association. Any such assignment or transfer shall be made by appropriate instrument in writing in which the assignee or transferee shall join for the purpose of evidencing its acceptance of such powers and rights and such assignee or transferee shall thereupon have the same rights and powers as herein given and reserved to the Developer. Any rights and powers reserved or granted to the Developer or its successors shall terminate, if not sooner assigned to the Association, at the conclusion of the Development and Sales Period as defined in Article III of the Master Deed. The immediately preceding sentence dealing with the termination of certain rights and powers granted or reserved to the Developer is intended to apply, insofar as the Developer is concerned, only to the Developer's rights to approve and control the administration of the Condominium and shall not, under any circumstances, be construed to apply to or cause the termination of any real property rights granted or reserved to the Developer or its successors and assigns in the Master Deed or elsewhere (including, but not limited to, access easements, utility easements and all other easements created and reserved in such documents which shall not be terminable in any manner hereunder and which shall be governed only in accordance with the terms of their creation or reservation and not hereby).

The Developer shall have the right to enforce these Bylaws throughout the Development and Sales Period, which right of enforcement shall include (without limitation) an action to restrain the Association or any Co-owner from any activity prohibited by these Bylaws.

## ARTICLE XXI
## SEVERABILITY

In the event that any of the terms, provisions or covenants of these Bylaws or the Condominium Documents are held to be partially or wholly invalid or unenforceable for any reason whatsoever, such holding shall not affect, alter, modify or impair in any manner whatsoever any of the other terms, provisions or covenants of such documents or the remaining portions of any terms, provisions or covenants held to be partially invalid or unenforceable.

ATTENTION COUNTY REGISTER OF DEEDS

THE CONDOMINIUM SUBDIVISION PLAN NUMBER MUST BE ASSIGNED IN CONSECUTIVE SEQUENCE, WHEN A NUMBER HAS BEEN ASSIGNED TO THIS PROJECT, IT MUST BE PROPERY SHOWN IN THE TITLE ON THIS SHEET AND IN THE SURVEYOR'S CERTIFICATE ON SHEET 2,

SHEET INDEX

1 COVER
2 SURVEY PLAN
3 SITE/UTILITY PLAN
4 BASEMENT AREA C PLAN
5 BASEMENT AREA D PLAN
6 1ST FLOOR AREA A PLAN
7 1ST FLOOR AREA B PLAN
8 1ST FLOOR AREA C PLAN
9 1ST FLOOR AREA D PLAN
10 2ND FLOOR AREA A PLAN
11 2ND FLOOR AREA B PLAN
12 2ND FLOOR AREA C PLAN
13 2ND FLOOR AREA D PLAN
14 3RD & 4TH FLOOR AREA A PLAN
15 3RD & 4TH FLOOR AREA B PLAN
16 3TH & 4TH FLOOR AREA C PLAN
17 3RD & 4TH FLOOR AREA D PLAN
18 SECTIONS
19 SECTIONS

CHARLEVOIX COUNTY CONDOMINIUM SUBDIVISION PLAN NO, 112

EXHIBIT B

TO THE MASTER DEED OF

THE MOUNTAIN GRAND LODGE

PART OF SECTION 16, T32N,R5N, BOYNE VALLEY TOWNSHIP, CHARLEVOIX COUNTY, MICHIGAN.

COMMENCING AT THE SOUTH 1/4 CORNER OF SECTION 16, T32N,R5N, BOYNE VALLEY TOWNSHIP, CHARLEVOIX COUNTY, MICHIGAN; THENCE ALONG THE SOUTH LINE OF SAID SECTION 16 N 89°04'29"E 29.58 FEET TO THE CENTERLINE OF THE "OLD BOYNE CITY RAILROAD RIGHT OF WAY" THENCE ALONG SAID CENTERLINE N 22°58'52"W 628.37 FEET; THENCE N 67°01'08"E 75.25 FEET TO THE PLACE OF BEGINNING; THENCE S 20°01'07"W 31.74 FEET; THENCE S 50°01'07"W 76.55 FEET; THENCE N 69°58'53"W 20.45 FEET; THENCE N 87°09'20"W 44.53 FEET; THENCE N 83°56'37"W 313.16 FEET; THENCE S 60°01'07"W 31.53 FEET; THENCE S 87°31'07"W 43.61 FEET; THENCE N 53°38'53"W 60.00 FEET; THENCE N 24°58'53"W 89.23 FEET; THENCE N 60°01'07"E 56.63 FEET; THENCE N 29°58'53"W 180.46 FEET; THENCE N 60°01'07"E 130.96 FEET; THENCE S 29°58'53"E 169.59 FEET; THENCE N 60°01'07"E 42.49 FEET; THENCE S 24°58'53"E 55.00 FEET; THENCE S 65°01'07"W 43.00 FEET; THENCE S 24°58'53"E 160.11 FEET; THENCE S 69°58'53"E 338.88 FEET TO THE PLACE OF BEGINNING

