UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA HORNBECK, et al.,

       Plaintiffs,

                                       Case No. 1:24-cv-682

v.

                                       Hon. Hala Y. Jarbou

BOYNE USA, INC., et al.,

       Defendants.

_____/

## OPINION

Plaintiffs Barbara Hornbeck and Cathy Demaria-McKay bring this action against Defendants Boyne USA, Inc., Boyne Properties, Inc., Boyne Mountain Resort, LLC, The Mountain Grand Lodge & Spa, LLC, Boyne Highlands Resort, LLC, and Heather Highlands Inn, Inc. (collectively, "Boyne"). Plaintiffs, who purport to sue on behalf of others similarly situated, assert claims for breach of fiduciary duty, fraud, breach of contract, unjust enrichment, violations of state and federal securities laws, and violations of the Sherman Act. They seek damages and a declaratory judgment against Boyne.

Before the Court is Boyne's motion to dismiss the amended complaint for failure to state a claim (ECF No. 46), Boyne's motion for summary judgment (ECF No. 110), and Plaintiffs' motion for class certification (ECF No. 115). For the reasons herein, the Court will grant Boyne's motion for summary judgment in part, dismissing all of Plaintiffs' claims other than their breach-of-contract claim that Boyne failed to share revenue from forfeited reservation deposits. The Court will deny Boyne's motion to dismiss and Plaintiffs' request for class certification.

# I. BACKGROUND

## A. Boyne

Boyne owns and operates several resorts in northern Michigan, such as Boyne Mountain Resort, The Highlands at Harbor Springs, and the Inn at Bay Harbor.  Each resort contains multiple lodging options—condominiums, hotel suites, cabins, cottages, villas, and townhomes (collectively, "Condos")—situated near the resort's ski hills, golf courses, or waterparks.  Boyne developed the resorts and the Condos.  It owns some of the Condos and offers others for sale to individuals.

## B. Plaintiffs

Plaintiff Hornbeck owns two units at The Mountain Grand Lodge ("MGL"), a condominium-hotel[1] at Boyne Mountain.  (Hornbeck Dep. 17-19, ECF No. 111-8; Rooney Dep. 43, ECF No. 111-10.)  She purchased one in 2005 and another in 2012.  (Hornbeck Dep. 26-27.)  The MGL contains about 220 units, some of which are owned by Boyne and some of which are owned by individuals like Hornbeck.  (*See* Spencer Dep. 70, ECF No. 111-9.)

Plaintiff Demaria-McKay owns a unit at Alpine Village, a condominium complex at The Highlands.  (Demaria-McKay Dep. 37, ECF No. 111-11.)  Demaria-McKay initially purchased a unit at Alpine Village in 2003.  (*Id.* at 17.)  She sold this unit in 2006 and purchased a different one at Alpine Village that she continues to own.  (*Id.* at 23.)  Demaria-McKay also purchased a unit at Ross Cottages, another complex at The Highlands, in 2015.  (*Id.* at 41.)  She sold this unit in March 2024.  (*Id.* at 66.)

---

[1] A condominium-hotel is a cross between a traditional condominium building and a hotel.  Like a hotel, the MGL has a front desk, a swimming pool, and restaurants inside the building.  (Hornbeck Dep. 77.)  The MGL is also attached to an indoor water park.  (Perlmutter Decl. ¶ 10, ECF No. 111-2.)

### C. Boyne's Role as Rental Manager

An individual who buys a Condo at MGL or Alpine Village must do so subject to a "Master Deed" (and bylaws incorporated therein) for the property.  (*See* Master Deed for MGL, ECF No. 44-1; Master Deed for Alpine Village, ECF No. 44-3.)  If an owner chooses to rent their Condo, the bylaws for MGL and Alpine Village require that the owner do so through Boyne or through an agent designated by Boyne.  (MGL Bylaws, ECF No. 44-1, PageID.453; Alpine Village Bylaws, ECF No. 44-3, PageID.530.)

To rent her first Condo, Hornbeck signed a rental management agreement ("RMA") with Boyne in 2005.  (Hornbeck RMA (2005), ECF No. 111-14.)  She signed an RMA for her second Condo in 2014.  (Hornbeck RMA (2014), ECF No. 111-15.)  Similarly, Demaria-McKay signed an RMA with Boyne in 2006 (Demaria-McKay RMA (2006), ECF No. 111-17), and another in 2021 (Demaria-McKay RMA (2021), ECF No. 111-18).

The RMAs spell out the fees Condo owners must pay to Boyne for its rental management services.  They also give Boyne control over who rents the Condos and what rates are charged.  A central issue in the case is whether Boyne has paid Plaintiffs their proper share of rental revenue.

The RMAs signed before 2021 provide:

> **12. Management Fee.**  In consideration for [Boyne]'s rental management services on behalf of Owner, Owner agrees to pay to [Boyne] a management fee equal to 50% of gross rental receipts (after the payment of hotel or resort taxes, resort fees, group tour and convention facility fees, incentive program costs, franchise-related fees and costs or any other such costs).

(Hornbeck RMA § 12 (2005); Hornbeck RMA § 12 (2014); Demaria-McKay RMA § 12 (2006).)

The newer RMAs signed in 2021 and after provide:

> **11. Collection of Rental Income.**  For purposes of this Agreement, the term "rental income" shall be defined as the amount received by [Boyne] from guests for their use of the Unit less taxes, related fees, travel agency commissions, third-party reservation firm fees and credit card service fees (in the amount of 3.0% of rental income).  Monies paid by guests for other goods and services (such as room service,

3

food and beverage, greens fees, ski tickets, ski rentals and lessons, resort fees, package components, etc.) and monies paid by guests to governmental agencies (such as taxes and tourism promotion fees) are not included in rental income. . . .

**12. Management Fee.**  In consideration for [Boyne's] rental management services, Owner agrees to pay to [Boyne] a management fee equal to 50% of Owner's rental income (as defined above).  This management fee shall be paid to [Boyne] upon [Boyne]'s receipt of the rental income.  For the purposes of this Agreement, the term "Owner's share of rental income" shall be defined as that portion of the rental income after the payment of [Boyne]'s rental management fee.

(Demaria-McKay RMA §§ 11-12 (2021).)

### D. Plaintiffs' Complaint

In their amended complaint, Plaintiffs assert seven counts under federal and state law. Count I asserts that Boyne breached its fiduciary duties to Plaintiffs by, among other things, manipulating the rental of Condos to Plaintiffs' detriment, failing to disclose a conflict of interest, and failing to disclose its profits to Plaintiffs.  Count II asserts that Boyne engaged in constructive fraud by making false representations to owners about the profits they would earn.  Count III asserts that Boyne breached its contracts with Plaintiffs in various ways, including "charging more than a fair, competitive rental rate" for their Condos.  (Am. Compl. ¶ 156.)  Count IV asserts a claim of unjust enrichment because Plaintiffs were not given "a reasonable fee for Boyne's use of their property."  (*Id.* ¶ 166.)  Count V asserts a violation of the Sherman Act because Boyne allegedly used its monopoly power to illegally "tie" its rental management services to the sale of a Condo.  (*Id.* ¶ 174.)  Count VI asserts that Boyne's sale of the Condos for rental purposes constitutes the sale of an unregistered security in violation of the Securities Acts of 1933 and 1934. Count VII asserts a parallel claim under the Michigan Uniform Securities Act.  Count VIII requests declaratory relief.

4

## II. MOTION TO DISMISS

Boyne filed a motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Plaintiffs lack standing to assert some of their claims and that Plaintiffs' complaint fails to state a viable claim. While that motion was still pending, Boyne filed a motion for summary judgment. Because of the latter, the Court finds it unnecessary to address Boyne's motion to dismiss. The Court will discuss Boyne's standing argument, which it also raises in its motion for summary judgment. That argument addresses its request for dismissal under Rule 12(b)(1). Insofar as Boyne relies on Rule 12(b)(6), if Plaintiffs' claims cannot survive summary judgment, it makes little difference whether they would survive dismissal under Rule 12(b)(6). And at any rate, to the extent any deficiencies in Plaintiffs' complaint are dispositive at this stage, Boyne's motion for summary judgment reiterates the relevant arguments from its motion to dismiss. (*See, e.g.*, Def.'s Summ. J. Br. 42, ECF No. 111 (discussing Plaintiffs' failure to plead fraud with particularity).) Accordingly, the Court will focus on Boyne's motion for summary judgment.