DEVELOPER

BOYNE PROPERTIES, INC,
P.O. BOX 19
BOYNE FALLS, MI 49713

ENGINEER-SURVEYOR

BIDSTRUP ENGINEERING, INC.
607 E. LAKE STREET
HARBOR SPRINGS, MICHIGAN 49740

ARCHITECT

BETA DESIGN GROUP
50 MONROE PLACE, SUITE 300
GRAND RAPIDS, MICHIGAN 49503

THIS PROPOSED SHEET PREPARED BY:
BIDSTRUP ENGINEERING, INC.
607 E. LAKE STREET
HARBOR SPRINGS, MICHIGAN 49740

JAMES E. YOUNG, P.S. NO. 24826
DATE: FEBRUARY 29, 2000

COVER

1

THE MOUNTAIN GRAND LODGE







LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS ARE 90 DEGREES UNLESS OTHERWISE SHOWN

ALL WALLS BETWEEN UNITS 0.5' THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND HALLWAYS 0.5 THICK UNLESS OTHERWISE NOTED

ALL EXTERIOR FOUNDATION WALLS 10' THICK UNLESS OTHERWISE NOTED

KEY PLAN

THIS SHEET PREPARED BY

BETA
Design
Group
ARCHITECTS
ENGINEERS
PLANNERS
INTERIORS

DANIEL P. HARDING
ARCHITECT
STATE OF MICHIGAN
LICEN

BASEMENT FLOOR PLAN
AREA C
MUST BE BUILT

0'   10'    30'          50

MOUNTAIN GRAND LODGE AND

SECTION B

UNIT 120

POOL FILTERS AND MECHANICAL

LAUNDRY

UNIT 112
8,790.01 S.F.

CORRIDOR

SECTION D

SECTION D

SECTION E

SECTION E

CORRIDOR

MEETING ROOM

UNIT 115
1,710.85 S.F. TOTAL

SECTION A

LIBER L03 PAGE 038







LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS ARE 90 DEGREES UNLESS OTHERWISE SHOWN

ALL DIMENSIONS ARE IN FEET

ALL WALLS BETWEEN UNITS 0.5' THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND HALLWAYS 0.25' THICK UNLESS OTHERWISE NOTED

KEY PLAN

THIS SHEET 7 PREPARED BY

FIRST FLOOR PLAN
AREA B
ALL IMPROVEMENTS SHOWN
MUST BE BUILT

0'   10'   30'   50'

MOUNTAIN GRAND LODGE AND SPA

SECTION B

SECTION B

CORRIDOR

UNIT 101
934.49 S.F.

UNIT 100
934.49 S.F.

UNIT 99
874.59 S.F.

UNIT 98
874.59 S.F.

UNIT 97
883.12 S.F.

UNIT 96
874.59 S.F.

UNIT 95
874.59 S.F.

UNIT 94
874.59 S.F.

UNIT 93
874.59 S.F.

UNIT 92
874.59 S.F.

UNIT 91
874.59 S.F.

STATE OF MICHIGAN
DANIEL P. HARDING
ARCHITECT
LICENSED



LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS ARE 90 DEGREES UNLESS OTHERWISE SHOWN

ALL DIMENSIONS ARE IN FEET

ALL WALLS BETWEEN UNITS 1.5' THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND HALLWAYS 0.5'THICK UNLESS OTHERWISE NOTED

KEY PLAN

THIS SHEET 8 PREPARED BY

SECTION A

MOUNTAIN GRAND LODGE AND SPA

POOL

POOL

UNIT 112
4184.07 S.F.