## III. MOTION FOR CLASS CERTIFICAITON

Plaintiffs move to certify a class under Rule 23(b)(3) of the Federal Rules of Procedure. Plaintiffs propose the following class definition:

> All former and current owners of condo units in Boyne Michigan Properties who have signed and rented under a Boyne Rental Management Agreement, that was in effect at any point in time from January 1, 2011 to the date class notice is given, that provides for a split of rental revenue between condo unit owner and Boyne of "gross rental receipts" or "gross revenue."

(Pls.' Br. in Supp. of Class Certification 1, ECF No. 116.)

Boyne asks the Court to decide Plaintiffs' motion for class certification before ruling on the motion for summary judgment because any ruling on the merits of the case before the Court issues notice to class members will not bind the putative class members. *See Faber v. Ciox Health,*

*LLC*, 944 F.3d 593, 602 (6th Cir. 2019) ("Certification notice for class actions under Fed. R. Civ. P. Rule 23(c)(2) must be given before class members can be legally bound."). But the Court of Appeals has "consistently held that a district court is not required to rule on a motion for class certification before ruling on the merits of the case." *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 616 (6th Cir. 2002). And "[w]hen the defendant moves for and obtains summary judgment before the class has been properly notified, the defendant waives the right to have notice sent to the class." *Faber*, 944 F.3d at 602. Such a defendant "assume[s] the risk that a judgment in their favor will not protect them from subsequent suits by other potential class members." *Id.* at 603 (quoting *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995)).

Here, Boyne filed its motion for summary judgment before Plaintiffs filed their motion for class certification. In effect, Boyne waived the right to have the Court's decision on the merits bind members of the putative class. Moreover, most of Plaintiffs' claims cannot survive summary judgment. It will be more efficient to evaluate the request for class certification based on the few issues that will survive rather than attempting to parse multiple claims and issues through a complex class certification analysis. Accordingly, for the sake of judicial economy, the Court will address Boyne's motion for summary judgment first.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring

6

the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## V. ANALYSIS

### A. Standing (Antitrust & Securities Claims)

Boyne objects that Plaintiffs do not have standing to bring their antitrust and federal securities claims. The Constitution empowers federal courts to decide "controversies" and "all cases, in law and equity, arising under this Constitution [and] the laws of the United States." U.S. Const. art. III, § 2. Consistent with this requirement, "several justiciability doctrines limit the judicial power, the most prominent being standing." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021). To have standing, a plaintiff must show "(1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-61 (1992)). "The evidence required to sustain these elements corresponds 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 673 (6th Cir. 2022) (quoting *Lujan*, 504 U.S. at 561). "[A]t summary judgment, it is enough that a plaintiff has 'set forth by affidavit or other evidence specific facts' supporting each element." *Id.* (quoting *Lujan*, 504 U.S. at 561).

"A plaintiff must have standing for each claim pursued in federal court. However, only one plaintiff needs to have standing in order for the suit to move forward." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015).

### 1. Antitrust Claims

Boyne argues that Plaintiffs do not satisfy the traceability requirement for their antitrust claims.  These claims are based on Boyne's requirement that Plaintiffs use Boyne as their exclusive rental agent for the Condos.  (*See* Am. Compl. ¶ 174, ECF No. 44.)  According to Plaintiffs, this requirement constitutes an invalid "tying arrangement" under antitrust law.  (*Id.* ¶ 175.)

For traceability, the defendant's actions must have a "causal connection" to the plaintiff's injury.  *Lujan*, 540 U.S. at 560.  Boyne argues that the rental agency requirement is not traceable to Boyne because that requirement is enforced by the homeowner's association, not by Boyne.  However, the MGL bylaws expressly give Boyne the power to enforce them.  (MGL Bylaws, PageID.453.)  In addition, the bylaws for MGL and Alpine Village ultimately give Boyne the power to determine the "terms and conditions" under which a Condo is leased.  (MGL Bylaws, PageID.453; Alpine Village Bylaws, PageID.530.)  Finally, Plaintiffs purchased their Condos from Boyne and entered into the RMAs with Boyne.  The homeowners' associations are not parties to RMAs and cannot enforce them, but Boyne can.  Thus, construing the evidence in Plaintiffs' favor, the injury allegedly suffered by Plaintiffs under their antitrust claims is traceable to Boyne.  The Court is satisfied that Plaintiffs have met the other requirements for standing.

### 2. Securities Claims

Boyne makes the same argument for Plaintiffs' federal securities claims.  The latter are based on Plaintiffs' assertion that the sale of the Condos to Plaintiffs, coupled with the requirement to use Boyne as the rental agent for the Condos, constitutes a sale of securities.[2]  (Am. Compl. ¶¶ 43, 45.)  A plaintiff has standing under Section 12(a) of the Securities Act of 1933 if the plaintiff bought the security from a statutory seller.  *In re EveryWare Glob., Inc. Secs. Litig.*, 175 F. Supp.

---

[2] The Court assumes, for the sake of the standing analysis, that the sales qualify as sales of securities.

3d 837, 867 (S.D. Ohio 2016) (citing *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011)).  "Section 12(a) 'imposes liability on only the buyer's immediate seller.'" *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988)).  Here, there is no dispute that both Plaintiffs bought at least one Condo from, and entered into RMAs with, Boyne.  These facts satisfy the traceability prong.  The Court is satisfied that Plaintiffs meet the other prongs as well.  Thus, Plaintiffs have standing to assert their securities claims.

### B. Breach of Contract (Count III)

When addressing the merits of Plaintiffs' claims, the Court will discuss the breach-of-contract claim in Count III first because the terms of the RMAs are central to the case.  Plaintiffs assert that Boyne breached the Master Deeds and RMAs by charging "more than a fair, competitive rental rate" for the Condos.  (Am. Compl. ¶ 156.)  Plaintiffs also contend that Boyne breached the agreements, or the implied covenant of good faith and fair dealing therein, by: (1) favoring Boyne-owned Condos in the booking process (*id.* ¶ 61); (2) selling "packages" to customers that combine room rentals with tickets for golf or skiing and that unfairly benefit Boyne by discounting the Condo rental rates while charging full price for the tickets (*id.* ¶ 62); (3) charging renters resort fees, breakfast fees, and other fees that are not shared with Plaintiffs (*id.* ¶¶ 69-82); (4) charging renters a deposit to reserve a Condo for rental and keeping the entire deposit if the reservation is canceled rather than treating the deposit as rental revenue (*id.* ¶ 86-90); and (5) using Plaintiffs' Condos for complimentary stays (*id.* ¶ 91).

Boyne seeks summary judgment on all these claims.  In Plaintiffs' response to the summary judgment motion, however, Plaintiffs ignore most of these claims.  They argue only that Boyne breached the RMAs by paying Plaintiffs less than they are owed.  (*See* Pls.' Resp. to Summ. J. 17, ECF No. 138.)

9

### 1. Charging More than a Fair, Competitive Rental Rate

The pre-2021 RMAs require Boyne, "in its sole discretion," to "charge a fair, reasonable and competitive [rate]" for renting Plaintiffs' Condos.  (Hornbeck RMA § 6 (2005).)  Similarly, the 2021 RMAs give Boyne "sole discretion" to determine the rental rate, giving consideration to "such factors as competition, seasonality, location, type of Unit, condition of Unit, number of persons occupying the Unit and market served."  (Demaria-McKay RMA § 6 (2021).)  In other words, the RMAs give Boyne the sole discretion to determine the rental rate, including the discretion to determine a fair and competitive one.  In any case, Boyne notes that there is no evidence that the rates it charged for renting Plaintiffs' Condos were unfair or not competitive. Plaintiffs offer no response.  Accordingly, Boyne is entitled to judgment on this claim.

### 2. Favoring Boyne's Condos in the Booking Process

Boyne manages the Condo rentals (including the rental of its own Condos) using a software program and a "rotational point system" that accounts for factors such as "frequency of owner use, the room type, and the reservation type."  (Childress Decl. ¶ 7, ECF No. 111-5.)  Boyne contends there is no evidence that it unfairly favors its own Condos.  Plaintiffs offer no response. Accordingly, Boyne is entitled to judgment on this claim.