CORRIDOR

UNIT 113
1156.33 S.F.

RESTROOM

RESTROOM

LIBRARY

SECTION D

SECTION D

SECTION E

SECTION E

SECTION A

FIRST FLOOR PLAN
AREA C
ALL IMPROVEMENTS SHOWN
MUST BE BUILT

0'  10'    30'      50'



LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS ARE 90 DEGREES UNLESS OTHERWISE SHOWN

ALL DIMENSIONS ARE IN FEET

ALL WALLS BETWEEN UNITS 0.5' THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND HALLWAYS 0.5' THICK UNLESS OTHERWISE NOTED

KEY PLAN

THIS SHEET PREPARED BY

BETA
Design
Group

DANIEL P. HARDING

FIRST FLOOR PLAN
AREA D
MUST BE BUILT

0'  10'    30'       50'

MOUNTAIN GRAND LODGE AND SPA

SECTION A

LOBBY

UNIT 114
1,110.66 S.F.

LOBBY

UNIT 116
2,598.46 S.F.

SECTION C

SECTION C

UNIT 118
2,776.03 S.F.

UNIT 117
4,988.23 S.F.

CORRIDOR

STAIRS

SECTION A

LIBER 403 PAGE 043



LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS ARE 90 DEGREES UNLESS OTHERWISE SHOWN

ALL DIMENSIONS ARE IN FEET

ALL WALLS BETWEEN UNITS 0.5' THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND HALLWAYS 0.5' THICK UNLESS OTHERWISE NOTED

ALL EXTERIOR WALLS 1.02' THICK UNLESS OTHERWISE NOTED

KEY PLAN

SECOND FLOOR PLAN
AREA A
MUST BE BUILT

0'   10'    30'      50'

MOUNTAIN GRAND LODGE AND SPA

UNIT 90
1514.19 S.F.

UNIT 88
1299.64 S.F.

UNIT 89
874.59 S.F.

UNIT 86
874.59 S.F.

UNIT 87
883.13 S.F.

UNIT 84
874.59 S.F.

UNIT 85
874.59 S.F.

UNIT 82
874.59 S.F.

UNIT 83
934.49 S.F.

UNIT 81
934.49 S.F.

UNIT 80
934.49 S.F.

UNIT 78
934.49 S.F.

SECTION B

SECTION B

LIBER 03 PAGE 044







LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS ARE 90 DEGREES UNLESS OTHERWISE NOTED

ALL DIMENSIONS ARE IN FEET

ALL WALLS BETWEEN UNITS 5" THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND HALLWAYS 0.5" THICK UNLESS OTHERWISE NOTED

ALL EXTERIOR WALLS 0.77" THICK UNLESS OTHERWISE NOTED

KEY PLAN

SECTION A

OPEN TO BELOW

BRIDGE

OPEN TO BELOW

UNIT 60
874.59 S.F.

UNIT 59
874.59 S.F.

UNIT 62
874.59 S.F.

UNIT 61
874.59 S.F.

SECTION C

UNIT 64
874.59 S.F.

CORRIDOR

UNIT 63
874.59 S.F.

SECTION C

UNIT 66
874.59 S.F.

UNIT 65
874.59 S.F.

UNIT 68
874.59 S.F.

UNIT 67
874.59 S.F.

STORAGE

HOUSE KEEPING

SECTION A

SECOND FLOOR PLAN
AREA D
MUST BE BUILT

0'   10'   30'   50'

MOUNTAIN GRAND LODGE AND SPA











LIMITED COMMON ELEMENT

GENERAL COMMON ELEMENT

LIMITS OF OWNERSHIP

NOTE: ALL WALL INTERSECTIONS
ARE 90 DEGREES UNLESS
OTHERWISE SHOWN

ALL DIMENSIONS ARE IN FEET

ALL WALLS BETWEEN UNITS 0.5'
THICK UNLESS OTHERWISE NOTED

ALL WALLS BETWEEN UNITS AND
HALLWAYS 0.5' THICK UNLESS
OTHERWISE NOTED

SECTION A

SECTION B

ATTIC SPACE BEYOND

MOUNTAIN GRAND LODGE AND SPA

0'    16'    48'    80'

THIS SHEET
PREPARED BY

BETA
Design
Group

DANIEL P.
HARDING