### 3. Package Discounts

For a period of time, Boyne discounted the Condo rental rate when offering a rental as part of a package deal that included lift tickets, green fees, or tickets to other Boyne attractions. Plaintiff Demaria-McKay testified that the nightly room rate for her Condo was "significantly less" when her Condo was rented as part of a golf package.  (Demaria-McKay Dep. 122, ECF No. 138-6.)  Boyne stopped discounting room rates in connection with ticket packages in 2019 or 2020, changing its software to allow guests to buy tickets separately from lodging.  (Childress Dep. 144-45, ECF Nos. 111-7, 138-14; MGL HOA Meeting Minutes (Oct. 2, 2021), ECF No. 111-23,

PageID.2199-2200.)  Before that time, however, Plaintiffs contend that Boyne used this situation to its advantage by not discounting the tickets it sold with these packages.

This claim is meritless because, as indicated above, the RMAs gave Boyne sole discretion to determine the rental rates.  Also, in the pre-2021 RMAs, Plaintiffs expressly agreed that Boyne could "deviate from [the] rental schedule at any time and from time to time as Agent may in its discretion determine, including rents which are a portion of a guest package."  (Hornbeck RMA § 6 (2005).)  Thus, Boyne did not breach the RMAs by discounting the rental rates.

### 4. Excluding Resort Fees, Breakfast Fees, and Other Fees from Rental Income

When Boyne rents a Condo, it charges the renter a nightly room rate (called the "rack rate") for the rental.  (Childress Dep. 93-95.)  On top of the rack rate, Boyne charges the renter a resort fee and taxes.  The resort fee, which has increased over time, is currently 10% of the room rate.  (*Id.* at 92, 96, 197; Rooney Dep. 112, ECF No. 111-10.)  Boyne keeps half of the room rate as its management fee, which leaves the other half for the owner.  (Rooney Dep. 110-12.)  Boyne keeps the resort fee for itself.  (Childress Dep. 116.)

Boyne must pay a credit-card processing fee for credit-card transactions, but it does not charge renters this fee.  (Johnson-Minkwic Dep. 99-100, ECF Nos. 111-26, 138-15.)  Instead, Boyne allocates 3% of the income from the room charge to the credit-card fee.  (*Id.* at 98; *see* Demaria-McKay RMA § 12 (2021) (specifying a credit card fee of 3.0%).)  In effect, this practice splits the cost of the credit card fee between Boyne and the Condo owner by reducing their respective shares of the rental income.  (*See* Revenue Breakdown, ECF No. 111-21, PageID.2187; Keen Dep. 132-33, ECF Nos. 111-12, 138-12.)

The pre-2021 RMAs also require owners to pay 5% of the "gross rental receipts" into a "pooled reserve fund" that is used to pay for the maintenance of Condos and for the repair and replacement of future, fixtures, and equipment as necessary to keep the Condos consistent with

"the high-quality standards of a first-class hotel."  (Hornbeck RMA §§ 7-8 (2005).)  The following chart illustrates how all this works for a hypothetical room rate of $100 with taxes of $11.60:

| Room charge ("rack rate") | $100.00 |
|---|---|
| **Boyne management fee (50%)** | **$50.00** |
| Gross owner share of room charge (room charge less management fee) | $50.00 |
| Less half of credit card fees (1.5% of room charge) | $1.50 |
| Less 5% pooled reserve | $5.00 |
| **Net Owner Revenue** | **$43.50** |
| 10% Resort Fee (paid by renter) | $10.00 |
| Taxes (state & local) (paid by renter) | $11.60 |
| Guest total | $121.60 |

(*See* Revenue Breakdown, PageID.2187.)

The RMAs do not prohibit Boyne from charging renters fees in addition to the rental rate. To the contrary, the pre-2021 RMAs expressly mention "resort taxes, resort fees" and other fees that Boyne might charge renters.  (Hornbeck RMA § 12 (2005).)  Similarly, when discussing items that are excluded from rental income, the 2021 RMAs mention "[m]onies paid by guests for other goods and services (such as room service, food and beverage, greens fees, ski tickets, ski rentals and lessons, resort fees, [and] package components . . . )."  (Demaria-McKay RMA § 11 (2021).) Thus, charging those fees is not itself a breach of the agreements.

However, Plaintiffs contend that some of these fees should be counted as rental income under the pre-2021 version of the RMAs.  As indicated above, the pre-2021 RMAs provide the

following regarding Boyne's management fee, which Plaintiffs use as the basis for calculating their share of revenue:[3]

> **12. Management Fee.**  In consideration for [Boyne]'s rental management services on behalf of Owner, Owner agrees to pay to [Boyne] a management fee equal to 50% of gross rental receipts (after the payment of hotel or resort taxes, resort fees, group tour and convention facility fees, incentive program costs, franchise-related fees and costs or any other such costs).

(Hornbeck RMA § 12 (2005).)

Focusing on the phrase "gross rental receipts," Plaintiffs argue that they are entitled to half of all revenue Boyne receives from renters, including the rental charge for the Condo as well as other fees paid by the renter, such as "resort fees, breakfast fees, group activity fees, [and] credit card fees."  (Pls.' Resp. to Summ. J. 13.)  In other words, Plaintiffs believe that the phrase "gross rental receipts" in the pre-2021 RMAs includes all of the foregoing.  By excluding the resort fee, taxes, and other charges from the 50% allocation, Plaintiffs argue that Boyne has paid Plaintiffs less than they are owed.

Plaintiffs' interpretation does not comport with the plain and ordinary meaning of the text of the RMAs.  "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement.  When interpreting a contract, [the Court's] primary obligation is to give effect to the parties' intention at the time they entered into the contract.  To do so, [the Court] examine[s] the language of the contract according to its plain and ordinary meaning." *County of Ingham v. Mich. Cnty. Rd. Comm'n Self-Ins. Pool*, 975 N.W.2d 826, 834 (Mich. 2021) (quoting *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 870 (Mich. 2016)).

---

[3] Plaintiffs note that there are "slight variations" in the pre-2021 RMAs, but they agree that these variations have "no effect" on the interpretation of this provision.  (Pls.' Resp. to Summ. J. 17 n.5.)

Notably, Plaintiffs ignore the beginning of the management fee provision, which clearly specifies that "50% of gross rental receipts" is the fee that *Plaintiffs* must *pay to Boyne*. Plaintiffs, however, inexplicably construe this provision to specify income that Plaintiffs are entitled to *receive from* Boyne. The Court finds no support for that construction.

Applying the fee provision as it reads, accepting Plaintiffs' interpretation of the scope of "gross rental receipts" would require Plaintiffs to pay a *higher* management fee compared to what Boyne currently charges. For example, Plaintiffs apparently contend they are entitled to *receive* half the resort fee because that fee is part of the gross rental receipts. However, adding that fee to the gross rental receipts would have the opposite effect. It would require Plaintiffs to *pay* half that fee, which Plaintiffs do not currently pay. Likewise, adding taxes to the gross rental receipts would require Plaintiffs to pay Boyne an amount equal to half those taxes, which Plaintiffs have not paid. In addition, Plaintiffs' pooled reserve payment, which was also calculated as a percentage of "gross rental receipts," would have increased.

Using the facts from the chart above, the result would look like the following:

| | |
|---|---|
| Room charge ("rack rate") | $100.00 |
| 10% Resort Fee | $10.00 |
| Taxes (state & local) | $11.60 |
| **Total "Gross Rental Receipts"** | **$121.60** |
| **Boyne Management Fee (50%)** | **$60.80** |
| Gross owner share of room charge (room charge less management fee) | $39.20 |
| Less half of credit card fees (1.5% of room charge) | $1.50 |
| Less 5% pooled reserve | $6.08 |

| Net Owner Revenue | $31.62 |
|---|---|

Thus, under Plaintiffs' interpretation of "gross rental receipts," Boyne's fees would have been higher and Plaintiffs' income would have been lower, meaning Plaintiffs have underpaid Boyne. That being the case, Plaintiffs cannot claim Boyne breached the contract in this manner because Plaintiffs cannot prove damages. *See Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014) (noting that damages is an essential element of a breach of contract action).

Moreover, the Court is not persuaded by Plaintiffs' interpretation of the phrase gross rental receipts. Plaintiffs do not adequately explain the parenthetical that follows that phrase. When calculating the management fee, the 50% is applied to gross rental receipts "*after the payment of* hotel or resort taxes, resort fees, group tour and convention facility fees, incentive program costs, franchise-related fees and costs or any other such costs." According to Plaintiffs, this parenthetical lists "fees" that are paid by renters and that are *part of* the gross rental receipts. (Pls.' Resp. to Summ. J. 6.) But that argument does not follow, for several reasons.

First, the most obvious form of rental receipt—the room charge—is conspicuously absent from the list. Second, the list includes items that do not naturally fit within the definition of a rental receipt. One such item is taxes. Although Boyne collects taxes from the renter, those taxes are owed to the government; neither Boyne nor Plaintiffs are entitled to receive those taxes in exchange for the rental. Finally, the provision expressly requires Plaintiffs to pay the management fee "after" the costs and fees in the parenthetical are paid; that term suggests that the items in the parenthetical are distinct from the "rental receipts" and are meant to be deducted or excluded before the management fee is calculated.

15

A more sensible reading of the management-fee provision is that the parenthetical lists items that are *not* part of the receipts subject to the 50 percent calculation.  And for reasons discussed above, this reading *benefits* Plaintiffs by lowering Boyne's management fee.  Thus, when the pre-2021 RMAs are properly interpreted, there is no evidence that Boyne breached them by failing to include resort fees, taxes, and other fees in the rental receipts.  If anything, under Plaintiffs' argument, Boyne paid Plaintiffs *more* than they are owed under the pre-2021 RMAs, which means Plaintiffs' breach-of-contract theory cannot succeed.

The RMAs from 2021 and after do not contain the phrase "gross rental receipts," and Plaintiffs make no argument that Boyne breached these agreements by paying an improper share of gross revenue.  In fact, Plaintiffs contend that Boyne's conduct is "consistent" with the 2021 RMAs  (*See* Pls.' Resp. to Summ. J. 6 (arguing that the 2021 version make Boyne's "unlawful practices . . . consistent with the terms of its RMAs").  Thus, there is no evidence that Boyne breached any version of the RMAs when excluding resort fees, taxes, and other fees from Plaintiffs' rental income.  Accordingly, the Court will dismiss this aspect of Plaintiffs' breach-of-contract claim.

### 5. Keeping Forfeited Deposits

A guest who makes a reservation to stay in a Condo pays a portion of their rental charge in advance, but if that guest cancels their reservation, Boyne keeps the deposit.  Boyne does not share any portion of that deposit with Plaintiffs, though Plaintiffs contend that they are entitled to a portion of this revenue.  Plaintiffs assert this claim under theories of breach of contract and breach of fiduciary duty, but in either case, the Court must decide whether Plaintiffs are entitled to such deposits under the terms of the RMAs.[4]

---

[4] As discussed below with regard to Count I, the RMAs determine the scope of Boyne's fiduciary duties.

Boyne argues that forfeited deposits are not rental income or rental receipts under the RMAs, but it does not elaborate on this argument.  At this stage, it is not obvious to the Court that a reservation deposit would fall outside the plain and ordinary meaning of those terms.  It is not the Court's responsibility to make Boyne's arguments.

Next, Boyne relies on its controller's testimony that "*typically* when guests make reservations, they are not booked into a specific unit." (Johnson-Minkwic Dep. 125 (emphasis added).)  Consequently, when such a reservation is canceled, "it's not unit specific." (*Id.*)  In other words, Boyne apparently contends that Plaintiffs are not entitled to forfeited deposits because those deposits are never tied to Plaintiffs' Condos.  However, Johnson-Minkwic only testified to what is "typically" the case, implying that there are instances when a reservation is, in fact, tied to a particular Condo.  Moreover, Boyne's argument is undermined by its separate admission that, "if a guest cancels their reservation to stay *in an owner's Condo Unit* and incurs a forfeited deposit, Boyne does not share that forfeited deposit with Condo Unit owners." (Defs.' Resps. to Pls.' Combined Discovery Reqs. ¶ 9, ECF No. 138-21 (emphasis added).)  This admission likewise implies that some reservations are tied to particular Condos.  The more recent version of the RMAs gives the same impression.  It requires a Condo owner to "honor pre-existing group or individual reservations made *for their Unit*." (Demaria-McKay RMA § 4 (2021) (emphasis added).) Construing the evidence in Plaintiffs' favor, a reasonable jury could find that reservations and forfeited deposits are at least sometimes tied to Plaintiffs' Condos.  Thus, Boyne's argument is not persuasive.  Accordingly, Boyne has not shown that it is entitled to summary judgment on the merits of this claim.

### 6. Using Condos for Complimentary Stays

Plaintiffs allege that Boyne benefits itself by using Plaintiffs' Condos for complimentary stays provided to Boyne's "guests and . . . business partners." (Am. Compl. ¶ 92.)  The pre-2021

RMAs permit Boyne to allow its guests to use the owner's Condo for complimentary stays up to two days per year.  (Hornbeck RMA § 19 (2014).)  The RMAs from 2021 and later permit Boyne to use the owner's Condo for complimentary stays "a reasonable number of times annually" in Boyne's "sole discretion," but not in a manner that is "excessive compared to other Units under rental management" by Boyne.  (Demaria-McKay RMA § 18 (2021).)

Boyne employees testified that Boyne uses Boyne-owned Condos whenever possible for complimentary stays, and that if it must use a Condo owned by someone else, it reimburses the owner for that use at the market rate.  (Keen Dep. 114; Childress Dep. 210-11.)  Demaria-McKay could recall only one instance in which Boyne used her Condo for a complimentary stay and she did not receive reimbursement for it; on other occasions, she received reimbursement from Boyne. (Demaria-McKay Dep. 114.)  The foregoing does not suggest that Boyne took advantage of Plaintiffs or breached the RMAs by using them for complimentary stays more than twice a year or more than a reasonable number of times.

Boyne contends there is no evidence to support this claim.  Plaintiffs do not respond to this issue.  Consequently, the Court will dismiss this claim.

### 7. Defenses

#### (a) Statute of Limitations

Boyne argues that the breach-of-contract claims are barred by the statute of limitations, which is six years.  *See* Mich. Comp. Laws § 600.5807(9).  The sole remaining breach-of-contract claim is Boyne's failure to pay Plaintiffs a share of forfeited deposits.  This claim is not barred because the asserted violation appears to be a recurring one.  Boyne pays rental revenue to Plaintiffs on a quarterly basis.  (Johnson-Minkwic Dep. 91-92.)  For "contracts requiring regular periodic payments, a separate and distinct breach of contract claim accrues with each allegedly deficient payment."  *Romeo Inv. Ltd. v. Michigan Consol. Gas Co.*, 2007 WL 1264008, at *6

(Mich. Ct. App. May 1, 2007).  Plaintiffs continue to own Condos at Boyne and presumably continue to rent them through Boyne.  Each time that Boyne distributes rental revenue to Plaintiffs without including revenue from forfeited deposits, Boyne has potentially breached its contract with Plaintiffs.  Boyne has not shown that all such payments occurred more than six years before Plaintiffs filed their complaint.  Thus, it appears that at least a portion of Plaintiffs' claim is timely.

### (b) Limitation of Liability

Boyne also argues that the breach-of-contract claims are barred by the limitation-of-liability provision in the RMAs, which provides as follows:

> Owner agrees to indemnify and hold [Boyne] harmless from all losses, expenses or damages of any nature whatsoever in connection with the management of the Unit and from liability for injury to any person or property on, about or in connection with the premises from any cause whatever, unless such costs, expenses, or damages be caused by [Boyne]'s own gross negligence or willful misconduct. [Boyne] shall not be liable to the Owner or to any other person for any error in judgment or for doing or omitting to do any matter or thing pursuant to the terms of this Agreement, except in cases of willful conduct or gross negligence.

(Hornbeck RMA § 10 (2005); *see* Demaria-McKay RMA § 14 (2021) (containing almost identical terms).)  In context, this provision bars a tort claim for damages arising from negligent conduct; it does not bar a claim for breach of contract.  It distinguishes omissions and errors in judgment from willful conduct and gross negligence, which implies that the omissions and errors are forms of simple negligence.  Negligence gives rise to a tort claim.  There is no cause of action for negligent breach of contract.  *See Brewster v. Martin Marietta Aluminum Sales, Inc.*, 378 N.W.2d 558, 569 (Mich. Ct. App. 1985) (affirming dismissal of claim for "negligent breach of contract" because the plaintiff could point to no cases recognizing such a cause of action).  Indeed, if Boyne was correct that this provision bars claims for breach of contract, the contract would be illusory and unenforceable.

\* \* \*

Based on the foregoing, the Court will deny summary judgment on the breach-of-contract claim only as to Boyne's failure to share forfeited deposits with Plaintiffs.  Boyne has not shown that it is entitled to summary judgment for this aspect of Plaintiffs' breach-of-contract claim.  The Court will grant Boyne summary judgment on all other aspects of the claim.

### C.  Breach of Fiduciary Duty (Count I)

Plaintiffs claim that Boyne owed certain fiduciary duties to Plaintiffs because Boyne allegedly acted as Plaintiffs' agent, property manager, and investment manager.  (Am. Compl. ¶¶ 132-35.)  Plaintiffs allege that this fiduciary relationship required Boyne to maintain trust accounts for Plaintiffs' funds, keep accurate accounting records of those funds, act in good faith in the best interests of Plaintiffs, and refrain from acting out of Boyne's own interests.  (*Id.* ¶¶ 136-38.)  Yet Boyne allegedly favored its own interests and failed to disclose a conflict of interest stemming from the fact that it "stands to profit" from rental transactions at the expense of Plaintiffs. (*Id.* ¶¶ 140-41.)

"To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty." *Highfield Beach at Lake Mich. v. Sanderson*, 954 N.W.2d 231, 247 (Mich. Ct. App. 2020). "Whether a duty exists is a question of law for the court to decide." *Prentis Fam. Found. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906 (Mich. Ct. App. 2005).  The fiduciary duties allegedly owed by Boyne to Plaintiffs, and the precise manner in which Boyne breached these duties, are difficult to discern from the complaint, but in responding to Boyne's motion to dismiss the complaint, Plaintiffs characterize the breaches this way:

> Boyne breached its fiduciary duties to Plaintiffs by siphoning their profit, failing to disclose their conflict of interests in prioritizing rental of competing Boyne-owned condos, and imposing unreasonable assessments and revenue deductions on Condo owners.

* * *

> Boyne breached its duties to Plaintiffs by mismanaging their properties and investments.  Boyne used its position as exclusive property manager with exclusive knowledge of rental income and sole ability to set rental rates by prioritizing rental of Boyne-owned units, setting below market rates for non-Boyne owned units, discounting non-Boyne owned units while charging full price for revenue drivers that flow only to Boyne, and by implementing unreasonable and unaccounted for assessments and revenue deductions on Condo-owners.

> Further, the duty to maintain trust accounts requires Boyne to keep those records accurately and be transparent with Condo owners. Boyne fails to be transparent with Condo owners regarding the transactions that affect their Condos.

(Pls.' Resp. to Mot. to Dismiss 13-15, ECF No. 53 (citations omitted).)  And in their response to the motion for summary judgment, Plaintiffs assert the following regarding Boyne's breach of fiduciary duties:

> Boyne only pays 50% of net (rather than gross) revenue despite the understanding that it would be the opposite. Boyne also fails to disclose: (1) that it actually pays on net, not gross, revenue; (2) what or how it deducts from gross revenue to reach the net revenue shared with owners; and (3) information on how taxes, fees, and credit card fees impact the revenue calculation, or that these fees are not shared with owners. Boyne also self-deals—rather than putting the interests of its principals first.

> For example, it manipulates package deals to decrease condo-owners' revenue while maximizing its own profits.   Additionally, it deducts unauthorized and arbitrary resort fees paid by guests from gross revenue before paying owners on net revenue, keeping 100% of resort fees for itself, rather than splitting that fee with condo-owners.  And, it charges an excessive management fee.

(Pls.' Resp. to Summ. J. 28-29 (citations omitted).)

Boyne argues that there is no fiduciary relationship and that any duties it owes Plaintiffs are set forth in its contracts with Plaintiffs.  Plaintiffs respond that the contracts themselves create a fiduciary relationship of principal to agent, property owner to property manager, or investment owner to investment manager.  Both sides are correct to some degree.

21

### 1. Existence of Fiduciary Relationship

As a general matter, a fiduciary relationship is one "in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship." *In re Estate of Kearney*, 658 N.W.2d 796, 799 (Mich. 2003) (quoting Black's Law Dictionary (7th ed.)). "A fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another." *Ulrich v. Federal Land Bank of St. Paul*, 480 N.W.2d 910, 911 (Mich. Ct. App. 1991).

A contract between two parties can create, or provide evidence of, a fiduciary relationship, such as a relationship between a principal and agent. *See St. Clair Intermediate Sch Dist. v. Intermediate Educ. Ass'n/Mich. Educ. Ass'n*, 581 N.W.2d 707, 717 (Mich. 1998) (noting that the court considers the parties' agreements and acts to determine whether an agency relationship exists). At the same time, that contract can define the scope of the relationship, reveal the extent to which one party is truly relying upon the judgment of another, and limit the duties owed by one to the other. *See* Restatement (Second) of Agency § 13 ("An agent is a fiduciary with respect to matters within the scope of his agency."); Restatement (Second) of Agency § 376 ("The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made."); Restatement (Third) of Agency § 8.01 cmt. c ("Fiduciary obligation, although a general concept, is not monolithic in its operation. In particular, an agent's fiduciary duties to the principal vary depending on the parties' agreement and the scope of the parties' relationship."); *see also Mater v. Auto-Owners Ins. Co.*, 338 N.W.2d 407, 408 (Mich. Ct. App. 1983) ("Whether an agent has negligently dealt with the affairs of the principal depends upon the agreement with the principal, since the agreement defines the scope of the agent's undertaking." (citing Restatement (Second) of Agency § 376)); *Rose v. Nat'l Auction Grp.*, No. 209582, 2000 WL 33522372, at *15 (Mich.

Ct. App. Mar. 7, 2000) ("[T]he duties and liabilities of a fiduciary relationship may be modified by contract."), *rev'd in part on other grounds*, 646 N.W.2d 455 (Mich. 2002).

Here, the pre-2021 RMAs provide that Boyne acts as Plaintiffs' "[a]gent for the purpose of renting, managing and operating" the Condos. (Hornbeck RMA § 1 (2005).) Boyne agreed to "use its best efforts in the rental, management and operation of the Unit." (*Id.*) The more recent version of the RMAs provides that Boyne is the "exclusive Agent for the purpose of the rental management" of the Condos. (Demaria-McKay RMA § 1 (2021).) In that capacity, Boyne agreed to "attempt to secure rentals for the Unit and to use due diligence in the rental management of said Unit." (*Id.*) These terms suggest that Boyne acted (and continues to act) as Plaintiffs' agent in the rental of their Condos, potentially creating a fiduciary relationship of principal and agent.

Assuming that a fiduciary relationship exists, the duties that flow from that relationship necessarily depend upon the terms of the parties' agreement. *See* Restatement (Second) of Agency § 376; *see also* Restatement (Third) of Agency § 8.08 (2006) (agent's duty to act with care, competence, and diligence are "[s]ubject to any agreement with the principal"); Restatement (Third) of Agency § 8.06(1)(a) (2006) (principal can consent to conduct that would otherwise violate the agent's duty of loyalty).

The Court will examine the asserted breaches of fiduciary duty individually to determine what impact the RMAs have on those claims.

### 2. Asserted Breaches of Fiduciary Duty

### (a) Paying Plaintiffs Half of "Net" Revenue

Plaintiffs contend that Boyne paid them half of net revenue rather than half of gross revenue, as agreed. For instance, Boyne purportedly deducts a resort fee from the gross revenue before paying Plaintiffs their share, rather than splitting that fee with Plaintiffs. Though framed as a breach of fiduciary duty, Plaintiffs assertion is simply a restatement of their breach-of-contract

23

claim.  Plaintiffs cannot bring a tort claim for breach of fiduciary duty based on what is essentially a breach of contract.  *See Nelson v. Nw. Sav. & Loan Ass'n*, 381 N.W.2d 757, 759 (Mich. Ct. App. 1985) ("For an action in tort to exist here, there must be a breach of a duty separate and distinct from the duties imposed by the contract."); *accord 123.net, Inc. v. Serra*, No. 353075, 2021 WL 5750626, at *13 (Mich. Ct. App. Dec. 2, 2021) (dismissing claim for breach of fiduciary duty that was based on promises made by one party because that claim "sound[ed] in contract").  And for reasons discussed above, Plaintiffs' claim is not supported by the terms of the RMAs.  Boyne did not agree to pay Plaintiffs half of all revenue or income it received from the renters of Plaintiffs' condos.

Along similar lines, Plaintiffs contend that Boyne failed to *disclose* that it pays Plaintiffs according to "net" revenue rather than gross revenue and failed to disclose the items that it deducts from the "gross" revenue to calculate Plaintiffs' income.  This contention also rests on a mistaken interpretation of the terms of the RMAs.  The RMAs set forth the rights and obligations of the parties with regard to rental receipts and Boyne's management fee.  Because these agreements do not require Boyne to pay Plaintiffs half of "gross rental receipts," as Plaintiffs contend, they do not require Boyne to disclose deductions from that "gross" figure.

At any rate, the RMAs give Plaintiffs the right to examine the accounting records related to Condos.  (Hornbeck RMA § 11 (2014); Demaria-McKay RMA § 11 (2021).)  Hornbeck never asked for that information.  (Hornbeck Dep. 105.)  When Demaria-McKay asked for that information, Boyne provided it.  (Demaria-McKay Dep. 115-16.)  Boyne would not provide her details about how it determines "variable pricing" and how it allocates packages deals (*id.* at 117); however, Plaintiffs provide no reason why Boyne would have a fiduciary duty to disclose such information.

24

### (b) Charging Resort Fees

Next, Plaintiffs contend that it was improper for Boyne to charge a resort fee and keep that fee to itself because this charge benefits Boyne. Generally, a fiduciary must act for the benefit of the other within the scope of the fiduciary relationship. *See Kearney*, 658 N.W.2d at 799. But in the principal-agent context, the duty of loyalty applies "unless otherwise agreed." Restatement (Second) of Agency § 387. "The facts in each case must be considered in determining whether or not it is understood that the primary obligation of one party is to act for the benefit of the other." Restatement (Second) of Agency § 13 cmt. c. In other words, the details of a relationship can make clear that one party is not obligated to put the other party's interests first.

To the extent Plaintiffs claim the resort fee violates Boyne's duty of loyalty or gave rise to a duty of disclosure, the RMAs expressly state that Boyne can charge renters a resort fee. (*See* Hornbeck RMA § 12 (2005) (discussing "resort taxes, resort fees, group tour and convention facility fees," as distinct from "gross rental receipts"); Demaria-McKay RMA § 11 (2021) (discussing "resort fees," which are "not included in rental income").) Moreover, it would have been obvious to Plaintiffs that Boyne had its own commercial relationship with renters, as many of them presumably chose to stay at Boyne's resorts in order to use the amenities provided exclusively by Boyne. Thus, Plaintiffs clearly understood that Boyne could act for its own benefit in transactions with renters, particularly when providing renters with its own goods or services. In effect, therefore, Plaintiffs consented to this arrangement. Consequently, Plaintiffs cannot claim that Boyne owed them a duty not to charge renters fees for goods or services provided by Boyne, such as the resort fee (for use of resort amenities), lift ticket fees (for use of the ski lifts), green fees (for use of the golf course), or food charges (for the sale of food to renters). For similar reasons, Plaintiffs cannot claim that Boyne was required to disclose those transactions.

25

Plaintiffs contend that the resort fee is arbitrary and that Boyne did not disclose its purpose. However, Plaintiffs point to no authority that constrained Boyne's discretion in setting that fee or that required Boyne to disclose its purpose to Plaintiffs.  Put another way, Boyne did not assume any fiduciary obligations to Plaintiffs with respect to its own commercial transactions with renters, particularly where Plaintiffs agreed Boyne could enter into such transactions.  Thus, neither the RMAs nor Boyne's purported fiduciary role in renting the Condos prohibited Boyne from charging resort fees or required Boyne to disclose those fees to Plaintiffs.

### (c) Discounting Rental Rates in Package Deals

Next, Plaintiffs contend that Boyne put its own interests first by "manipulating" package deals.  As discussed above, this claim is meritless because Plaintiffs expressly gave Boyne sole discretion to determine the rental rates (including discretion to lower the rate as part of a package deal).  Plaintiffs cannot assert that Boyne breached a fiduciary duty where the terms of the agreements gave Boyne authority to act as it did.

Plaintiffs respond that Boyne had a duty of good faith that arose from its discretionary authority.  Generally, where a contract leaves performance of a matter to one party's discretion, Michigan law implies a covenant of good faith and fair dealing in exercising that discretion. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003).  However, Michigan law does not permit an implied covenant to "override express contract terms."  *Id.* (quoting *Cook v. Little Caesar Enter., Inc.*, 210 F.3d 653, 657 (6th Cir. 2000)).  Thus, where a contract "expressly grants a party complete discretion with respect to particular matters, the covenant of good faith will not be imposed to restrict the exercise of that discretion and thereby override the contract." *Jacobsen v. BH Assocs. Ltd.*, No. 222945, 2001 WL 738408, at *1 (Mich. Ct. App. June 29, 2001); *see Parlovecchio Bldg., Inc. v. Charter Cnty. of Wayne Bldg. Auth.*, No. 313257, 2014 WL 631264, at *4 (Mich. Ct. App. Feb. 13, 2014) (contract provision granting "sole discretion" to a party did not

26

give rise to an implied covenant of good faith and fair dealing); *Stephenson*, 328 F.3d at 827 (contract provision giving one party "exclusive judgment" to make a decision "removed any basis upon which to imply a covenant of good faith and fair dealing").  Here, enforcing an implied covenant would restrict the exercise of Boyne's discretion in setting rates and thereby override the contract.    Accordingly, the Court will dismiss Plaintiffs' claim insofar as it relies upon manipulation of package deals.

### (d) Excessive Management Fee

Plaintiffs assert that Boyne's 50%  management fee is excessive because it is higher than the fee charged by Boyne's competitors and other rental management companies.  Regardless, Plaintiffs are in no position to complain because they agreed to the fee set forth in the RMAs. Moreover, Boyne did not act as Plaintiffs' fiduciary when setting the management fee.  The fiduciary relationship, if any, arose after the parties entered into the RMAs.  Consequently, Boyne did not breach any duty to Plaintiffs by charging such a fee.

\* \* \* \*

In short, the Court discerns no basis for a claim based on breach of fiduciary duty.  The RMAs govern the relationship between the parties and shape the duties that Boyne owes Plaintiffs. Those agreements generally permit Boyne's conduct.  To the extent there is a lingering issue regarding Boyne's failure to share or disclose the forfeited deposits, that claim appears to rest on what the parties agreed in the RMAs and is properly brought as a breach-of-contract claim rather than as a separate claim for breach of fiduciary duty.  Thus, the Court will dismiss Count I.

### D. Constructive Fraud (Count II)

Plaintiffs allege that Boyne committed "constructive fraud" by "ma[king] representations to realty owners regarding profits they would earn as owners, as well as the amount of payments Plaintiffs . . . were entitled to receive through participation in the rental management program."

(Am. Compl. ¶ 147.)   Plaintiffs allegedly "acted in reliance on these statements" and suffered unspecified damages as a result.  (*Id.* ¶¶ 150, 152.)

> Generally, a claim of fraud requires a plaintiff to show the following:
>
> (1) the defendant made a material representation; (2) the representation was false; (3) when the representation was made, the defendant knew that it was false, or made it recklessly, without knowledge of its truth, and as a positive assertion; (4) the defendant made it with the intention that the plaintiff should act upon it; (5) the plaintiff acted in reliance upon the representation; and (6) the plaintiff thereby suffered injury.

*Roberts v. Saffell*, 760 N.W.2d 715, 719 (Mich. Ct. App. 2008).  Constructive fraud is actual fraud without the element of intent.  *Gen. Elec. Credit Corp. v. Wolverine Ins. Co.*, 362 N.W.2d 595, 601 (Mich. 1984); *see Feldkamp v. Farm Bureau Ins. Co.*, No. 272855, 2009 WL 103223, at \*5 (Mich. Ct. App. Jan. 15, 2009) ("[T]he distinction between actual fraud and constructive fraud is that actual fraud is an intentional misrepresentation that a party makes to induce detrimental reliance, while constructive fraud is a misrepresentation that causes the same effect, but without a purposeful design to defraud.").

Boyne moved for dismissal of Plaintiffs' fraud claim, arguing that it is not pled with particularity as required by the Federal Rules of Civil Procedure.  Boyne reiterates this argument in its motion for summary judgment.  A plaintiff alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  In other words, the plaintiff must "'allege the time, place, and content of the alleged misrepresentation' and 'the fraudulent scheme; the [defendant's] fraudulent intent; and the [resulting] injury.'"  *Koliminsky v. Root*, 100 F.4th 675 (6th Cir. 2024) (cleaned up) (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010)).  Plaintiffs' complaint does not identify any particular statements that they claim are fraudulent, let alone the content of those statements or the time and place those statements were made.

Plaintiffs responded to Boyne's motion to dismiss by arguing that the Court should give them some leeway and allow their fraud claim to proceed to discovery because Boyne held sole possession of information pertinent to the fraud claim.  It is true that "[Rule 9(b)] may be relaxed where information is only within the opposing party's knowledge."  *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988).  But the Court of Appeals has relaxed the particularity requirement only in cases where "the circumstances of the fraud [are] pled with enough specificity to put defendants on notice as to the nature of the claim."  *Michaels Bldg. Co.*, 848 F.2d at 680.  "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8."  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007).  "Rule 8 is commonly understood to embody a regime of 'notice pleading' where technical pleading requirements are rejected in favor of an approach designed to reach the merits of an action."  *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

In *Michaels*, the plaintiffs provided sufficient notice to defendant by identifying

> the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud. In addition, the plaintiffs identified the fraudulent loan documents and attached copies of them to the complaint.

*Michaels Bldg. Co.*, 848 F.2d at 679.  By contrast, this Court cannot discern the nature of Boyne's allegedly fraudulent conduct from Plaintiffs' complaint.  Thus, the complaint fails to state a viable claim for fraud.

Plaintiffs fare little better in their response to Boyne's motion for summary judgment. Indeed, they have apparently abandoned the factual and legal basis for their original claim. Plaintiffs' initial assertion that Boyne misrepresented the "profits" that Plaintiffs "would earn" or "were entitled to receive" as Condo owners implied that Boyne made false representations to

induce Plaintiffs to purchase their Condos or to participate in the rental management program. Boyne interpreted the claim as such, deposing Plaintiffs about any false representations Boyne made before Plaintiffs purchased their Condos.  (*See* Hornbeck Dep. 145-50, 153-54; Demaria-McKay Dep. 44-46.)  In response, Hornbeck testified that Boyne representatives and Boyne's marketing materials from 2005 made false promises about improvements Boyne would add to the resort property and about the revenue and benefits she would receive as a Condo owner. (Hornbeck Dep. 147-48, 152-54, 157.)  She realized within a couple years of purchasing her unit that the revenue was not as much as she had anticipated.  (*Id.* at 149, 154.)  For her part, Demaria-McKay could not identify any false statements by Boyne regarding the revenue she would receive if she purchased a unit.  (Demaria-McKay Dep. 44-47.)  A Boyne representative told her that her rental income would exceed her expenses, but Demaria-McKay does not believe this statement was false.  (*Id.* at 45-46.)

Boyne notes there is no evidence that it misrepresented the profits Plaintiffs would earn. Plaintiffs respond with a new theory.  Instead of showing false statements about Plaintiffs' expected profits, they shift focus to Boyne's quarterly statements to Plaintiffs showing the rental income for their Condos.  Plaintiffs now contend that these quarterly statements were fraudulent or misleading because they omitted the full revenue to which Plaintiffs were entitled.  And instead of asserting a theory of constructive fraud, Plaintiffs now contend that Boyne's conduct amounts to "silent fraud" because Boyne had a fiduciary duty to disclose the omitted information.  "Silent fraud or fraudulent concealment has also long been recognized in Michigan."  *Roberts*, 760 N.W.2d at 719.  It requires a "legal or equitable duty of disclosure" and "some type of representation by words or actions that was false or misleading and was intended to deceive."  *Id.*

at 719-20.  Thus, unlike constructive fraud, silent fraud requires an intent to deceive and a duty of disclosure.

Plaintiffs' new claim is not part of their complaint, which failed to give Boyne adequate notice of the factual basis for any fraud claim, let alone the one they are now raising.  At no time have Plaintiffs attempted to amend their complaint to fix this deficiency.  Plaintiffs cannot use their response to summary judgment as a way to "expand [their] claims to assert new theories." *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *see Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that a party cannot raise a new legal claim for the first time in response to a motion for summary judgment). Accordingly, the Court will dismiss Plaintiffs' fraud claim.

### E. Unjust Enrichment (Count IV)

Plaintiffs contend that Boyne received unwarranted benefits by requiring Plaintiffs to use Boyne as their rental manager.  (Am. Compl. ¶¶ 165, 167.)  Boyne, however, argues that Plaintiffs cannot bring an unjust enrichment claim regarding matters that are governed by an express contract.  In response, Plaintiffs accept Boyne's request for summary judgment on this claim. (Pls.' Resp. to Summ. J. 35.)  Therefore, the Court will dismiss this claim.

### F. Sherman Act (Count V)

As discussed above, Plaintiffs contend that Boyne violated the Sherman Act when selling the Condos with the requirement that Boyne act as the exclusive agent for renting them to third parties.  Plaintiff contends that Boyne used its monopoly power to tie the sale of one product (a condo) to the sale of another product (Boyne's rental management services).  "In a tying arrangement, a seller requires buyers of a product over which it has market power—the 'tying product'—also to purchase a product over which it seeks to gain market power—the 'tied product.'" *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 267 (6th Cir. 2015).  "The

tie falls foul of antitrust law if 'the seller has appreciable economic power in the tying product market and . . . the arrangement affects a substantial volume of commerce in the tied market.'" *Id.* at 271 (cleaned up) (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462 (1992)).

Boyne notes that Plaintiffs provide no evidence of Boyne's market power. This evidence is necessary "to ensure that only those tying arrangements that restrict competition over the tied product market are prohibited." *Id.* If the seller lacks appreciable market power, customers "face little pressure" to buy from the seller because they can purchase the tying product elsewhere. *Id.*

Plaintiffs respond that they do not oppose Defendants' motion for summary judgment on this claim. (Pls.' Resp. to Summ. J. 35.) Therefore, the Court will dismiss it.

### G. Sale of Unregistered Securities - Federal Law (Count VI)

Plaintiffs contend that Boyne's sale of Condos subject to a requirement that Boyne provide rental management services constitutes the sale of an investment contract, which is a regulated security under federal law. *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10) (defining "security" to include an "investment contract"). Plaintiffs contend that Boyne violated the Securities Act of 1933 by selling these securities without registering them first. Section 5 of the Securities Act makes it unlawful to sell a security without a registration statement in effect. 15 U.S.C. § 77e(a). Section 12(a)(1) creates a private right of action by purchasers of a security against a person who sells the security in violation of Section 5. 15 U.S.C. § 77*l*(a)(1).

The parties disagree about whether Boyne sold a security governed by the Securities Act but the Court need not resolve that issue because, as Boyne points out, the Plaintiffs' claims are untimely. Section 13 of the Securities Act contains the relevant statute of limitations. It provides that an action under Section 12(a)(1) must be "brought within one year after the violation upon which it is based." 15 U.S.C. § 77m. Section 13 also contains a statute of repose, stating, "[i]n no

event shall any such action be brought to enforce a liability created under [Section 12(a)(1)] more than three years after the security was bona fide offered to the public." *Id.*; *see Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*, 582 U.S. 497, 505 (2017) (characterizing the latter as a "statute of repose" that "reflects the legislative objective to give a defendant a complete defense to any suit after a certain period").

Boyne sold Plaintiffs their Condos more than a year before Plaintiffs filed this action. Plaintiffs apparently argue that they are entitled to tolling of the statute of limitations due to fraudulent concealment; however, Plaintiffs do not explain how Boyne could have concealed the fact that its purported security was not registered, as registration statements are publicly available.

Plaintiffs' claims are also barred by the statute of repose. The statute of repose runs for three years "after the security was bona fide offered to the public." 15 U.S.C. § 77m. The parties agree that the purported securities at issue were first offered to the public before Plaintiffs purchased their Condos, which is more than three years before Plaintiffs filed this action. The parties disagree about whether that offer was "bona fide." Plaintiffs contend that an offer to sell an *unregistered* security is not a bona fide offer because it is not legal.

The Court of Appeals for the Second Circuit examined this issue in *P. Stolz Family Partnership LP v. Daum*, 355 F.3d 92 (2d Cir. 2004), concluding that an offer to sell a security is bona fide as long as it is genuine. *Id.* at 99. For registered securities, the statute of repose begins on the date of registration because the registration is "the manifestation of . . . the genuineness of the offer to the public." *Id.* Applying that principle to unregistered securities, the "relevant question" is "when was the [security] really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering." *Id.* Thus, a genuine offer to sell an unregistered security

is bona fide even though the offer is not legal. According to that court, "the majority of courts and commentators" agree with this view. *Id.* (collecting authorities).

Statutory analysis helps confirm the point. Section 4 of the Securities Act also uses the phrase "bona fide offered to the public." That section exempts transactions by a dealer "prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter." 15 U.S.C. § 77d(a)(3)(A). In this instance, the phrase bona fide "was obviously copied" from an earlier version of Section 4; it was included in the dealer exemption to ensure that "the prospectus-delivery requirement should apply for an entire year from the date of the *first genuine rather than simulated offering to the public*." *P. Stolz*, 355 F.3d at 99 (quoting Louis Loss & Joel Seligman, Securities Regulation § 2-B-6 n.285 (3d ed. 1996)). In other words, the phrase bona fide in Section 4 clarifies that a bona fide offer is one that is *genuine* rather than *simulated*; that phrase does not refer to the legality of the offer. *Id.* For the sake of consistency, this phrase should have the same meaning in Section 13 as it does in Section 4.

Plaintiffs' interpretation could lead to an "absurd result"; "unregistered securities would never be subject to the three-year repose period." *P. Stolz*, 355 F.2d at 99; *accord* Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 7:10 n.3 (2025). Plaintiffs argue that the statute of repose would begin running when the unregistered securities are registered. However, that outcome is equally strange. Indeed, the statute of repose in Section 13 expressly encompasses violations of Section 12(a)(1), which prohibits the sale of unregistered securities. That violation is complete when the securities are sold. Plaintiffs argue that another event must occur in order for the statute of repose to begin running, but this contention is not supported by the text of Section 13.

Plaintiffs rely on district court cases for their argument that "bona fide" in Section 13 means good faith compliance with the law.  *See, e.g.*, *Bradford v. Moench*, 809 F. Supp. 1473, 1487 (D. Utah 1992); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1064 (D. Minn. 2003) (citing *Bradford*).  In *Bradford*, a district court purported to define bona fide according to its "ordinary, plain meaning," which is: "in good faith, without fraud or deception."  *Bradford*, 809 F. Supp. at 1487 (cleaned up).  But the foregoing definition does not include compliance with the law; the court imported that concept from a Supreme Court decision interpreting an unrelated statute.  *See id.* (citing *Hosmer v. Wallace*, 97 U.S. 575, 581 (1878)).  In *Hosmer*, the Supreme Court held that "bona fide, as applied to [a] pre-emption claimant" to land under an 1866 land grant statute, means one who "had complied, or was proceeding to comply, in good faith, with the requirements of the law to perfect his right to it."  *Hosmer*, 97 U.S. at 581.

The reasoning in *Hosmer* arises from a different context[5] and has no application to the Securities Act.  By contrast, the analysis in *P. Stolz* is more focused on the text and history of the Securities Act.  The latter is more persuasive than the logic in *Bradford*.

The court in *Bradford* also reasoned that applying the statute of repose to unregistered securities would thwart the purpose of the Securities Act by "encourag[ing] nonregistration." *Bradford*, 809 F. Supp. at 1487.  Along the same lines, the court in *Deutsche Bank* argued that applying the statute of repose to the sale of unregistered securities would encourage sellers of such securities to avoid the registration requirement by "[running] the gauntlet" for three years. *Deutsche Bank*, 282 F. Supp. 2d at 1064 (quoting *In re Bestline Prods. Secs. & Antitrust Litig.*, No. MDL 162-CIV-JLK, 1975 WL 386, at *3 (S.D. Fla. Mar. 21, 1975)).  These concerns are

---

[5] A claimant seeking to perfect a claim sits in a different position than one making an offer of unregistered securities. It makes sense to require a claimant to act in good faith to comply with the law in order to perfect their claim.  It makes less sense to put that requirement on the offeror of an unregistered security to trigger a statute of repose because that person is, by definition, not complying with the law.

understandable, but they simply highlight the sort of consequences that inevitably flow from any statute of repose.  Such a limitation necessarily allows some illegal conduct to evade enforcement.  Indeed, in some scenarios, the statute "extinguish[es] a cause of action before it even accrues."  *P. Stolz*, 355 F.3d at 103.  When Congress included the statute of repose in Section 13, it presumably considered these foreseeable consequences.  It may have intended them.  *See P. Stolz*, 355 F.3d at 104 (noting that a statute of repose provides "an easily ascertainable and certain date for the quieting of litigation").  Consequently, Plaintiffs' policy concerns add little support to their argument, which is not persuasive.

On a slightly different tack, Plaintiffs apparently contend that the statute of repose begins anew each time Boyne sells another Condo.  (*See* Pls.' Resp. to Mot. to Dismiss 24, ECF No. 53.) However, "[t]he *vast* majority of courts . . . have impliedly or expressly found that the three-year [statute of repose in Section 13] begins when the security is *first* bona fide offered [to the public]," rather than after the most recent public offer.  *P. Stolz*, 355 F.3d at 100-101 (collecting cases). "[M]ost leading commentators" agree.  *Id.* at 101.  In *P. Stolz*, the Second Circuit adopted the same conclusion.  *Id.* at 105-106 (analyzing the history of the statute and the historical understanding of when the statute of repose began).

Plaintiffs cite no authority supporting their argument, though the court in *Bradford* discussed the issue.  Relying on the "remedial purpose" of the Securities Act, that court concluded that the statute of repose runs from when the security was *last* offered to the public.  *Bradford*, 809 F. Supp. at 1490.  The Second Circuit, however, noted a "dearth of foundational analysis" for that reasoning.  *P. Stolz*, 355 F.3d at 102.  The Court finds *P. Stolz* more persuasive.

This Court adopts the majority view for the reasons given in *P. Stolz*.  Boyne's initial offer for sale of their purported security triggered the statute of repose, which continued running until it

36

expired three years later.   Upon expiration, the statute of repose quieted litigation regarding Boyne's purportedly illegal sales of an unregistered security, ending Plaintiffs' right to bring their federal securities claims.

### H. Sale of Unregistered Securities - Michigan Law (Count VII)

Plaintiffs claim that Boyne violated Michigan's Uniform Securities Act when it failed to register the Condos as securities as required by section 301, Mich. Comp. Laws § 451.2301.  (Am. Compl. ¶ 198.)  This claim accrued when Plaintiffs bought their Condos from Boyne.  *See Pukke v. Hyman Lippitt, P.C.*, No. 265477, 2006 WL 1540781, at *6 (Mich. Ct. App. June 6, 2006) (finding that the plaintiffs' unregistered securities claim accrued when they invested their money). The statute gave Plaintiffs one year from the dates of those purchases to file their claims.  *See* Mich. Comp. Laws § 451.2509(10)(a) (providing that "[a] person may not obtain relief . . . for violation of section 301 . . . unless the action is commenced within 1 year after the violation occurred").  Plaintiffs did not bring their claims within that time period.

Plaintiffs contend that Boyne fraudulently concealed its conduct, tolling the statute of limitations until two years after Plaintiffs discovered or should have discovered their claims.  *See* Mich. Comp. Laws § 600.5855.  However, Plaintiffs present no evidence or argument showing that Boyne concealed the fact that their Condos were not registered.  Indeed, that fact is not concealable because applications for registration of securities and registration statements are public records.  *See* Mich. Comp. Laws § 451.2606.  Plaintiffs could have consulted those records to determine whether the Condos were registered as securities.  Accordingly, Plaintiffs' claims for violation of the Michigan Uniform Securities Act will be dismissed as untimely.

### I. Count VIII – Declaratory Judgment

Count VIII of Plaintiffs' complaint seeks a declaratory judgment that the requirement that condo owners must use Boyne as their rental agent is illegal and unenforceable.  (Am. Compl.

¶ 203.)  Boyne seeks summary judgment on this request for relief.  Plaintiffs respond that they do not object to summary judgment on this count.  (Pls.' Resp. to Summ. J. 35.)  Accordingly, the Court will dismiss it.

## VI. CONCLUSION

For the reasons herein, the Court will grant Boyne's motion for summary judgment in part and dismiss all claims other than Plaintiffs' breach-of-contract claim asserting that Boyne does not distribute forfeited deposits to Condo owners.  The Court will deny Boyne's motion to dismiss as moot.  The Court will also deny Plaintiffs' motion to certify a class.  In light of the dismissal of almost all of Plaintiffs' claims, Plaintiffs' request for class certification stands on a much different footing than when they filed their motion.  At this stage, it is not clear whether the remaining claim can meet the prerequisites for class certification.  The Court will allow Plaintiffs to file an updated motion for class certification addressing that issue.

An order will enter consistent with this Opinion.


Dated: August 14, 2025                              /s/ Hala Y. Jarbou
                                                    HALA Y. JARBOU
                                                    CHIEF UNITED STATES DISTRICT JUDGE